**NON-CONFIDENTIAL**

**Nos. 26-1443, 26-1444, 26-1613**

**UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT**

RAYDIANT OXIMETRY, INC.,

*Plaintiff-Appellee,*

v.

ALC MEDICAL HOLDINGS LLC,

*Defendant-Appellant,*

MATTHEW K. BLACKBURN, WOMBLE BOND
DICKINSON (US) LLP,  BARRY J. HERMAN,
CHRISTINE H. DUPRIEST,

*Sanctioned Parties-Appellants.*

On Appeal from the United States District Court for the Northern
District of California, Case No. 3:25-cv-00392-VC

**CORRECTED APPELLANTS'  OPENING BRIEF**

| | |
|---|---|
| Matthew K. Blackburn | Matthew J. Dowd |
| Womble Bond Dickinson | Robert J. Scheffel |
| (US) LLP | Elliot A. Gee |
| 50 California Street | Morris D. Young |
| Suite 2800 | Dowd Scheffel PLLC |
| San Francisco, CA 94111 | 1717 Pennsylvania Ave., NW |
| (650) 687-8442 | Suite 1025 |

Christine H. Dupriest
Womble Bond Dickinson (US)
LLP
1331 Spring Street, NW
Suite 1400
Atlanta, GA 30309
(404) 962-7538

Barry J. Herman
Womble Bond Dickinson (US)
LLP
100 Light Street, 26th Floor
Baltimore, MD 21202
(410) 545-5830

Washington, D.C. 20006
(202) 995-9175
mdowd@dowdscheffel.com

*Counsel for Appellants*

## EXEMPLARY PATENT CLAIM

U.S. Patent No. 11,839,408

**1.** A postpartum hemorrhage mitigation device comprising:

a flexible tube comprising:

a distal end;

a proximal tip, the proximal tip comprising a suction line extension being configured for placement in a uterine cavity of a uterus after childbirth either vaginally or via cesarean section;

a tube center of the flexible tube; and

at least one lumen around the tube center, the at least one lumen comprising a suction line, the suction line being in communication with a source of negative pressure and the suction line extension, the suction line extension being configured for applying the negative pressure to the uterine cavity using the source of the negative pressure thereby causing mechanical hemostasis of bleeding blood vessels of a uterine wall of the uterine cavity;

a placement marker, the placement marker being configured for movement along the suction line extension for personalization of the postpartum hemorrhage mitigation device to a size of the uterus, the placement marker covering one or more ports; and

an anchoring mechanism being proximate to the suction line extension along the flexible tube, the anchoring mechanism being configured for maintaining the suction line extension in a desired position within the uterine cavity.

## CERTIFICATE OF INTEREST

Counsel for Appellants certify the following:

1.     The full name of every party or amicus represented by me is:

**ALC Medical Holdings LLC, Womble Bond Dickinson (US) LLP, Matthew K. Blackburn, Barry J. Herman, and Christine H. Dupriest**

2.     The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

*Not Applicable.*

3.     All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

*Not Applicable*

4.     The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

**Dowd Scheffel PLLC: Matthew J. Dowd, Elliot A. Gee, Morris D. Young, and Robert J. Scheffel**

**Womble Bond Dickinson (US) LLP: Matthew K. Blackburn, Christine H. Dupriest, and Barry J. Herman**

5.     The title and number of any case known to counsel to be pending in this or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. See Fed. Cir. R. 47. 4(a)(5) and 47.5(b). (The parties should attach continuation pages as necessary):

**None**

6.    Organizational Victims and Bankruptcy Cases.  Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees).  Fed. Cir. R. 47.4(a)(6):  **None**


Date:  June 8, 2026                    /s/ Matthew J. Dowd
                                       Matthew J. Dowd
                                       *Counsel for Appellants*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES....................................................vii

STATEMENT OF RELATED CASES....................................xvi

STATEMENT OF JURISDICTION .......................................... 1

STATEMENT OF ISSUES ...................................................... 1

STATEMENT OF THE CASE ................................................. 2

I.    Procedural History ..................................................... 2

II.   ALC, Ms. West, And Her Patented PPH Devices............................ 3

III.  Raydiant Files A Declaratory-Judgment Action Instead Of Responding To ALC's Letter ............................ 9

IV.   Raydiant Withholds Evidence About Its Multiple DAISY Devices ................................................... 15

V.    ALC Offers To Pause The Litigation Within Weeks Of Raydiant's First Specific Non-Infringement Contention .............. 20

VI.   Raydiant's Pursuit Of Sanctions And Fees................................... 23

VII.  The District Court Stays the Sanctions Order ............................. 25

VIII. The Final Rulings On The Claims And The Fee Award .............. 26

SUMMARY OF THE ARGUMENT ........................................ 27

ARGUMENT ....................................................................... 31

I.    Standards of Review ................................................. 31

II.   The Imposition Of Sanctions And Fees Was An Abuse Of Discretion.................................................... 32

      A.    Two Foundational Errors .................................... 32

B.    ALC's Letter was Reasonable.............................................. 38

C.    The Compulsory Counterclaim of Infringement was Not Sanctionable or Exceptional............................................ 41

D.    The Annotated DAISY Image Fairly Depicted ALC's Infringement Contention ....................................................... 46

E.    ALC's Motion to Dismiss was Reasonable ........................... 49

1.    Rule 12(b)(1).................................................................. 49

2.    Rule 41(a)(2) ................................................................ 57

F.    The Lanham Act Counterclaim was Not Frivolous or Exceptional ............................................................................... 59

G.    Raydiant's Unreasonable Tactics .......................................... 63

H.    Additional Legal Errors in the Sanctions Decision.............. 66

1.    The Rule 11 Motion was Partially Procedurally Barred.............................................................................. 66

2.    No Basis for Sanctions under § 1927 or Inherent Authority ......................................................................... 68

III.    The Court Erred When Striking Evidence Revealing Raydiant's Litigation Motive ........................................................ 72

IV.    The Court's Decision On § 285 And § 1117 Is Legally Erroneous ................................................................................... 74

V.    The Amount Of Fees Awarded Is An Abuse Of of Discretion ....... 76

A.    No Exceptional Case for Post-Sanctions Work ..................... 76

B.    No Billing Records ................................................................. 77

C.    The Amounts are Punitive and Grossly Excessive .............. 78

VI.    Conclusion ..................................................................................... 82

ADDENDUM TABLE OF CONTENTS ............................................... 85

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

**CONFIDENTIAL MATERIAL OMITTED**

The material omitted on pages 1, 22, 65, and 71-74 contains confidential negotiation terms between the parties and the material omitted on pages 5, 7, 20, 27, 38, and 64 contains Raydiant's confidential technical information.

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.D. v. California Highway Patrol,*
712 F.3d 446 (9th Cir. 2013).............................................................. 73

*AbTox, Inc. v. Exitron Corp.,*
122 F.3d 1019 (Fed. Cir. 1997) ......................................................... 55

*AeroTech, Inc. v. Estes,*
110 F.3d 1523 (10th Cir. 1997).......................................................... 67

*Already, LLC v. Nike, Inc.,*
568 U.S. 85 (2013)...................................................................... 50, 51

*American Manufacturers Mutual Insurance Co. v.*
*American Broadcasting-Paramount Theatres, Inc.,*
87 S. Ct. 1 (1966)............................................................................... 65

*Amlong & Amlong, P.A. v. Denny's Inc.,*
500 F.3d 1230 (11th Cir. 2007)......................................................... 72

*AntiCancer, Inc. v. Pfizer, Inc.,*
769 F.3d 1323 (Fed. Cir. 2014) ......................................................... 31

*Ariix, LLC v. NutriSearch Corp.,*
985 F.3d 1107 (9th Cir. 2021)........................................................... 60

*Arnett v. Kennedy,*
416 U.S. 134 (1974).......................................................................... 75

*Benitec Australia, Ltd. v. Nucleonics, Inc.,*
495 F.3d 1340 (Fed. Cir. 2007) ......................................................... 52

*Blumberg v. Gates,*
152 F. App'x 652 (9th Cir. 2005) ...................................................... 72

*Calloway Golf Co. v. Slazenger,*
384 F. Supp. 2d 735 (D. Del. 2005) .................................................. 57

*Christian v. Mattel, Inc.,*
  286 F.3d 1118 (9th Cir. 2002)............................................................. 31

*Clark v. Sweeney,*
  146 S. Ct. 410 (2025)......................................................................... 75

*Cooter & Gell v. Hartmarx Corp.,*
  496 U.S. 384 (1990)........................................................................... 31

*Dow Jones & Co. v. Ablaise Ltd.,*
  606 F.3d 1338 (Fed. Cir. 2010)......................................................... 50

*Dragon Intellectual Property LLC v. DISH Network L.L.C.,*
  101 F.4th 1366 (Fed. Cir. 2024) ....................................................... 75

*Edwards Lifesciences Corp. v. Meril Life Sciences Private Ltd.,*
  96 F.4th 1347 (Fed. Cir. 2024) ......................................................... 55

*Eltech Systems Corp. v. PPG Industries, Inc.,*
  903 F.2d 805 (Fed. Cir. 1990)........................................................... 69

*Eon-Net LP v. Flagstar Bancorp,*
  653 F.3d 1314 (Fed. Cir. 2011).......................................................... 31

*Eon-Net LP v. Flagstar Bancorp,*
  249 F. App'x 189, 195 (Fed. Cir. 2007).............................................. 34

*Exeltis USA Inc. v. First Databank, Inc.,*
  520 F.Supp.3d 1225 (N.D. Cal. 2021) ............................................... 60

*FedEx Ground Package Systems, Inc. v. Route Consultant, Inc.,*
  661 F. Supp. 3d 765 (M.D. Tenn. 2023) ............................................ 59

*Fox v. Vice,*
  563 U.S. 826 (2011)............................................................................ 78

*Friends of the Earth, Inc. v.
  Laidlaw Environmental Services (TOC), Inc.,*
  528 U.S. 167 (2000) ...........................................................................51

*Gates v. Deukmejian,*
  987 F.2d 1392 (9th Cir. 1992)............................................................77

Case: 26-1443 Document: 23 Page: 11 Filed: 06/08/2026

*Gaymar Industries, Inc. v. Cincinnati Sub-Zero Products, Inc.,*
790 F.3d 1369 (Fed. Cir. 2015) ........................................................... 66

*Goodyear Tire & Rubber Co. v. Haeger,*
581 U.S. 101 (2017) ........................................................ 79, 80, 81, 82

*Gordon & Breach Science Publishers S.A. v.*
*American Institute of Physics,*
859 F. Supp. 1521 (S.D.N.Y. 1994) ............................................... 61, 62

*Gust, Inc. v. Alphacap Ventures LLC,*
905 F.3d 1321 (Fed. Cir. 2018) ...................................................... 60, 72

*Haeger v. Goodyear Tire & Rubber Co.,*
793 F.3d 1122 (9th Cir. 2015) ........................................................ 31, 68

*Hall v. Cole,*
412 U.S. 1 (1973) ................................................................................. 63

*Heckethorn v. Sunan Corp.,*
992 F.2d 240 (9th Cir. 1993) ............................................................... 75

*Hensley v. Eckerhart,*
461 U.S. 424 (1983) ............................................................................ 78

*Hill-Rom Services, Inc. v. Stryker Corp.,*
755 F.3d 1367 (Fed. Cir. 2014) .......................................................... 40

*Holgate v. Baldwin,*
425 F.3d 671 (9th Cir. 2005) ............................................................... 67

*Hudson v. Moore Business Forms, Inc.,*
836 F.2d 1156 (9th Cir. 1987) ............................................................. 58

*In re Facebook, Inc. Consumer Private User Profile Litigation,*
655 F. Supp. 3d 899 (N.D. Cal. 2023) ................................................ 69

*In re Keegan Managemnt Co., Security Litigation,*
78 F.3d 431 (9th Cir. 1996) ................................................ 33, 39, 68, 72

*In re PersonalWeb Technologies LLC,*
85 F.4th 1148 (Fed. Cir. 2023) ............................................... 31, 32, 37

- ix -

*In re Ronco, Inc.,*
  838 F.2d 212 (7th Cir. 1988)...................................................................... 58

*In re Zilog, Inc.,*
  450 F.3d 996 (9th Cir. 2006)..................................................................... 34

*Ingram v. Oroudjian,*
  647 F.3d 925 (9th Cir. 2011)..................................................................... 73

*Innovation Technologies, Inc. v. Splash! Medicial Devices, LLC*
  528 F.3d 1348 (Fed. Cir. 2008)................................................................. 78

*Intamin Ltd. v. Magnetar Technologies, Corp.,*
  483 F.3d 1328 (Fed. Cir. 2007)................................................................. 34

*Judin v. United States,*
  110 F.3d 780 (Fed. Cir. 1997)................................................................... 34

*Kraemer v. Grant County,*
  892 F.2d 686 (7th Cir. 1990)..................................................................... 33

*Lahiri v. Universal Music & Distribution Corp.,*
  606 F.3d 1216 (9th Cir. 2010).................................................................... 77

*Lake v. Gates,*
  130 F.4th 1064 (9th Cir. 2025) ................................................................. 33

*Lamboy-Ortiz v. Ortiz-Velez,*
  630 F.3d 228 (1st Cir. 2010) ..................................................................... 79

*Liebel-Flarsheim Co. v. Medrad, Inc.,*
  358 F.3d 898 (Fed. Cir. 2004) ............................................................ 40, 41

*Lohman v. Duryea Borough,*
  574 F.3d 163 (3rd Cir. 2009) .................................................................... 73

*Mars Steel Corp. v. Continental Bank, N.A.,*
  880 F.2d 928 (7th Cir. 1989)............................................................... 58, 59

*McGuire Oil Co. v. Mapco, Inc.,*
  958 F.2d 1552 (11th Cir. 1992).................................................................. 33

*Merck KGaA v. Integra Lifesciences I, Ltd.,*
    545 U.S. 193 (2005) ................................................................ 55

*MGIC Indemnity Corp. v. Weisman,*
    803 F.2d 500 (9th Cir. 1986) .................................................. 77

*Momenta Pharmaceuticals, Inc. v. Teva Pharmaceuticals USA Inc.,*
    809 F.3d 610 (Fed. Cir. 2015) ................................................ 55

*Morda v. Klein,*
    865 F.2d 782 (6th Cir. 1989) .................................................. 42

*National Presto Industries, Inc. v. West Bend Co.,*
    76 F.3d 1185 (Fed. Cir. 1996) ................................................ 63

*Orr v. Bank of America, NT & SA,*
    285 F.3d 764 (9th Cir. 2002) .................................................. 32

*OrthoAccel Technologies, Inc. v. Propel Orthodontics, LLC,*
    No. 4:16-CV-00350-ALM, 2017 WL 1495177
    (E.D. Tex. Apr. 26, 2017) ...................................................... 60

*Phonometrics, Inc. v. Economy Inns of America,*
    349 F.3d 1356 (Fed. Cir. 2003) .............................................. 38

*Poller v. Columbia Broadcasting Services,*
    368 U.S. 464 (1962) ................................................................ 33

*PPG Industries, Inc. v. Valspar Sourcing, Inc.,*
    679 F. App'x 1002 (Fed. Cir. 2017) ........................................ 50

*Primus Automotive Financial Services, Inc. v. Batarse,*
    115 F.3d 644 (9th Cir. 1997) .................................................. 68

*Q-Pharma, Inc. v. Andrew Jergens Co.,*
    360 F.3d 1295 (Fed. Cir. 2004) .............................................. 34

*Realtek Semiconductor Corp. v. MediaTek, Inc.,*
    769 F. Supp. 3d 1067 (N.D. Cal. 2025) ........................... 62, 63

*Segan LLC v. Zynga Inc.,*
    131 F. Supp. 3d 956 (N.D. Cal. 2015) .................................... 81

*Seven-Up Co. v. Coca-Cola Co.,*
  86 F.3d 1379 (5th Cir. 1996) ................................................................ 61

*Sneller v. City of Bainbridge Island,*
  606 F.3d 636 (9th Cir. 2010) ................................................................ 67

*Southern Walk at Broadland's Homeowner's Association, Inc. v.*
  *OpenBand at Broadland's, LLC,*
  713 F.3d 175 (4th Cir. 2013) ................................................................ 58

*Sunearth, Inc. v. Sun Earth Solar Power Co.,*
  839 F.3d 1179 (9th Cir. 2016) .............................................................. 75

*Taurus IP, LLC v. DaimlerChrysler Corp.,*
  726 F.3d 1306 (Fed. Cir. 2013) ............................................................ 38

*ThermoLife International, LLC v. Gaspari Nutrition Inc.,*
  648 F. App'x 609 (9th Cir. 2016) ......................................................... 71

*Tom Growney Equipment, Inc. v. Shelly Irrigation Development, Inc.,*
  834 F.2d 833 (9th Cir. 1987) ................................................................ 68

*Townsend v. Holman Consulting Corp.,*
  929 F.2d 1358 (9th Cir. 1990) .............................................................. 33

*Truesdell v. South California Permanente Medical Group.,*
  293 F.3d 1146 (9th Cir. 2002) .............................................................. 66

*United National Insurance Co. v. R&D Latex Corp.,*
  834 F.2d 833 (9th Cir. 1987) ................................................................ 63

*United States ex rel. Robinson Rancheria Citizens*
  *Council v. Borneo, Inc.,*
  971 F.2d 244 (9th Cir. 1992) ................................................................ 56

*View Engineering, Inc. v. Robotic Vision Systems, Inc.,*
  208 F.3d 981 (Fed. Cir. 2000) .............................................................. 42

*W. L. Gore & Associates Inc. v. GI Dynamics Inc.,*
  No. CV-10-8088-PHXGMS, 2010 WL 5184254
  (D. Ariz. Dec. 15, 2010) ....................................................................... 55

*World Axe Throwing League, Inc. v. Cold Steel, Inc.,*
  No. LA-CV20-11407 JAK (EX), 2023 WL 12065783
  (C.D. Cal. Dec. 28, 2023) ................................................................73

*World Wrestling Federation Entertainment, Inc. v. Bozell,*
  142 F. Supp. 2d 514 (S.D.N.Y. 2001) ...............................................61

*Zaldivar v. City of Los Angeles,*
  780 F.2d 823 (9th Cir. 1986)............................................................56

**Statutes**

21 C.F.R. § 812.5................................................................................ 18

15 U.S.C. § 1117 ............................................ 1, 30, 31, 63, 74, 75, 78, 82

28 U.S.C. § 1295(a)(1)........................................................................ 1

28 U.S.C. § 1331 ............................................................................... 1

28 U.S.C. § 1338 ............................................................................... 1

28 U.S.C. § 1927 ............................... 1, 24, 25, 30, 31, 68, 69, 72, 78, 79

28 U.S.C. § 2201 ............................................................................... 1

28 U.S.C. § 2202 ............................................................................... 1

35 U.S.C. § 154(d) ............................................................................. 8

35 U.S.C. § 271(e)(1)........................................... 10, 18, 29, 50, 54

35 U.S.C. § 285 ...................................... 1, 30, 31, 74, 75, 78, 82

**Rules**

Fed. R. Civ. P. 11 ...................................................................*passim*

Fed. R. Civ. P. 11(b)(3)...............................................................34, 64

Fed. R. Civ. P. 11(b)(4)...................................................................78

Fed. R. Civ. P. 11(c)(2) ...........................................................66, 67, 68

Fed. R. Civ. P. 12(b)(1) ........................................................ 2, 49

Fed. R. Civ. P. 26(a)(1)(A)(ii) ..................................................... 44

Fed. R. Civ. P. 41(a)(2) ................................................. 2, 29 57, 75

**Other Authorities**

Stanford Medicine Children's Health, *Stanford Medicine Pediatric & Maternal Innovation Showcase 2024*, Youtube (Apr. 23, 2024), https://www.youtube.com/live/LUEm35JYszc?si=dAZBZcO2R_wMKYtr &t=3395 ................................................................................ 11

# LIST OF ABBREVIATIONS

ALC Medical Holdings LLC ................................................................ALC

Lucie Medical Inc. ....................................................................... Lucie

Post-partum hemorrhage ...............................................................PPH

Raydiant Oximetry, Inc.............................................................. Raydiant

U.S. Patent No. 11,839,408......................................................'408 patent

U.S. Patent No. 12,058,053......................................................'053 patent

Womble Bond Dickinson (US) LLP ..................................... Womble Bond

## STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rule 47.5, counsel for Appellants state that:

1. There are no, nor have there been any other, appeals in or from this same action or proceeding in the lower tribunal before this or any other appellate court.

2. No other cases may be directly affected by the Court's decision in this appeal.

**CONFIDENTIAL MATERIAL OMITTED**

## STATEMENT OF JURISDICTION

The district court was alleged to have subject-matter jurisdiction over this declaratory-judgment patent-infringement action. 28 U.S.C. §§ 2201, 2202, 1331, 1338. Final judgment was entered on January 14 and/or February 27, 2026. Appx0071-0072. Appellants timely filed notices of appeal. Appx2516-2519; Appx2795-2796. This Court has jurisdiction under 28 U.S.C. §1295(a)(1).

## STATEMENT OF ISSUES

1. Whether the district court abused its discretion based on legal and factual errors in imposing sanctions against patent owner ALC and its counsel under Rule 11, 28 U.S.C. § 1927, and inherent authority, for $1.4 million.

2. Whether the court abused its discretion based on legal and factual errors when awarding attorney's fees under 35 U.S.C. § 285 and 15 U.S.C. § 1117, including by imposing liability against ALC and its counsel, for $2.3 million.

3. Whether the court abused its discretion in excluding evidence probative of Raydiant's motivation to obtain a **Negotiation Terms** to the asserted patent.

- 1 -

## STATEMENT OF THE CASE

### I.    Procedural History

On January 10, 2025, Raydiant filed a declaratory-judgment action of non-infringement of U.S. Patent No. 11,839,408.  Appx0100-0106. On February 11, ALC Medical answered and filed two counterclaims. Appx0203-0225.  The district court stayed discovery shortly thereafter. On May 2, ALC moved to dismiss the declaratory judgment claim under Rule 12(b)(1) and its two counterclaims under Rule 41(a)(2).  Appx0830-0845.  Almost six months later, on October 29, 2025, the district court denied ALC's motion.  Appx0001-0024.  In the same order, the court granted Raydiant's two sanctions motions (filed on June 26 after ALC's motion to dismiss) and imposed a $1.4-million sanction, payable to Raydiant.  *Id.*  On January 14, 2026, the court granted Raydiant's motion for judgment on the pleadings.  Appx0025.  On February 27, 2026, the court granted Raydiant's attorney's fees motion, awarding approximately $2.3 million with both ALC and its counsel liable.  Appx0026-0027.

## II.   ALC, Ms. West, And Her Patented PPH Devices

Jennifer West is the sole inventor of the '408 patent and two additional patents.  Appx0211; Appx2554.[1]  The patents cover her innovative post-partum hemorrhage ("PPH") devices.  Appx0211.  She founded ALC Medical, which owns her patents, and is a principal of Lucie Medical, which licenses the technology for development purposes.  Appx0210; Appx1200; Appx1539; Appx2002; Appx2553.

Before West worked at Raydiant, she "conceived of a low-cost mechanical device capable of preventing PPH" after she "nearly lost [her] life" "during [her] C-section delivery."  Appx0211; Appx1201.  Her device "is inserted during the cesarean procedure" and "facilitate[s] accurate assessment of blood loss in real-time, reduce[s] the formation of intrauterine blood clots, and encourage[s] physiologic contraction of the uterus thereby limiting the amount of blood loss during surgery."  Appx0211.

---

[1] The third patent, U.S. Patent No. 12,616,503, issued on May 5, 2026.



Atraumatic Placement        Contraction and        Easy Removal
                             Quantification

Appx0211.

West's '408 patent claims a PPH device having a placement marker "configured for movement." Appx0049. Her '053 patent, in contrast, claims a device without the "configured for movement" limitation. Appx2554; Appx2567-2587. A PPH device with a moveable placement marker has treatment advantages over one with a non-moveable marker but is less "cost effective." Appx1204; Appx1537-1540. The claimed '408 invention is also configured to work with a suction-line extension. Appx0049.

Before founding ALC and Lucie, West worked briefly for Raydiant, as a consultant first and then an employee. Appx0206-0214; Appx1200-1201. While there, West disclosed her pre-employment inventions to Raydiant but later learned that Raydiant improperly filed patent applications adding Raydiant's now-former CEO and other individuals as

purported inventors. Appx0211-0216. She also oversaw Raydiant's development of her invention as the DAISY device and other prototypes, some with " **Tech** **Info** ." Appx0245-0249; Appx2002-2019; Appx2553.

West effectively left Raydiant in late 2022 and was formally terminated on March 3, 2023. Appx0214-0215. "Ultimately, Raydiant terminated Ms. West as part of its effort to misappropriate her invention of the PPH treatment device for its own use without any compensation to her." Appx0215.

Fast-forward two years to 2024. ALC learned new information suggesting that Raydiant changed its DAISY device to incorporate West's moveable-marker invention. Appx1202-1205;Appx1185-1187. In April 2024, ALC watched Raydiant's presentation at the Stanford Showcase. Appx1202-1203. At the Showcase (broadcast on YouTube), Raydiant's now-former CEO Dr. Neil Ray presented on the DAISY device, noting that it was not being made "as a single, injection-molded piece." Appx2556. His statement "led [her] to believe that the design of the DAISY device had a moveable placement marker." *Id.*

Then, in October 2024, Raydiant's patent applications—derivative of West's inventions—published. Appx0251-0403. Their disclosures signaled to West that Raydiant was now pursuing the more-advantageous moveable placement marker she disclosed to Raydiant. Appx2554-2555.



FIG. 10A1          FIG. 10B          FIG. 6D

Raydiant's applications describe its placement marker (named a "positioning mechanism") as being, in some embodiments, "sized, positioned, and configured to be positioned proximate to a patient's internal cervical os." Appx0300 (¶0009); Appx0353-0359; Appx0385. In other embodiments, "the positioning mechanism may be positioned proximate to a patient's cervix." Appx0300; Appx0385. The published claims do not limit the invention to a bonded "positioning mechanism." Appx0317-0318; Appx0402-0403.

**CONFIDENTIAL MATERIAL OMITTED**

This new information collectively struck a chord with West based on her time at Raydiant two years earlier.  Appx2554-2555.  West of course knew that Raydiant had developed one DAISY device with a non-moveable placement marker, calling it "just stunning" in 2022 when she was at Raydiant leading the device's development.  Appx1051.  Plus, as the technology's inventor, she oversaw development at Raydiant. Appx0521-0612.  She also knew Raydiant was interested in ▇Tech▇ ▇Information▇ like those protected by her '408 patent.  Appx2004-2008; Appx2553-2554.  Raydiant had in fact worked on prototypes with ▇Technical Info▇.    Appx2589-2594;  Appx2561;  Appx2067-2071; Appx2274-2275.

Additionally, as noted, West knew that a moveable marker has advantages over the non-moveable version when treating patients. Appx1204; Appx1537-1583; Appx2561.  With the moveable version, one can "adjust the device to different uterus sizes," and that is beneficial because the uterus "changes in size during pregnancy."  Appx1204; Appx2559.  By December 2024, West strongly believed that Raydiant changed its DAISY device to incorporate her patented improvement. Appx1202-1203; Appx1540; Appx2556-2557.

At that time, though, the DAISY device was not publicly available. Appx0796-0797; Appx1187; Appx1190-1194; Appx2379.  Raydiant would later make a device available for inspection to ALC counsel but only on an attorney-eyes-only basis subject to the protective order.  *E.g.*, Appx0945-0949.  But in December 2024, ALC and its counsel could not inspect any DAISY device.  Appx1187.

Based on the information available as of December 2024, ALC counsel notified Raydiant (rather than filing a lawsuit) about the perceived infringement.  Appx0238; Appx0724.  The letter stated that Raydiant's "DAISY surgical device ('DAISY') practices at least claim 1 of the '408 patent," and, consistent with providing notice of provisional patent rights under 35 U.S.C. § 154(d), the letter also identified West's then-pending patent applications.  Appx0238.  The letter included the slide from the Stanford Showcase and a figure from Raydiant's patent application depicting the placement marker as a separate component that slides onto the suction tube.  *Id.*



Appx0238. ALC ended its letter with its request for an amicable resolution: "We trust that this matter can be resolved amicably, and we look forward to your prompt reply." Appx0239; Appx0724.

## III. Raydiant Files A Declaratory-Judgment Action Instead Of Responding To ALC's Letter

On January 10, 2025, without responding to ALC's letter, Raydiant filed its declaratory-judgment action, claiming non-infringement of the '408 patent but without identifying any factual basis for non-infringement. Appx0100-0106; Appx0724. Specifically, Raydiant did not state that its DAISY device does not have a moveable placement marker. *Id.*

On February 3, ALC asked Raydiant for a thirty-day extension to respond to the complaint, Appx0793; Appx2296, but Raydiant refused unless ALC agreed to immediately proceed with full discovery,

Appx0724; Appx0793-0794.  Raydiant would agree to only a seven-day extension.  Appx2293-2294.

One of ALC counsel's first actions was to investigate declaratory-judgment jurisdiction.  Appx1764.  Some information suggested that Raydiant's product was investigational and subject to 35 U.S.C. § 271(e)(1)'s safe harbor, thus negating case-or-controversy jurisdiction.  Appx1764-1765.  But that information was incomplete, and ALC counsel concluded that there was not enough to challenge Raydiant's assertion of jurisdiction.  Appx1765.

With only a seven-day extension, ALC had to answer by February 11.  Appx0203-0428; Appx0793-0794.  With its answer, ALC filed a compulsory counterclaim for patent infringement that was effectively the mirror-image of Raydiant's non-infringement claim.  *Id.*  ALC included a claim chart (following the guidance in this Court's precedents) showing infringement of the '408 patent on a limitation-by-limitation basis.  Appx0423-0428.  The chart used textual and graphical annotations to explain how ALC thought the new DAISY device infringed.  *Id.*  The DAISY device was not publicly available, and Raydiant had very little information on its website about the product, Appx0797; Appx0818-0829;

Appx1185-1186, so ALC used the image below from Dr. Ray's Stanford Showcase presentation to illustrate its infringement contention. Appx0425-0428.[2]    The same image was in ALC's December letter. Appx0238.



ALC specified its infringement contention by annotating the image from Raydiant's slide to include a dashed outline to depict how ALC believed the new DAISY device infringed.

---

[2] https://www.youtube.com/live/LUEm35JYszc?si=dAZ-BZcO2R_wMKYtr&t=3395; Appx2009-2019.



| US 11,839,408 | Raydiant Oximetry DAISY Device |
|---|---|
| **1[f]** a placement marker, the placement marker being configured for movement along the suction line extension for personalization of the postpartum hemorrhage mitigation device to a size of the uterus, the placement marker covering one or more ports; and | Raydiant Oximetry's DAISY Device includes a placement marker, the placement marker being configured for movement along the suction line extension for personalization of the postpartum hemorrhage device to a size of the uterus, the placement marker covering one or more ports, as shown in the image below. |

Appx0427. The claim chart showed the outline of a placement marker "by the dashed lines." *Id.* The dashed-line outline contrasts with the actual placement marker, shown to the right as a solid shape. *Id.* With the annotation and accompanying text, ALC explained precisely how the new DAISY was thought to infringe: "*When moved,* as indicated by the dashed lines, the placement marker covers one or more ports." *Id.* (emphasis added).

ALC also added a false-advertising counterclaim based on Raydiant's undeniably false statements about its DAISY device. Appx0217-0219. At the Stanford Showcase, Raydiant's then-CEO falsely told potential investors (as well as anyone watching on YouTube) that its DAISY device was "cleared" and "approved" by the FDA. Appx0217. Raydiant has never disputed the falsity of that statement. Appx1970-1978.[3]

On March 4, 2025, when Raydiant answered the counterclaims, it asserted for the first time that its DAISY device "lacks a placement marker being configured for movement." Appx0480; Appx0794. Even then, Raydiant did not include evidence showing non-infringement. Appx0480.

Raydiant would soon walk back its non-infringement contention. Appx0807. Over a month later, on April 22, in its response to a contention interrogatory asking for its non-infringement position, Raydiant stated that the interrogatory required "Raydiant's claim construction

---

[3] It was also discovered that FDA is investigating Raydiant and its former CEO. Appx1529. That information came to light via FOIA requests submitted by a former Attorney General for the State of Idaho. Appx1753-1762.

position," *id.*, which it would not provide until required under "the Patent Local Rules," which was months later, on July 7, Appx0768.

ALC's first action after Raydiant's answer was on March 28 to propose "a temporary stay" "to allow the Parties to pursue a resolution of the central claims." Appx0690. Raydiant's specific infringement denial suggested to ALC counsel that West's earlier read of the new DAISY information needed to be reevaluated. Appx1131-1135; Appx1156-1158. ALC stated that it "has no desire or intention to proceed with infringement allegations against a product that does not practice the claimed inventions." Appx0690. ALC asked to inspect the device by April 4 to determine if Raydiant's infringement denial had evidentiary support. Appx0691. But Raydiant withheld the inspection for three more weeks—until April 18 when it produced the first of multiple devices for inspection. Appx0796; Appx1190.

Despite ALC's attempt to pause the case, Raydiant wanted to press ahead. Appx0704-0706; Appx2277; Appx2337. On April 16, it took the unusual step of asking that a $1.2-million bond requirement be levied against ALC if it wanted to defend itself. Appx0487-0508. Raydiant invoked California law, improperly, as ALC argued. Appx0781-0782.

Raydiant claimed to have spent over $600,000 in fees in less than four months, even though that time involved only Raydiant's bare-bones de-claratory-judgment complaint, its answer to the two counterclaims, and other limited preliminary work. Appx0618; Appx0718-0738.[4]

The motion was ultimately denied. Appx0940. But its speculation-based narrative and incomplete facts achieved Raydiant's apparent ob-jective. *See* Appx0761-0763. The judge saw the motion as an entrée to what he described, during the first hearing, as his "fun hobby" of "div[ing] into the question of whether a patent case is patently frivolous." Appx0762.

## IV. Raydiant Withholds Evidence About Its Multiple DAISY Devices

Raydiant's bond motion misstated one key fact among many: It re-peatedly referred to "the DAISY device," in the singular, but Raydiant would later disclose multiple DAISY devices and prototypes. Appx1140-1141; Appx2301. ALC originally believed that Raydiant had marketed

---

[4] The district court incorrectly stated that "Raydiant filed a Motion for Bond" "[d]uring briefing on the motion to dismiss." Appx0007. As ex-plained below, Raydiant filed its bond motion two weeks before ALC's motion to dismiss (and three weeks after ALC counsel sent its letter ask-ing to stay the case).

only a single DAISY device.    Appx1156-1158; Appx1191; Appx1204. Raydiant itself gave that impression on several occasions, Appx0105; Appx0456; Appx0796; Appx1157-1158, but then gradually revealed numerous DAISY variants, the exact number of which is still unknown. Appx1103; Appx1190-1193.

Raydiant's conflicting statements about its DAISY devices started with its complaint referring to the "DAISY device" in the singular. Appx0101-0102.    But it also referenced "post-partum hemorrhage devices," in the plural.    Appx0105.    In an April 11 letter, Raydiant lead counsel repeatedly referenced "the DAISY device," saying it is "a one-size-fits-all device."    Appx0705.    In the parties' joint statement to the court on April 18, Raydiant repeatedly referenced "the DAISY device," again as if only one device existed.    Appx0719; Appx0721-0722.

When Raydiant allowed ALC counsel to inspect a first DAISY device (DSY15) on April 18, Raydiant counsel continued the misimpression that only one device existed.    Appx0733 (representing to the court that "Raydiant's DAISY device [singular] is available for inspection in its counsel's downtown San Francisco[] offices"); Appx0796; Appx2390.

The single-device misrepresentation was exposed in May when ALC counsel realized (based on a Raydiant document production) that Raydiant had another DAISY device (DSY10), necessitating a second inspection. Appx1192-1193; Appx2384-2385. ALC counsel asked if there were still other devices, but Raydiant counsel declined to answer. Appx2299-2301. And Raydiant's proposed consent judgment on May 5 used the plural "DAISY products," making "the scope of the requested judgment unclear." Appx1157-1158.

Later developments revealed more DAISY devices. In a June 26 declaration, a Raydiant witness averred that, the day before, he approved "two new Models of the DAISY device" ("DSY12" and "DSY14") with separate "Manufacturing Process Instructions." Appx1103. Raydiant had been planning the DSY12 and DSY14 versions since December 2024. *Id.*

At the September sanctions hearing, Raydiant counsel told the court about more devices, objecting to ALC's covenant because it was tailored to "two particular iterations" of the DAISY device and did not "address the changes to the device," without acknowledging his earlier "one-size-fits-all" characterization. Appx1276. Raydiant never produced

complete discovery on all existing or in-development DAISY variants. Appx2607-2609.

The April 18 inspection of the first DSY15 device revealed other new facts. Appx0796-0797. First, the sample (produced on an outside-counsel-eyes-only basis) was labeled as "INVESTIGATIONAL DEVICE Limited by Federal (or United States) law to investigational use." Appx0796; Appx1190-1191. That wording tracked an FDA regulation for devices subject to an Investigational Device Exemption ("IDE"). Appx0840-0841; Appx1149; *see also* 21 C.F.R. § 812.5(a) (2025). To ALC counsel, this new fact indicated that Raydiant was using the DAISY device in a manner requiring information to be developed for FDA submission and thus subject to § 271(e)(1)'s safe harbor. Appx1191-1192; Appx1260; Appx1256-1257; Appx1764-1765.





Appx0796-0797.

ALC counsel also learned that the DSY15 device did not meet the "moveable placement marker" limitation. Appx0797. The DSY15 device had a placement marker that was manufactured as a separate component, meaning the marker could initially move along the tube, as shown in Raydiant's patent applications, but the marker was then bonded in place. *Id*. ALC agreed that the DSY15 device did not infringe the '408 patent (although it may fall within the scope of West's '053 patent). Appx0838; Appx2554.

On May 13, Raydiant provided for inspection the second DAISY device, DSY10, again subject to the protective order. Appx1192-1193;

Appx2299-2300.  This time, the device was in a plastic food-storage bag, not labeled "investigational."  Appx1193.



**Technical Information**

*Id.*  Raydiant had no explanation for why the DSY10 version lacked the "investigational" labeling or was in a food-storage bag.  Appx0883-0892; Appx1212-1223.

## V.    ALC Offers To Pause The Litigation Within Weeks Of Raydiant's First Specific Non-Infringement Contention

Returning to March 2025: Immediately after Raydiant's answer specifying non-infringement based on the placement-marker limitation, ALC's March 28 letter suggested a litigation pause.  Appx0690-0691; Appx1156.  Raydiant refused and instead demanded—even before it

produced discovery or a device for inspection—that ALC "dismiss with prejudice its counterclaims against Raydiant and reimburse Raydiant its attorney's fees and costs." Appx0704. At this early stage, ALC counsel had a clear ethical obligation to their client, and they could not simply accept opposing counsel's unsubstantiated representations, particularly given the known false statements of Raydiant's then-CEO. Appx0217; Appx0223-0224; Appx1155-1160.

Still, ALC continued its efforts to end the case as soon as possible. Appx0830-0845. Within two weeks of the first device inspection, on May 2, ALC moved to dismiss the declaratory-judgment claim and its counterclaims, with Raydiant opposing. Appx0844-0845; Appx0882-0889; Appx1254-1256. On May 23, ALC also offered a fully executed, "unconditional[]" and "irrevocable[]" covenant not to sue based on the DSY10 and DSY15 devices. Appx0963-0964. At that point, Raydiant had represented that the DSY10 and DSY15 were the only relevant devices. But Raydiant rejected the covenant. Later in the case, ALC agreed to a consent judgment that covered all devices that "do not incorporate a 'placement marker being configured for movement along the suction line

extension.'" Appx2045 (quoting '408 patent, claim 1); Appx1157. This too Raydiant rejected. Appx2319-2320; Appx2058-2059.

To ALC, it was unclear why Raydiant resisted ALC's offers to end the litigation, though counsel suspected that it was "impos[ing] excessive legal costs on ALC," with the objective of pressuring ALC "to relinquish its patent rights." Appx1157. One clue was tucked away in an email from Raydiant's attorney from June 24: Raydiant wanted a **Negotiation Term** to ALC's patents. Appx2660. The demand was notable for at least two reasons. First, Raydiant did not explain why it wanted a **Term** when it purportedly did not infringe West's patent. Appx2660-2661; Appx2759-2769. The gradual revelation of multiple DAISY devices, in hindsight, suggested a possible need for a **Term** for its undisclosed devices. Appx1103.

Second, Raydiant did not explain why it would **Term** West's technology when Raydiant's contractor and lead counsel would represent to the court that West's technology is purportedly "hazardous" and defies "common sense." Appx2660; Appx1037; Appx2579-2587.

## VI.    Raydiant's Pursuit Of Sanctions And Fees

By June 2025, ALC had made it abundantly clear that the case should end. *E.g.*, Appx1259-1260. Raydiant, however, appeared set on continuing litigation and seeking fees, encouraged by the court's remarks. Appx0934-0935. Those remarks, in ALC's view, did not align with the facts. For instance, ALC's patent-infringement counterclaim was a fully contested issue for only six weeks—from February 11 (ALC's compulsory counterclaim filed) through March 28 (ALC letter asking to stay litigation). Appx0690-0691. After that, ALC was explicit on multiple occasions: If Raydiant could demonstrate with evidence that its devices did not infringe, then the case would end one way or the other. Appx0690-0691; Appx0727; Appx0830-0845. Despite this, the court later characterized ALC and its counsel as "continuing to pursue" "frivolous counterclaims." Appx0019.

In early June, Raydiant served its Rule 11 letter, even though ALC had moved to dismiss the counterclaims a month earlier. Appx1177-1182. ALC explained in writing why Raydiant's Rule 11 position lacked merit and was contrary to Federal Circuit precedent. Appx1179. Raydiant nevertheless filed two sanctions motions on June 26, one under

Rule 11 and the second under 28 U.S.C. § 1927 and inherent authority. Appx0061-0062. Raydiant was asking for over $1.4 million for a case it started and an infringement dispute lasting at most a few weeks with virtually no discovery. Appx1225-1233.

On October 29, the court granted the sanctions motions, ordering full payment be made within 28 days, on November 26, 2025—the day before Thanksgiving. Appx0024. The opinion's introduction ends with a reference to *Saturday Night Live*, stating that the positions of ALC and its counsel that "would have made even SNL's Tommy Flanagan blush." Appx0002-0003. The court characterized ALC's December letter as "no ordinary fishing expedition" while lumping ALC and West with "patent plaintiffs [who] send baseless demand letters to defendants with some regularity," even though the '408 patent was West's first patent. Appx0001. The order's tenor aligned with the court's earlier remarks at the September hearing when the court described ALC counsel as "immoral," "bottom feeding," and "from the gutter." Appx1252; *cf.* Appx1283 (ALC counsel explaining good-faith belief).

The court held ALC's two counterclaims and its motion to dismiss to be sanctionable under Rule 11. Appx0008-0016. It granted Raydiant's

motion "for sanctions against Womble Bond under Section 1927 and the Court's inherent authority" but without identifying specific conduct as exhibiting bad faith separate from the Rule 11 analysis. Appx0019. Finally, it did not impose a sanction on the attorneys and instead imposed joint and several liability against ALC and Womble Bond. Appx0023-0024.

The opinion made no reference to much of what ALC raised in its briefing and during argument. Nor did the opinion address Raydiant's failure to provide transparency on its multiple DAISY devices and whether any have a moveable placement marker.

## VII. The District Court Stays the Sanctions Order

Next, the court held a status conference on November 14, where the court granted ALC's request to file a motion to stay the sanctions order but signaled that a motion hearing would be unnecessary. Appx1509 ("I doubt I will need to hear argument on it[.]"). The court made the motion due within two days, by Sunday, November 16. Appx1508.

After the motion was filed, the court apparently changed its view and heard argument on November 20. Appx1925-1937. ALC had identified numerous Raydiant misrepresentations of the facts and the law.

Appx1512-1889.   The court also learned for the first time that FDA was investigating Raydiant and its former CEO Dr. Neil.   Appx1753-1762. Undeterred, Raydiant demanded immediate payment to fund its business operations, including DAISY-related work.   Appx1925-1937.   But the court was concerned about Raydiant's ability to repay the money if this Court reversed, even asking Raydiant counsel if there would be "anything wrong with requiring ... [Raydiant] to post a bond, if [Raydiant] receives the money?"   Appx1932-1933.   On November 21, 2025, the court granted the stay in a two-sentence order.   Appx1938.

## VIII. The Final Rulings On The Claims And The Fee Award

On December 5, Raydiant filed a dispositive motion, asking for judgment on the pleadings or alternatively summary judgment. Appx1970-1978.   ALC again agreed the case should end but explained that Raydiant's requested relief was overbroad and would be procedurally improper if invoking disputed facts or information beyond the pleadings.   Appx1982-2000.   Raydiant should not be granted "a free pass for future infringement," ALC explained.   Appx1986.   Nevertheless, shortly before the scheduled motion hearing, the court cancelled the hearing and later issued a two-sentence order granting judgment.   Appx0025.

**CONFIDENTIAL MATERIAL OMITTED**

After that, Raydiant filed its motion for fees and costs, which included no invoices or billing records. Appx2497-2509. The court granted Raydiant's motion in full—again with a terse order that did not address the arguments or evidence ALC raised in opposition. Appx0026-0027. The order's bad-faith analysis was only a single sentence reiterating three high-level points from the sanctions order. Appx0026. The order also imposed liability on Womble Bond even though Raydiant did not ask for such relief.

These appeals follow.

## SUMMARY OF THE ARGUMENT

The decisions in this case are clear abuses of discretion resting on a mix of legal and factual errors. The court also effectively made every possible inference on a disputed fact against Appellants.

First, the Rule 11 sanctions should be reversed. Under the circumstances, ALC and its counsel conducted a reasonable investigation of Raydiant's suspected infringement. Because the accused device was not available for inspection, counsel reasonably relied on (1) Jennifer West's knowledge that Raydiant was developing a PPH device with **Tech Info**; (2) her expert knowledge that a moveable placement marker

offered treatment benefits over non-moveable marker; (3) Raydiant's patent applications covering devices with a moveable placement marker; and (4) the statement of Raydiant's now-former CEO that the device was not made as a single molded piece. ALC counsel considered all information available to them before sending its cease-and-desist letter. When ALC had to file its counterclaims, Raydiant intentionally withheld evidence of non-infringement. Raydiant did not meet its burden to establish sanctionable conduct with clear and convincing evidence.

The court's Rule 11 analysis overlooks the leeway doctrine and the shortened time available for ALC to obtain discovery on the DAISY devices before filing its compulsory infringement counterclaim. When relevant evidence, *e.g.*, the accused device, is unavailable for inspection, "more leeway must be given" to an attorney and the client. This context-based approach in assessing the reasonableness of a pre-filing investigation under Rule 11 aligns with Ninth Circuit and Federal Circuit precedent, but the district court gave mere lip service to it. Further, the district court gave no consideration to the fact that Raydiant refused to provide a reasonable extension of time before ALC had to file its compulsory counterclaim.

- 28 -

Additionally, the court speculated when mischaracterizing ALC's annotation of the image of Raydiant's DAISY device. The pleading's annotation, which is merely a contention and not "evidence," has all the telltale signs of a typical annotation depicting a patent owner's infringement theory. No reasonable attorney, reading the claim chart with the multiple annotations, could reasonably view the annotation as "manipulated evidence."

Nor was ALC's motion to dismiss frivolous. The motion presented a reasonable option for the court to end the case. When ALC filed the motion in May 2025, Raydiant had finally produced one device for inspection, and it was labeled as "investigational," consistent with FDA regulations. ALC thus had a reasonable belief that Raydiant could not satisfy its burden of establishing ongoing jurisdiction because the investigational device was likely subject to § 271(e)(1)'s safe harbor. Furthermore, in reply, ALC served a fully executed covenant not to sue covering the DSY10 and DSY15 devices, *i.e.*, all DAISY devices known to exist at the time. That covenant by itself should have mooted the dispute. For good measure, ALC asked to have its counterclaims voluntarily dismissed under Rule 41(a)(2). All this should have ended the case, but Raydiant was

encouraged by the court to continue litigating for purposes of seeking sanctions and fees.

The court's Lanham Act analysis is equally flawed and reversible. It exhibits a gross failure to appreciate the uncertainty with the commercial-speech doctrine. It also rests on clearly erroneous factual findings, such as the incorrect statement that Dr. Ray's uncontested false statements—still available on YouTube—were not widely disseminated.

Second, there is no basis for sanctions under § 1927 or inherent authority. The court's two-page analysis largely piggybacks on its flawed Rule 11 analysis and makes no separate findings that could reasonably establish the required subjective bad faith based on the motion to dismiss.

Third, the amount of fees awarded to Raydiant is a clear abuse of discretion. Neither $1.4 million (as a sanction) or $2.3 million (as fee shifting under §285 and §1117) is appropriate for litigation Raydiant itself started. Raydiant withheld evidence, misrepresented the number of DAISY devices, and never identified all devices. The evidence does not warrant an exceptional-case finding and the amounts are not "reasonable."

## ARGUMENT

### I.    Standards of Review

This Court applies the law of the regional circuit when reviewing sanctions decisions. *AntiCancer, Inc. v. Pfizer, Inc.*, 769 F.3d 1323, 1328 (Fed. Cir. 2014); *Eon-Net LP v. Flagstar Bancorp*, 653 F.3d 1314, 1328 (Fed. Cir. 2011).

Under Ninth Circuit law, Rule 11 sanctions require a showing that the challenged paper is "legally or factually 'baseless' from an objective perspective" and that the attorney did not conduct a "reasonable and competent inquiry" before filing. *Christian v. Mattel, Inc.*, 286 F.3d 1118, 1127 (9th Cir. 2002). For sanctions under § 1927 or inherent authority, a court must find that the sanctioned behavior "constituted or was tantamount to bad faith." *Haeger v. Goodyear Tire & Rubber Co.*, 793 F.3d 1122, 1132 (9th Cir. 2015), *rev'd on other grounds*, 581 U.S. 101 (2017). Imposition of sanctions is reviewed for an abuse of discretion. *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 405 (1990).

An attorney's fees award under § 285 or § 1117 is reviewed for an abuse of discretion. *In re PersonalWeb Techs. LLC*, 85 F.4th 1148,

1153-54 (Fed. Cir. 2023); *Trader Joe's Co. v. Trader Joe's United*, 150 F.4th 1040, 1048 (9th Cir. 2025).

The exclusion of evidence is reviewed for an abuse of discretion. *Orr v. Bank of America, NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002).

## II. The Imposition Of Sanctions And Fees Was An Abuse Of Discretion

The sanctions order and award of attorney's fees were an abuse of discretion. The Rule 11 sanctions decision rests on two foundational errors—one of law and one of fact. The sanctions order exhibits additional errors, including misapplications of patent and FDA law, clearly erroneous factual findings, and a persistent misreading of the record.

### A. Two Foundational Errors

Two fundamental errors underpin the sanctions order. First, it disregards Ninth Circuit and Federal Circuit precedent holding that additional leeway is afforded to a party when relevant evidence, such as the accused device, is not publicly available or is controlled solely by the opposing party. Second, it fails to account for ALC's prompt efforts to pause the case once Raydiant identified a specific non-infringement basis, and it erroneously characterized ALC as pursuing meritless claims.

**The Leeway Doctrine.** "If the relevant facts are in control of the opposing party, more leeway must be given to make allegations in the early stages of litigation that may not be well-grounded." *Townsend v. Holman Consulting Corp.*, 929 F.2d 1358, 1364 (9th Cir. 1990). This principle is why Rule 11 "must not bar the courthouse door to people who have some support for a complaint but need discovery to prove their case," *Kraemer v. Grant Cnty.*, 892 F.2d 686, 689 (7th Cir. 1990), especially where the "proof is largely in the hands of the [defendants]," *Poller v. Columbia Broad. Serv.*, 368 U.S. 464, 473 (1962); *McGuire Oil Co. v. Mapco, Inc.*, 958 F.2d 1552, 1564 (11th Cir. 1992) ("The level of inquiry necessary in a given case depends on the complexity of the issues and the need for and availability of discovery.").

Under Ninth Circuit law, for a pleading to be frivolous, it must be (1) legally or factually baseless *and* (2) made without a reasonable and competent inquiry. *Lake v. Gates*, 130 F.4th 1064, 1068 (9th Cir. 2025); *In re Keegan Mgmt. Co., Sec. Litig.*, 78 F.3d 431, 434 (9th Cir. 1996). The "reasonable and competent inquiry" prong incorporates whether the party reviewed and considered all available relevant evidence and thus incorporates the leeway doctrine when certain information is not

- 33 -

available for review and analysis. "The party seeking sanctions bears the burden of demonstrating by clear and convincing evidence that sanctions are justified." *Eon-Net LP v. Flagstar Bancorp*, 249 F. App'x 189, 195 (Fed. Cir. 2007) (citing *In re Zilog, Inc.*, 450 F.3d 996, 1007 (9th Cir. 2006)).

This Court's jurisprudence similarly incorporates leeway in patent cases when an accused device is not publicly available. In *Intamin Ltd. v. Magnetar Technologies, Corp.*, 483 F.3d 1328, 1338 (Fed. Cir. 2007), this Court explained how it had previously rejected a "blanket rule" requiring a patentee to obtain and deconstruct a product. *See also Q-Pharma, Inc. v. Andrew Jergens Co.*, 360 F.3d 1295, 1299 (Fed. Cir. 2004); *Judin v. United States*, 110 F.3d 780, 784 (Fed. Cir. 1997).

Rule 11 itself embodies the same principle by allowing factual contentions that "will likely have evidentiary support after a reasonable opportunity for further investigation or discovery." Fed. R. Civ. P. 11(b)(3). The Advisory Committee's Notes likewise list as relevant factors "how much time for investigation was available to the signer" and "whether he had to rely on a client for information as to the facts." Fed. R. Civ. P. 11 advisory committee's note.

Despite these settled principles, the district court gave mere lip service to the law, saying that, "whatever additional 'leeway'" might apply, ALC's counterclaim was worse than "a fishing expedition in the hope of stumbling upon some colorable infringement claim." Appx0008. That mischaracterization fails to acknowledge Raydiant as the only party with complete information about the structure of the multiple DAISY devices.

Ultimately, neither the court nor Raydiant identified what additional information ALC and its counsel could have considered to satisfy the "reasonable and competent inquiry" prong. Even assuming ALC's infringement counterclaim was incorrect for the undisclosed DAISY prototypes, ALC and its counsel considered all available evidence to satisfy the "reasonable and competent inquiry."

The court went further, however, and disparaged West's technical explanation supporting her belief that Raydiant had likely adopted her moveable-placement-marker invention. The court reduced West's scientific explanation to a "hunch." Appx0012; *see also* Appx1263 (characterizing West Declaration: "Right. I can file a declaration that says I think the sky is pink and I know a lot about the sky."). The court speculated that West "knows that such a design [with a moveable placement marker]

- 35 -

would be unsafe." Appx0012. "West's belief in the 'benefits' of a moveable placement marker" was, in the court's view, "nothing more than a post hoc justification," despite science-based explanations in her detailed declarations. Appx0013.

The court's speculation cannot be squared with the evidence. West detailed how a moveable placement marker is advantageous because it "could be tailored to the size of the uterus, which changes in size during pregnancy." Appx1204(¶25); Appx1199-1205;Appx1536-1540;Appx2002-2005; Appx2551-2563. She refuted, with scientific literature, Don Hannula's bald, unsupported assertions that her invention is "hazardous" and against "common sense." Appx1537-1749. ALC counsel reasonably relied on their client's expertise and knowledge (and other information) when inferring that the DAISY device was redesigned to incorporate her patented moveable-placement-marker feature.

**Prompt Corrective Action.** The orders also do not account for ALC's prompt offer to pause the dispute once Raydiant finally provided a specific basis for non-infringement. ALC took eminently reasonable action by asking to pause the litigation—even before Raydiant provided any

evidence—once Raydiant shared the first indication of no redesign of the DAISY device.

The timeline matters: From December 2024 (ALC's letter) through April 18 (first device inspection), Raydiant alone had complete information about the DAISY devices, thus creating the "information asymmetry" the court noted. Appx0008. Once Raydiant asserted a specific non-infringement position in its compulsory-counterclaim answer, ALC proposed staying the litigation within three weeks so it could inspect the DAISY device. Appx0689-0691. ALC was prepared to withdraw its claims if Raydiant could substantiate with evidence its noninfringement contention, even before Raydiant had provided any discovery. *Id.* On that record, the court had no basis to find ALC and Womble Bond to be "continually pursuing meritless claims." Appx0026.

Neither the court nor Raydiant identified a comparable case where counsel were sanctioned despite promptly reassessing its infringement contention at the first articulation of a concrete non-infringement position. To the contrary, this Court's cases affirm that a telltale sign of sanctionable conduct is pressing an argument in the face of contradictory precedent or evidence. *E.g.*, *PersonalWeb*, 85 F.4th at 1160;

**CONFIDENTIAL MATERIAL OMITTED**

*Phonometrics, Inc. v. Economy Inns of Am.*, 349 F.3d 1356, 1360 (Fed. Cir. 2003). ALC and its counsel did precisely what those cases advise— "continually assess the soundness of pending infringement claims." *Taurus IP, LLC v. DaimlerChrysler Corp.*, 726 F.3d 1306, 1328 (Fed. Cir. 2013).

### B. ALC's Letter was Reasonable

The court characterized ALC's December letter as "frivolous" and lacking "proper due diligence." Appx0023; Appx0026. That finding is clearly erroneous and rests in part on misunderstanding patent law. Neither the district court nor Raydiant identified any case where a party was sanctioned for sending a remotely similar letter under remotely similar circumstances where the accused device was not available for inspection. *See* Appx0001-0024; Appx0975-0995; Appx1081-1101.

When ALC sent its December letter, it reasonably relied on four concrete sources of available evidence: (1) West's knowledge from 2022 that Raydiant was developing a device with **Technical Information**; (2) West's expertise that a moveable placement marker offered treatment benefits; (3) Raydiant's newly published patent applications covering devices with a moveable placement marker; and (4) Raydiant's CEO's public

statement that the device was not made as a single molded piece. Taken together, the evidence established solid grounding for ALC's belief that the DAISY device had been redesigned by Raydiant, a competitor West knew tried to misappropriate her patented technology. Appx0211-0215; Appx1200-1201.

ALC counsel considered and analyzed all available evidence. Appx1156; Appx1178-1180; Appx1185-1190. Simply because the letter is later shown, by later-produced evidence, to be factually incorrect for some DAISY devices does not make it sanctionable. In the Ninth Circuit, an attorney may *not* be sanctioned under Rule 11 "for a complaint that is not well-founded, so long as she conducted a reasonable inquiry." *Keegan*, 78 F.3d at 434.

Further, the order overlooks how a skilled artisan would reasonably understand Raydiant's patent applications, in the context of the other evidence, to suggest a moveable placement marker. Take published claim 22 in the '719 publication, which requires that "the positioning mechanism is configured to prevent unintended displacement of the sur- gical drain." Appx0318. Claim 22 requires a specific configuration of the positioning mechanism, as opposed to alternative configurations,

Appx0317, thus suggesting movement of the mechanism.  Claim differentiation thus leads an ordinarily skilled artisan to understand claim 1 as being broader than claim 22.  *See Hill-Rom Servs., Inc. v. Stryker Corp.*, 755 F.3d 1367, 1376 (Fed. Cir. 2014).

Moreover, claims in the '719 publication track the broader scope of the pre-amendment claims in the application for West's '408 patent and notably parallel the issued claims in West's '053 patent.  Appx0402-0403; *cf.* Appx0049-0050; Appx2586-2587.  This matters because the prosecution history of West's patents confirms that the broader claim language can be understood as encompassing a moveable placement marker. Appx1792-1796.

Further, the written description of Raydiant's patent applications inherently teaches that, in some embodiments, the "positioning mechanism" is moveable.  Appx0311; Appx0396.  That reading flows from the specification's use of "[i]n most embodiments," the components are "affixed together," thus meaning that, in other embodiments, the components, including the positioning mechanism, are not "permanently affixed together prior to use."  *See Liebel-Flarsheim Co. v. Medrad, Inc.*,

- 40 -

358 F.3d 898, 904 (Fed. Cir. 2004) ("[I]t is improper to read a limitation from the specification into the claims.").

Against this backdrop, ALC reasonably viewed Raydiant's published applications as indicative of a likely design change to the DAISY device. Appx1540; Appx2541. All this evidence provided ALC with a reasonable evidentiary foundation for its December 2024 letter, and it refutes the district court's finding that "all evidence available to ALC Medical and its lawyers at the time they sent the letter pointed strongly towards noninfringement." Appx0001. While later evidence showed that some DAISY devices do not infringe the '408 patent, the letter rested on a reasoned consideration of the then-available information for a device that was not publicly available.

### C. The Compulsory Counterclaim of Infringement was Not Sanctionable or Exceptional

The district court's ruling on ALC's compulsory patent counterclaim rests on five reversible errors.

*First*, the court failed to correctly apply Ninth and Federal Circuit law recognizing the leeway afforded when relevant evidence is solely within the possession of the opposing party. *See* § II.A, *supra.* By ALC's deadline for asserting a compulsory counterclaim, Raydiant had refused

access to its multiple DAISY devices, and ALC should not have been sanctioned because it did not have access to evidence only Raydiant controlled. *See, e.g.*, *Morda v. Klein*, 865 F.2d 782, 785-86 (6th Cir. 1989) ("It would be particularly difficult to fault plaintiffs for a lack of prefiling inquiry when, as here, defendants have refused plaintiffs access to material information that would bear on certain allegations made in the complaint.").

*Second*, the court overlooked ALC's claim chart. As this Court has explained, "[t]he presence of an infringement analysis plays the key role in determining the reasonableness of the pre-filing inquiry made in a patent infringement case under Rule 11." *View Eng'g, Inc. v. Robotic Vision Sys., Inc.*, 208 F.3d 981, 986 (Fed. Cir. 2000).

*View Engineering* is particularly instructive because ALC counsel did exactly what sanctioned counsel there did not do. There, the accused infringer filed for declaratory judgment, and the patent owner filed its eight infringement counterclaims. *Id.* The patent owner's attorney "had four months" after the counterclaims to assess infringement yet never performed either a formal or informal infringement analysis of any sort. *Id.* In contrast, ALC counsel included a limitation-by-limitation analysis,

even providing an annotation to depict ALC's theory of infringement. Appx0422-0428. Importantly, the patent counterclaim, with its annotation, spurred Raydiant to specify its basis for noninfringement in its answer. Appx0480 (¶2).

*Third*, the court mischaracterized ALC's infringement counterclaim as "exploding" the case scope. Appx0021. That is incorrect. The patent-infringement counterclaim was compulsory under Federal Rule of Civil Procedure 13, and it was essentially a mirror-image claim to Raydiant's declaratory-judgment claim for non-infringement.

The court also did not account for Raydiant's unreasonable refusal of ALC's requested thirty-day extension. *See* Appx0001-0024; Appx2601-2616 (summarizing Raydiant conduct). That extension would have allowed time to eliminate the information asymmetry through discovery (presuming Raydiant cooperated). Before March 4, Raydiant still had not identified any specific non-infringement basis for its DAISY devices. But Raydiant wanted to barrel ahead, Appx2277, and its insistence was seemingly intended to pressure ALC and enable Raydiant to keep churning the billing clock. A reasonable extension would have allowed ALC to

inspect the DAISY devices—assuming Raydiant cooperated—and it would have short-circuited essentially the entire case.

As of February 2025, Raydiant was still withholding evidence of non-infringement, even though it started the litigation. *Cf.* Fed. R. Civ. P. 26(a)(1)(A)(ii) ("[A] party must, without awaiting a discovery request, provide . . . tangible things … to support its claims[.]"). With the pressing deadline for answering, ALC complied with Rule 11 and had conducted a full investigation of all available evidence. Under these circumstances, a court must consider "how much time for investigation was available to the signer" when assessing the pre-filing inquiry was reasonable. Fed. R. Civ. P. 11, advisory committee's note (1983). The court's decision fails to account for Raydiant's imposition of the timing constraint.

Perhaps ALC could have gambled by waiting to amend until after discovery, but that would not have changed the scope of the infringement issues. If it had waited, ALC had no guarantee that Raydiant would have provided full discovery on all its DAISY devices before the deadline to amend. *See* Appx0734-0736 (Raydiant proposing fact discovery to end after the deadline to amend).

- 44 -

*Fourth*, the sanctions order does not address Raydiant's April 22 retreat from its non-infringement position. Raydiant refused to state why "it does not practice each and every limitation of at least Claim 1" of the '408 patent because, according to Raydiant, claim construction was necessary. Appx0807. While after ALC filed its counterclaim, Raydiant's retreat adds credence to the reasonableness of ALC's actions. If non-infringement were as patently clear as Raydiant claimed, answering that interrogatory should have been simple. *See, e.g.*, Appx0487-0507. Instead, Raydiant wanted to wait until July 2025.

*Finally*, the district court's decision is rife with speculation and factual contentions that are inappropriate at the pleading stage and equate to improper burden shifting. The court made much of ALC's mistaken allegation that the '408 patent covers Lucie's KIRA device. Appx0012. As West explained, though, when ALC filed its patent counterclaim, the KIRA device was covered not by the '408 patent but by one of her then-pending patent applications, now issued as the '053 patent, which covers a non-moveable placement marker. Appx2556-2559; Appx2115; Appx2564-2587. ALC corrected its oversight about the KIRA device,

Appx1203. Such a promptly corrected, minor error does not justify Rule 11 sanctions.

The court also attacks the declaration of one of ALC's attorneys in in which she acknowledged that, based on "publicly available" information, infringement could not be "confirm[ed]" or "exclude[d]" with certainty. Appx0009; Appx1189. ALC counsel also relied on West's personal and scientific knowledge, as well as "discussions with Ms. West's prior counsel." Appx1187.

### D. The Annotated DAISY Image Fairly Depicted ALC's Infringement Contention

The district court reserved some of its strongest remarks for ALC's annotation of the DAISY image taken from the YouTube video. Contrary to the court's conclusion, no reasonable, objective factfinder could conclude that the annotated image was "manipulated" evidence.

To begin with, as a matter of law, the infringement contention is not "evidence." It is merely a party's contention, an averment. Appx00427; Appx1013. The infringement chart, which had multiple annotations, is part of the pleading and is not intended to be presented as evidence to the ultimate factfinder, such as the jury, on the question of infringement. Its purpose is to provide notice to Raydiant's counsel about

the infringement claim. The objective reasonableness of the annotation must therefore be assessed from counsel's perspective, having reviewed all the relevant accompanying allegations in the pleading.

Here, that additional context includes the claim chart's multiple snapshots taken from the YouTube video. Appx0422-0428. ALC's December 2024 letter also included a snapshot of the slide showing the unannotated DAISY device. Appx0236-0239. Any reasonable attorney would immediately recognize the claim chart's annotated image as being based on the YouTube slide.

In the annotation itself, ALC used "dashed lines" to augment the underlying DAISY device image. The dashed outline is an obvious depiction of ALC's understanding of how the placement marker *would* move along the DAISY device and thus would infringe the '408 patent. ALC expressly labeled the "dashed lines." The dashed outline (and not a solid shape) is further visual confirmation that it is an annotation and not an image of an actual device.

Further, viewing the image in the full context of the amended complaint further confirms that the image cannot be a depiction of an actual DAISY device. Raydiant and its counsel necessarily knew that ALC did

- 47 -

not have access to the current Raydiant device. Appx1138. Given that

ALC lacked access to the DAISY device, any reasonable attorney would

necessarily conclude that the annotated image is not an image of an ac-

tual DAISY device with the placement marker moved.

If that were not enough, ALC included the YouTube link—down to

the precise minute-and-second timestamp—showing the source image of

the DAISY device upon which the annotation is based. Appx0427. View-

ing the video dispels any possible misconception that the annotated fig-

ure is an image of an actual DAISY device.

| **Image from YouTube Video and December 2024 Letter** | **Image in Infringement Chart** |
|---|---|
|  |  |

Appx0427.

In short, it was clear error for the court to find that the annotated

image "makes it seem like Raydiant's presentation revealed a moveable

placement marker." Appx0011. Perhaps that finding might be reasona-

ble if the annotation did not use a dashed outline, did not use text in a

different font explaining the infringement, did not have the actual

placement marker (shown as solid, non-outline) in its original position, and did not include the YouTube link. No reasonable attorney—reading the entire claim chart with multiple excerpted YouTube images—would objectively believe that the annotation was trickery.

Finally, the court made much of the image being mistakenly filed as black and white, but ALC counsel explained that error. Appx1183-1195. Even without the color, the claim chart contains multiple telltale signs of annotation. Watching the YouTube video via the link would cast aside any remotely conceivable doubt. Any reasonable attorney immediately knows that the image in the claim chart is an annotation.

### E.    ALC's Motion to Dismiss was Reasonable

The district court's findings and conclusions on ALC's motion to dismiss are divorced from the record and exhibit an extraordinarily misplaced speculation about ALC's efforts to end the case in a procedurally correct manner. Appx0014-0020. Each argument was warranted under governing law and the factual record at the time.

#### 1.    Rule 12(b)(1)

The court erred on three key points. First, the covenant not to sue was appropriately tailored based on the evidence. Second, it was

Raydiant's burden to establish continuing declaratory-judgment jurisdiction, and the new evidence suggesting the DAISY's investigational status created a reasonable inference that Raydiant had not met its burden. Third, Raydiant's conflicting information about the DAISY's investigational status led the court down a path into confusion about the proper application of § 271(e)(1)'s safe harbor.

**Covenant Not to Sue.** When it filed its reply supporting the motion to dismiss, ALC satisfied its burden via the voluntary-cessation doctrine under *Already, LLC v. Nike, Inc.*, 568 U.S. 85 (2013). ALC provided a fully executed "unconditional[] and irrevocabl[e]" covenant for all existing products, *i.e.*, the only two DAISY devices Raydiant had disclosed (DSY10 and DSY15).[5] Under these circumstances, ALC's tailored, unconditional covenant mooted all contemplated potential infringement. *See PPG Indus., Inc. v. Valspar Sourcing, Inc.*, 679 F. App'x 1002 (Fed. Cir. 2017) (covenant limited to "currently existing products" sufficient to moot case); *Dow Jones & Co. v. Ablaise Ltd.*, 606 F.3d 1338, 1348 (Fed. Cir. 2010) (same).

---

[5] Note again that Raydiant produced its second device on May 13, after ALC filed its motion to dismiss but before its reply. Appx0960-0961.

In the court's view, though, ALC should have provided a far broader covenant on any possible DAISY device and abandoned any concern about Raydiant's future, undisclosed products. Appx0017-0018. No reasonable patent owner would forgo patent rights to all unidentified future products. Without evidence of non-infringement, ALC counsel could not have reasonably and competently advised their client to grant an overbroad covenant not to sue on any "new prototypes and variants," as the district court suggested. Appx0018.

Raydiant offered no evidence that it intended to make a different DAISY device that might infringe. Appx0891-0922. This was no different than in *Already v. Nike*, where "Already did not assert any intent to design or market a shoe that would expose it to any prospect of infringement liability" "when given the opportunity." 568 U.S. at 94. Based on the evidence as briefed, ALC thus met its "formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 190 (2000).

Rather than decide the motion based on the briefing, the court turned to Raydiant's later self-serving assertion (during the September

hearing) that "Raydiant is actively developing new prototypes and variants of the DAISY device that fall outside the scope of the covenant." Appx0018. This new post-briefing information was revealed more than a month after ALC offered its executed covenant. Thus, if the court had decided the motion based on the evidence presented—including the "unconditional[] and irrevocabl[e]" covenant for all existing products—it should have held that the covenant mooted the dispute.

Importantly, the question here is not whether ALC's covenant mooted the dispute but whether it was a reasonable attempt to moot the litigation. ALC counsel's explanations should have been ample evidence demonstrating ALC's good-faith and reasonable efforts. Appx0941-0972. Instead, the district court turned to speculation when it took "a step back to reflect." Appx0018.

**Burden.** Raydiant had the burden to establish that an ongoing case or controversy existed under the Declaratory Judgment Act throughout the entire case. *E.g.*, *Benitec Australia, Ltd. v. Nucleonics, Inc.*, 495 F.3d 1340, 1344 (Fed. Cir. 2007). When Raydiant revealed the first DAISY device with the "investigational" labeling, ALC raised the safe-harbor issue within two weeks, arguing that Raydiant could no longer

meet its burden to show that Raydiant's device was not subject to the safe harbor and therefore there was no jurisdiction. Appx0830-0845.

ALC of course knew that, in February 2025, Raydiant was "recruiting participants for a clinical trial involving DAISY." Appx0218. But that fact stands among Raydiant's shifting opacity on commercialization. In October 2024, Raydiant's then-CEO Dr. Ray had told potential investors at the Stanford Showcase that the company was commercializing its DAISY device. Appx0217. But in another turn, on January 31, 2025, Raydiant counsel stated that Raydiant had "anxiety" about the dispute because it "is interested in going to market with the DAISY product and is coming out with the product," adding further uncertainty. Appx1765-1766.

Then in February 2025, Raydiant changed its website to specify the DAISY as an "[i]nvestigational device." Appx0797.

CAUTION Investigational device. Limited by Federal (or United States) law to investigational use.

*Id.*; Appx0818-829; Appx0841. That website change was followed by Raydiant producing the single device having the "investigational" regulatory notification. Appx0796-0797. Raydiant also refused to answer

complete discovery about its FDA communications, which could have clarified the regulatory status of the DAISY devices. Appx0806; Appx0841-0842. Raydiant's conflicting statements were enough, in ALC counsel's mind, to cast significant doubt on whether Raydiant could show ongoing jurisdiction because the only DAISY device Raydiant produced was labeled as "investigational." Appx1763-1769.

ALC thus had strong evidence—as of May 2, 2025, when it filed its motion—that the single DAISY device Raydiant produced was "investigational" and subject to § 271(e)(1)'s safe harbor despite being a Class II device. ALC counsel had earlier internally investigated the potential jurisdictional deficiency but waited for more evidence. Appx1764-1765. ALC's motion was therefore not "baseless on its face" and not a "ham-fisted scramble" to avoid fees, as the district court "guess[ed]." Appx1237. The first DAISY device which Raydiant produced for inspection under the misimpression as representative of all DAISY devices was labeled as "investigational" in accordance with FDA regulations.

**The Safe Harbor.** The court erred by treating § 271(e)(1) as straightforward without the safe harbor's fact-dependent complexities. Courts continue to wrestle with its fact-dependent application, noting

that "the safe harbor is available only for acts or uses that bear a reasonable relation to the development and submission of information to the FDA." *Edwards Lifesciences Corp. v. Meril Life Scis. Pvt. Ltd.*, 96 F.4th 1347, 1353 (Fed. Cir. 2024); *Momenta Pharms., Inc. v. Teva Pharms. USA Inc.*, 809 F.3d 610, 614 (Fed. Cir. 2015). Furthermore, the safe harbor "provides a wide berth for the use of patented [inventions] in activities related to the federal regulatory process." *Merck KGaA v. Integra Lifesciences I, Ltd.*, 545 U.S. 193, 202 (2005).

Importantly, courts apply the safe harbor similar to how ALC thought it should apply. *See AbTox, Inc. v. Exitron Corp.,* 122 F.3d 1019, 1030 (Fed. Cir. 1997); *W.L. Gore & Assocs. Inc. v. GI Dynamics Inc.*, No. CV-10-8088-PHXGMS, 2010 WL 5184254, at *6-7 (D. Ariz. Dec. 15, 2010).

Only after ALC filed its motion did Raydiant produce Dr. Ray's declaration asserting that the DAISY device is commercial. Appx0890-0892. Dr. Ray claimed that the product was commercialized on January 8, 2025, Appx0891, but, on January 31, Raydiant counsel represented that, Raydiant had "anxiety" about the dispute because it was interested "in *going to market* with the DAISY product and *is coming out* with the

product." Appx1765-1766 (emphasis added). Based on Raydiant counsel's statement, as of January 31, Raydiant still had not gone to market with the DAISY product, contrary to Dr. Ray's declaration. Plus, on April 22, Raydiant had resisted answering an interrogatory asking about Raydiant's FDA "approvals" and "clearances." Appx2094. Dr. Ray's declaration raises more questions than answers about jurisdiction in view of the other evidence, and the district court overlooked these inconsistencies.

Additionally, Dr. Neil's declaration does not render ALC's jurisdictional argument frivolous. The later-produced declaration might have been a reason to order jurisdictional discovery, for example, but a denied motion based on a later-produced declaration raising disputable facts does not equate to frivolousness. *See United States ex rel. Robinson Rancheria Citizens Council v. Borneo, Inc.*, 971 F.2d 244, 254 (9th Cir. 1992) (reversing Rule 11 sanction because "the district court's view about the clarity of the law" was "erroneous"); *Zaldivar v. City of Los Angeles*, 780 F.2d 823, 830 (9th Cir. 1986) ("[T]he pleader need not be correct in his view of the law.").

### 2.    Rule 41(a)(2)

Equally reasonable was ALC's motion to dismiss under Rule 41(a)(2). "[V]oluntary dismissal is generally deemed an indication of good faith." *Calloway Golf Co. v. Slazenger*, 384 F. Supp. 2d 735, 747 (D. Del. 2005) (Jordan, J.) (quotation omitted).  Even before seeking voluntary dismissal on May 2, ALC's intent to end the case was plain.  There was no reason to keep the counterclaims pending until January 2026. Appx0025.

The motion also established that ALC's counterclaims should have been dismissed.  Appx0844-0845.  Raydiant had no legitimate basis to oppose dismissal of the counterclaims.  Appx0885-0889.  If the court believed that dismissal should have been subject to certain terms, it could have imposed "terms that the court considers proper."  Fed. R. Civ. P. 41(a)(2).  Indeed, during the September hearing, the judge recognized that Raydiant could have agreed that "the case should be dismissed without prejudice" and Raydiant could have "file[d] a two-page motion for summary judgment" in the alternative.  Appx1266; Appx1269-1273.[6]

---

[6] ALC's motion proposed dismissal without prejudice and alternatively with prejudice, and counsel acknowledged the latter and "apologize[d] for

* * *

Rule 11 captures "two competing concerns: the desire to avoid abusive use of the judicial process and to avoid chilling zealous advocacy." *Hudson v. Moore Business Forms, Inc.*, 836 F.2d 1156, 1159-60 (9th Cir. 1987). Rule 11 "is not intended to chill an attorney's enthusiasm or creativity in pursuing factual or legal theories." Fed. R. Civ. P. 11 advisory committee's note. A court is therefore "expected to avoid using the wisdom of hindsight and should test the signer's conduct by inquiring what was reasonable to believe at the time the pleading, motion, or other paper was submitted." *Id.*

"Concerns for the effect on both an attorney's reputation and for the vigor and creativity of advocacy by other members of the bar necessarily require that we exercise less than total deference to the district court in its decision to impose Rule 11 sanctions." *In re Ronco, Inc.*, 838 F.2d 212, 217 (7th Cir. 1988); *see also Mars Steel Corp. v. Continental Bank, N.A.*,

---

that" at the hearing. Appx1253; Appx1145. This mistake is not unprecedented; district court judges have done the same on occasion. *E.g., S. Walk at Broadland's Homeowner's Ass'n, Inc. v. OpenBand at Broadland's, LLC*, 713 F.3d 175, 185 (4th Cir. 2013); Appx1525.

880 F.2d 928, 940 (7th Cir. 1989) (Flaum, J., concurring) ("[N]no single abuse of discretion standard exists.").

### F.     The Lanham Act Counterclaim was Not Frivolous or Exceptional

The sanction based on the false-advertising claim should also be reversed, as it rests on only the "commercial speech" element. Appx0013-0014. The ruling misapplies Ninth Circuit law.

*First*, the sanctions order rests on a clearly erroneous statement. Appx0014. The court incorrectly stated that ALC did not make any "comparable allegations that the Stanford Showcase slides are … or otherwise disseminated to potential customers." *Id.* That conclusion overlooks ALC's allegations that Dr. Ray's false statements were widely disseminated on YouTube. Appx0217 (¶39).

The YouTube broadcasting of Dr. Ray's false statements further strengthened the plausibility of ALC's claim. *See FedEx Ground Package Sys., Inc. v. Route Consultant, Inc.*, 661 F. Supp. 3d 765, 778-81 (M.D. Tenn. 2023) (declining to dismiss on commercial-speech grounds where statements were posted on YouTube).

*Second*, treating the false-advertising claim as sanctionable—without an opportunity to amend—runs counter to cases involving similar

false statements.  *E.g.*, *OrthoAccel Techs., Inc. v. Propel Orthodontics, LLC*, No. 4:16-CV-00350-ALM, 2017 WL 1495177, at \*1-3 (E.D. Tex. Apr. 26, 2017) (denying summary judgment for false statements about marketing a 510(k)-exempt device as "cleared" or "approved").

Neither the court nor Raydiant identified a single case where a similar Lanham Act claim—presented one time and then withdrawn—was deemed sanctionable or exceptional based on an unsettled legal doctrine. Appx0013-0014; Appx0975-0995; Appx1081-1101; Appx1212-1223.  Indeed, the commercial-speech analysis is "fact-driven, due to the inherent difficulty of drawing bright lines that will clearly cabin commercial speech in a distinct category." *Ariix, LLC v. NutriSearch Corp.*, 985 F.3d 1107, 1115 (9th Cir. 2021).  "[T]he law is not 'clear' about 'what type of speech qualifies as commercial speech." *Exeltis USA Inc. v. First Databank, Inc.*, 520 F. Supp. 3d 1225, 1229 (N.D. Cal. 2021) (quotation omitted).  After all, "the domain of colorable arguments is broader when the law is unsettled." *Gust, Inc. v. Alphacap Ventures, LLC*, 905 F.3d 1321, 1328 (Fed. Cir. 2018).

*Third*, although ALC need not prove the plausibility of its false-advertising claim to establish reversible error, the claim was entirely

plausible.  Dr. Ray  falsely stated that the DAISY device was, *inter alia*, "cleared" and "approved."  Appx0217; Appx0223-0224.  In the context of the Showcase and its YouTube broadcast, it was reasonable to infer that Dr. Ray made those statements in pursuit of economic advantage, *i.e.*, the "fundraising prize."  Appx0993.[7]

ALC's false-advertising claim aligns with cases treating materially false statements made for economic advantage—including fundraising-related statements—as at least plausible.  *See, e.g.*, *Seven-Up Co. v. Coca-Cola Co.*, 86 F.3d 1379, 1386 (5th Cir. 1996); *World Wrestling Federation Entertainment, Inc. v. Bozell*, 142 F. Supp. 2d 514, 526 (S.D.N.Y. 2001) (finding commercial speech for "a fundraising video" and "fundraising letters"); *Gordon & Breach Sci. Publishers S.A. v. Am. Inst. of Physics*, 859 F. Supp. 1521, 1535 (S.D.N.Y. 1994) (observing that commercial speech has been found for "the fundraising letters of a non-profit pregnancy counseling group" and "the distribution of marketing information to retailers at a trade show").

---

[7] West's company Lucie Medical also presented at the Showcase, receiving the top prize of $50,000, and Raydiant did not.  Appx0217.

Raydiant acknowledged that the Stanford Showcase was a "fund-raising prize competition," or "pitch competition," in which the goal was a financial benefit. Appx0993. Fundraising efforts, depending on evidence developed in discovery, can satisfy the commercial-speech element of a viable false-advertising claim—particularly when the false statements were made in pursuit of financial gain. *See, e.g.*, *Gordon & Breach*, 859 F. Supp. at 1534-35.

The district court relied on *Realtek Semiconductor Corp. v. MediaTek, Inc.*, 769 F. Supp. 3d 1067 (N.D. Cal. 2025), but the facts there are materially different. A party failed to state a valid false-advertising claim because the "private statements" were made individually to third parties and were not "disseminated widely" "within the industry." *Id.* at 1097. In contrast, Dr. Ray widely disseminated his false FDA-approval statements on YouTube and to industry participants at the Stanford Showcase. Appx0217; Appx0993.

*Fourth*, if necessary, ALC could have amended its allegations to remedy any perceived shortcoming. Appx2547. The court took no account of this fact. Courts rarely impose Rule 11 sanctions for a non-amended false-advertising claim based on an undisputedly false

statement based on the commercial-speech doctrine. That's why, in *Realtek*, the court dismissed the claims without prejudice and allowed the party to file an amended complaint "[s]hould discovery reveal additional evidence." 769 F. Supp. 3d at 1098.

*Finally*, even if the false-advertising claim were deficient, that alone does not establish sanctionable conduct. *E.g.*, *United Nat'l Ins. Co. v. R&D Latex Corp.*, 242 F.3d 1102, 1117 (9th Cir. 2001) (argument not sanctionable when "[c]ounsel also had some plausible basis, albeit quite a weak one" for the argument).

## G.    Raydiant's Unreasonable Tactics

Imposing fees as a sanction or as fee-shifting is an exception to the American Rule. At its base, it is an exercise of discretion and equity. *Hall v. Cole*, 412 U.S. 1, 4-5 (1973); *Nat'l Presto Indus., Inc. v. West Bend Co.*, 76 F.3d 1185, 1197 (Fed. Cir. 1996) (considering "any other factors whereby fee shifting may serve as an instrument of justice"). Here, awarding Raydiant any fee amount contravenes justice given its continuous and unreasonable conduct—including false statements, misrepresentations, and unanswered questions about why it recently removed the

**CONFIDENTIAL MATERIAL OMITTED**

DAISY devices from its website in the wake of FDA's investigation. Appx2616-2670; Appx2610; Appx2641; Appx2645.

*First*, Raydiant's misrepresentations and conduct obfuscated the key issue: whether all its DAISY devices are non-infringing. From the beginning, Raydiant and its counsel created the false impression that it had only a single DAISY device, but that misdirection quickly unraveled. Once ALC and its counsel discovered that Raydiant was not being candid in discovery, they had every reason to be skeptical, especially because West knew that Raydiant tried to misappropriate her technology and was interested in developing a device with a Technical Information. Appx2553-2562. ALC's covenant and its later proposed consent judgment were appropriately tailored. Appx0963-0964; Appx2045.

*Second*, Raydiant's actions were extraordinarily unusual from the start. It could have resolved the infringement contention with a simple letter and a device inspection, but it instead voluntarily started the litigation and immediately ran up unnecessary legal costs. None of it made sense, especially given that Raydiant's counsel accused ALC (without a factual basis) of being an "undercapitalized shell company." Appx0488;

- 64 -

**CONFIDENTIAL MATERIAL OMITTED**

Appx0935.   But in hindsight, Raydiant's plan to extract a **Negotiation Term** explains Raydiant's actions that extended the litigation.

*Third*, Raydiant's aggressive litigation tactics continued long after the infringement dispute had effectively resolved.   In November 2025, Raydiant opposed ALC's revised consent judgment, without identifying any DAISY devices not covered by the consent judgment.   Appx2038; Appx2612-2613; Appx2619-2624.   It opposed ALC's motion to stay the sanction order, even after ALC obtained a bond.   Appx1771-1783; Appx1915-1924; Appx2281-2284; Appx2304-2305; Appx2323-2328.   Staying enforcement of a money judgment is the standard approach when a party posts a supersedeas bond.  *Am. Mfrs. Mutual Ins. Co. v. Am. Broadcasting–Paramount Theatres, Inc.*, 87 S. Ct. 1, 3 (1966) (Harlan, J.) (recognizing as "accepted" that an appellant "is entitled to a stay of a money judgment as a matter of right if he posts a bond").

Raydiant also refused to explain its removal of the DAISY devices from its website.  Appx2546; Appx2610-2611; Appx2641-2645; Appx2651-2655.  Perhaps the removal was tied to the earlier website update labeling the DAISY device as "investigational," indicating that the devices cannot be commercially marketed.  But that would conflict with Dr. Ray's

declaration and counsel's representations of continued developments. Appx0890-0892. Raydiant's earlier statements, if factually misleading, would themselves be sanctionable. *See Truesdell v. S. Cal. Permanente Med. Grp.*, 293 F.3d 1146, 1153 (9th Cir. 2002); Fed R. Civ. P. 11(b)(3).

Perhaps Raydiant removed the devices because of West's newer '053 patent, which is broader than the '408 patent. Appx2554. Raydiant never provided answers.

To grant Raydiant any amount of fees—whether as a sanction or as a fee-shifting award—would be a gross miscarriage of justice. *Cf. Gaymar Indus., Inc. v. Cincinnati Sub-Zero Prods., Inc.*, 790 F.3d 1369, 1373 (Fed. Cir. 2015) ("[T]he conduct of the parties is a relevant factor under *Octane*'s totality-of-the-circumstances inquiry, including the conduct of the movant.").

## H. Additional Legal Errors in the Sanctions Decision

### 1. The Rule 11 Motion was Partially Procedurally Barred

A Rule 11 motion "must not be filed or be presented to the court if the challenged paper, claim, defense, contention, or denial is withdrawn or appropriately corrected within 21 days after service." Fed. R. Civ. P. 11(c)(2). Here, ALC moved to withdraw its counterclaims well before

the 21-day safe harbor expired.  ALC filed its motion to dismiss the counterclaims on May 2—one month before Raydiant served its Rule 11 notice letter on June 3 and seven weeks before Raydiant filed its Rule 11 motion.  Appx1177.  ALC's motion should have barred, as a matter of law, Raydiant's request for sanctions based on ALC's counterclaims because the counterclaims were "withdrawn or appropriately corrected" even before the safe-harbor period.

This case falls within the rule espoused in other cases where a party's motion to dismiss a challenged claim triggers Rule 11(c)(2)'s safe harbor.  *E.g.*, *Sneller v. City of Bainbridge Island*, 606 F.3d 636, 640 (9th Cir. 2010) ("Because their motion was filed within the 21-day safe harbor period, the Snellers complied with Rule 11's requirement that the challenged claim be 'withdrawn or appropriately corrected.'"); *AeroTech, Inc. v. Estes*, 110 F.3d 1523, 1528-29 (10th Cir. 1997) (holding Rule 11 sanctions unavailable when plaintiff moved to voluntarily dismiss its claims before Rule 11 motion filed); *Holgate v. Baldwin*, 425 F.3d 671, 677-79 (9th Cir. 2005).

Notably, Raydiant's Rule 11 motion did not acknowledge or address how the safe-harbor rule applied here.  *See* Appx0975-0995.  Raydiant

has thus forfeited any argument that its Rule 11 motion based on the counterclaims is not barred by Rule 11(c)(2). The only portion not barred by the safe harbor is Raydiant's argument that the motion to dismiss was frivolous.[8]

### 2. No Basis for Sanctions under § 1927 or Inherent Authority

An imposition of sanctions under 28 U.S.C. § 1927 or a court's inherent powers is "an extraordinary remedy, one to be exercised with extreme caution." *Keegan*, 78 F.3d at 437*; Primus Auto. Fin. Servs., Inc. v. Batarse*, 115 F.3d 644, 649 (9th Cir. 1997) (inherent-authority sanctions "should be reserved for the rare and exceptional case"). The moving party bears the burden to demonstrate why sanctions are justified. *Tom Growney Equip., Inc. v. Shelly Irrigation Dev., Inc.*, 834 F.2d 833, 837 (9th Cir. 1987).

Sanctions under § 1927 or inherent authority require a showing of subjective bad faith. *Haeger*, 793 F.3d at 1132; *Keegan*, 78 F.3d at 437. Thus, the sanctions—to the extent they rest on § 1927 or inherent

---

[8] The district court characterized ALC's opposition based on the Rule 11 safe harbor as a "creative-yet-frivolous effort[] to avoid liability," Appx0018 n.5, but the court cited no cases to support its rejection of ALC's application of the Rule 11 safe harbor, *see* Appx0018.

authority—should be reversed because there is no evidence of subjective bad faith and certainly not clear and convincing evidence.

*First*, the court's ruling on sanctions under § 1927 and inherent authority focuses narrowly on ALC's motion to dismiss and rests largely on the same findings and reasoning for the Rule 11 sanctions. If this Court holds that the conduct is not frivolous under Rule 11, then the Court should reverse the § 1927 and inherent-authority sanctions.

*Second*, there is no evidence of bad faith, let alone clear and convincing evidence of bad faith. Raydiant did not identify specific bad-faith conduct, and it cited no cases equating ALC's actions as satisfying the bad-faith standard. Appx1222. Nor is there an "inference" of bad faith because ALC did not "continu[e] to assert infringement in court." *Eltech Sys. Corp. v. PPG Industries, Inc.*, 903 F.2d 805, 811 (Fed. Cir. 1990). The Ninth Circuit has not resolved whether § 1927 and inherent-authority sanctions require clear and convincing evidence, but courts in the Ninth Circuit frequently apply that standard. *E.g.*, *In re Facebook, Inc. Consumer Priv. User Profile Litig.*, 655 F. Supp. 3d 899, 925 (N.D. Cal. 2023) (Chhabria, J.). While the record has no evidence of bad faith, the Court

should also hold that the bad-faith findings cannot be affirmed under the clear-and-convincing standard that should apply.

The district court's findings (limited to two pages) largely rehash the same points as for the Rule 11 issue. Appx0019-0020. According to the court, ALC counsel "vexatiously multiplied these proceedings" by continuing to pursue the counterclaims and by supposedly "scrambling to prevent Raydiant from becoming the 'prevailing party.'" Appx0019. In the court's view, there was "only [one] rational course of action to end the dispute: agreeing to dismiss with prejudice" the counterclaims and "allowing Raydiant to seek fees as the prevailing party." *Id*. But those conclusions overlook a host of facts—some contested and some not.

The district court's "only rational course" finding entirely overlooks Raydiant's misleading representations about multiple Raydiant DAISY devices. The sanctions order presents a superficially powerful narrative, but that too rests on the mistaken view that only a single DAISY device existed. At no point in time did Raydiant ever represent that it produced all representative DAISY devices. Appx1997-1998.

For this reason, there is no evidence of bad faith with respect to ALC's infringement counterclaim. Under the circumstances—where

**CONFIDENTIAL MATERIAL OMITTED**

Raydiant concealed evidence, delayed in making DAISY devices available for inspection, and refused a reasonable extension of time—ALC's mirror-image compulsory counterclaim does not prove bad faith. While the court's opinion speculates about ALC's motives, speculation is not evidence of bad faith. *ThermoLife International, LLC v. Gaspari Nutrition Inc.*, 648 F. App'x 609, 618 (9th Cir. 2016) ("[E]vidence was too speculative [for] bad faith.").

The same applies to ALC's executed covenant not to sue and its later proposed consent judgment. ALC's proposed consent judgment, offered a resolution for all non-infringing devices. Appx2045. ALC counsel repeatedly asked Raydiant counsel to explain why it was unsatisfactory, and counsel's response aligned with Raydiant's earlier request for ███ **Negotiation Term**. Appx2026-2065.

The district court also stated that ALC "offered dismissal contingent on unreasonable terms, like Raydiant's meritorious declaratory judgment claim also being thrown out and ALC Medical's being shielded from liability for attorneys' fees." Appx0020. That mischaracterization aside, "unreasonable" is not the same as subjective bad faith.

Even if ALC should have been more capitulating to Raydiant's demand for a broad pass on all future infringement, that does not establish ALC counsel's subjective bad faith.  Counsel made judgment calls where reasonable minds may differ.  But any purported error due to mere negligence is not sanctionable under § 1927 or inherent authority.  *Blumberg v. Gates*, 152 F. App'x 652, 654 (9th Cir. 2005); *Amlong & Amlong, P.A. v. Denny's, Inc.*, 500 F.3d 1230, 1239 (11th Cir. 2007).

*Third*, to the extent that the § 1927 sanction is premised on ALC's answer and counterclaims, that is reversible error.  *Keegan*, 78 F.3d at 435; *Gust*, 905 F.3d at 1328.

## III.  The Court Erred When Striking Evidence Revealing Raydiant's Litigation Motive

When ruling on the attorney's fees motion, the court erroneously excluded an email and associated briefing revealing Raydiant's desire for a  Negotiation Term  to ALC's patents.  Appx0026-0027; Appx2659-2661.  Raydiant's motive, established by the email, is highly relevant to assessing its aggressive litigation conduct and the reasonableness of ALC's actions in response.

Ninth Circuit law is clear: Evidence probative of a party's litigation conduct is relevant to a fees motion and is not barred under Federal Rule

of Evidence 408. *E.g.*, *A.D. v. Cal. Highway Patrol*, 712 F.3d 446, 460-61 (9th Cir. 2013) ("Federal Rule of Evidence 408 does not bar district courts in the Ninth Circuit from considering amounts discussed in settlement negotiations as evidence of the extent of the plaintiff's success."); *Ingram v. Oroudjian*, 647 F.3d 925, 927 (9th Cir. 2011).[9] District courts in the Ninth Circuit routinely "consider settlement discussions when determining whether to award attorney's fees." *World Axe Throwing League, Inc. v. Cold Steel, Inc.*, No. LA CV20-11407 JAK (EX), 2023 WL 12065783, at *4 (C.D. Cal. Dec. 28, 2023).

Here, Raydiant's demand for a **Negotiation Term** undermines Raydiant's assertion about West's patent technology being dangerous. Recall that Raydiant's witness Don Hannula asserted, without any literature support, that a device having a moveable placement marker would be "hazardous" and contrary to "common sense." Appx1037. Raydiant's lead counsel repeated that unsupported assertion. Appx0704. Raydiant's demand for a **Negotiation Term** undermines those assertions. *See* Appx2660. That inconsistency is probative of not only

---

[9] Ninth Circuit law aligns with other circuits' law. *E.g.*, *Lohman v. Duryea Borough*, 574 F.3d 163, 167 (3d Cir. 2009); Appx2787-2794.

"Raydiant's litigation strategy," but also ALC's skepticism toward Raydiant's representations. Appx1157. No reasonable litigant would want to ███Term███ technology that it claims is "hazardous" and common-sense defying—unless one of its devices might infringe.

Even if there were doubt about the email's relevancy, Raydiant itself opened the door to settlement-discussion evidence when it included, in its bond motion, ALC's March 2025 letter seeking to pause the case and offering a covenant not to sue. Appx0689-0691; Appx0992-0993; *see also* Appx0435-0444. The excluded email adds necessary context about Raydiant's litigation motives and conduct, as well as the unreasonableness of Raydiant's requested fees. Raydiant's desire for a ███Negotiation Term███ is also evidence that Raydiant, not ALC, was "multipl[ying] the proceedings" "unnecessarily." The exclusion of this evidence was therefore highly prejudicial to ALC, and the district court should have considered the email when evaluating Raydiant's litigation conduct and any fee-shifting equities.

## IV. The Court's Decision On § 285 And § 1117 Is Legally Erroneous

Raydiant sought fees against ALC only, not counsel. Appx2496. The court's *sua sponte* imposition of fee-award liability is error for

multiple reasons, including violating the party-presentation principle, *Clark v. Sweeney*, 146 S. Ct. 410, 412 (2025) (per curiam), and Womble Bond's due process rights, *Arnett v. Kennedy*, 416 U.S. 134, 178 (1974).

Additionally, Womble Bond cannot be liable for fees under 35 U.S.C. § 285. There is "no basis in [Federal Circuit] precedent to allow [prevailing parties] to recover § 285 fees from counsel." *Dragon Intell. Prop. LLC v. DISH Network L.L.C.*, 101 F.4th 1366, 1372 (Fed. Cir. 2024).

The Ninth Circuit "interpret[s] the fee-shifting provisions in the Patent Act, 35 U.S.C. § 285, and the Lanham Act in tandem." *Sunearth, Inc. v. Sun Earth Solar Power Co.*, 839 F.3d 1179, 1180 (9th Cir. 2016) (en banc). Because § 1117, like § 285, "does not mention an award against the losing party's attorney, the appropriate inference is that an award against attorneys is not authorized." *Heckethorn v. Sunan Corp.*, 992 F.2d 240, 242 (9th Cir. 1993) (assessing Rule 41(a)(2)). Womble Bond therefore cannot be liable under § 1117.

Third, the court did not make separate findings under the exceptional-case standard and instead relied solely on its sanctions findings. If the sanctions findings are clearly erroneous, then there is no independent basis to affirm the exceptional-case ruling. Raydiant's motion for fees

merely repeated arguments it raised in its sanctions briefs. Nor could such work be exceptional. ALC successfully moved for a stay of the sanctions order. Appx1938. ALC's oppositions to the motion for judgment on the pleadings and the motions for fees are well-reasoned and meticulously researched. Appx1982-2001; Appx2531-2550. That did not stop Raydiant from claiming that every single submission filed by ALC was frivolous, including the successful stay motion. Appx2486-2496; Appx2531-2550; Appx2759-2764. For these reasons, the court's exceptional-case ruling should be reversed.

## V. The Amount Of Fees Awarded Is An Abuse Of Discretion

The amount of fees awarded or imposed as a sanction is a clear abuse of discretion for multiple reasons.

### A. No Exceptional Case for Post-Sanctions Work

The February 2026 order has no explanation on why the amount for work post-dating the sanctions decision is reasonable. Courts have discretion in awarding fees, but it is not unfettered, and a court must provide an explanation. Here, the court abused that discretion when imposing millions of dollars in fees, without explanation and without reviewing invoices.

## B.    No Billing Records

ALC could not meaningfully challenge the amount Raydiant sought.  The record contains no invoices or detailed billing records to explain how, for example, Raydiant's counsel billed over $600,000 in fees in the first few months with no discovery.  It was Raydiant's burden to "document[] the appropriate hours" supported by "evidence in support of those hours worked." *Gates v. Deukmejian*, 987 F.2d 1392, 1397 (9th Cir. 1992).

This case is like others where an opposing party has the right to meaningfully review the evidence filed in support of a fee request.  *E.g.*, *MGIC Indem. Corp. v. Weisman*, 803 F.2d 500, 505 (9th Cir. 1986) (remanding because timesheets should have been made available so plaintiffs were "given the opportunity to challenge them"); *Lahiri v. Universal Music & Video Distribution Corp.*, 606 F.3d 1216, 1222 (9th Cir. 2010) (reviewing "contemporaneous billing records").  Although several Ninth Circuit rulings do not mandate invoices or timesheets, those cases typically involve much lower fee awards or have detailed declarations describing the attorney activities supporting the fee award.

Furthermore, a district court must "provide a concise but clear explanation for its reasons for the fee award." *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983); *Innovation Techs., Inc. v. Splash! Med. Devices, LLC*, 528 F.3d 1348, 1350-51 (Fed. Cir. 2008). The attorney's fee order gives no such reason, other than referencing the sanctions order. The fee order does not explain why the amount awarded for activity *before* February 11, 2025, and from September 2025 through January 2026 is reasonable under § 285 or § 1117. The court's order even granted fees for Raydiant's unsuccessful opposition to ALC's successful motion to stay the sanctions order. Further, Raydiant chose to seek fees without submitting any billing invoices or records.

## C.   The Amounts are Punitive and Grossly Excessive

For Rule 11, a monetary sanction "must be limited to what suffices to deter repetition of the conduct." Fed. R. Civ. P. 11(b)(4). Under § 1927 and inherent authority, a party may recover "only the portion of [its] fees that [it] would not have paid but for" the misconduct. *Fox v. Vice*, 563 U.S. 826, 836 (2011); *Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101, 108 n.5 (2017). Here, the record lacks the but-for nexus.

Here, there is no evidence that a $1.4-million penalty is necessary to deter the two specified bases for Rule 11: (a) filing the counterclaims, one of which was compulsory; and (b) filing the motion to dismiss. Monetary fines under Rule 11 are typically far lower. *E.g.*, *Lamboy-Ortiz v. Ortiz-Velez*, 630 F.3d 228, 249 (1st Cir. 2010) (reducing attorney's fees under § 1927 from $64,936 to $5,000, as it exceeded what would be reasonably necessary to deter future behavior). Appellants proposed a sanction of $72,455.49 as sufficient. Appx1291-1303. The district court rejected that number and went nearly twenty times higher, with little explanation.

Moreover, the lack of detailed factual findings contravenes the demanding but-for standard. The district court's "fundamental job is to determine whether a given legal fee—say, for taking a deposition or drafting a motion—would or would not have been incurred in the absence of the sanctioned conduct." *Goodyear*, 581 U.S. at 109-10. "[S]uch a sanction, when imposed pursuant to civil procedures, must be compensatory rather than punitive in nature." *Id.* at 108.

Here, a proper analysis should have found a lack of but-for causation for the amounts imposed. For one, Raydiant initiated suit by filing

an ultimately unnecessary declaratory-judgment action. All Raydiant had to do—instead of initiating an expensive legal process and running up $600,000 in just a few months—was to send a letter explaining that all its multiple DAISY devices use a fixed placement marker. Raydiant withheld this crucial evidence for months.

While a court can, in certain cases, impose a sanction that "shift[s] all of a party's fees . . . in one fell swoop," *id.* at 110, the present case is not one of them, for several reasons. Raydiant started the litigation. Raydiant's counsel refused a reasonable extension in answering the complaint. Raydiant withheld evidence solely within its control. That evidence would have resolved the disputed infringement claim or at least mitigated the uncertainty enveloping the multiple DAISY devices. For each action—and specifically for ALC's motion to dismiss—ALC considered all information available at the time and presented reasonable arguments to effect dismissal and end the case.

Moreover, "if a court finds that a lawsuit, absent litigation misconduct, would have settled at a specific time—for example, when a party was legally required to disclose evidence fatal to its position—then the court may grant all fees incurred from that moment on." *Goodyear*, 581

U.S. at 110-11. That guidance underscores the district court's flawed decision. Raydiant delayed in disclosing its evidence of non-infringement, notably not specifying a basis for noninfringement in its case-initiating complaint. Had Raydiant disclosed all its devices, *e.g.*, in response to the December 2024 letter or before ALC's answering deadline of February 11, that would have been the end of the dispute.

Finally, the magnitude of the fees imposed here contrasts sharply with the same court's earlier approach. *See Segan LLC v. Zynga Inc.*, 131 F. Supp. 3d 956 (N.D. Cal. 2015) (Chhabria, J.). There, the court imposed $1.2 million as a sanction, but the litigation (started by the patent owner) proceeded through full discovery, and the patent owner lost on summary judgment. *Id.* at 957. Here, in contrast, Raydiant started the litigation, very little discovery occurred, and ALC reassessed its infringement claim early, in March 2025, just three weeks after receiving Raydiant's answer to the patent-infringement counterclaim. While not dispositive, the contrast between the two cases highlights the unreasonableness of the fees awarded here.

## VI.    Conclusion

This Court should reverse the sanctions and the § 285 and § 1117 exceptional-case rulings and reverse any fee award.  At a minimum, the Court should vacate and remand on the fee award.


Date: June 8, 2026

Respectfully submitted,

By: */s/ Matthew J. Dowd*
Matthew J. Dowd
Robert J. Scheffel
Elliot A. Gee
Morris D. Young
Dowd Scheffel PLLC
1717 Pennsylvania Avenue, NW
Suite 1025
Washington, D.C. 20006
mdowd@dowdscheffel.com

Matthew K. Blackburn
Womble Bond Dickinson (US) LLP
50 California Street
Suite 2800
San Francisco, CA 94111

Christine H. Dupriest
Womble Bond Dickinson (US) LLP
1331 Spring Street, NW
Suite 1400
Atlanta, GA 30309

Barry J. Herman
Womble Bond Dickinson (US) LLP
100 Light Street, 26th Floor

Baltimore, MD 21202

*Counsel for Appellants*

# ADDENDUM

## ADDENDUM TABLE OF CONTENTS

**Page(s)**

Order re Sanctions and Motion to Dismiss (Oct. 29, 2025)
(Dkt. 92)..............................................................................Appx0001

Order Granting Raydiant's Motion for Judgment On The
Pleadings (Jan. 14, 2026) (Dkt. 130).....................................Appx0025

Order Regarding Bill of Costs and Motion for Attorneys' Fees
(Feb. 27, 2026) (Dkt. 144) ......................................................Appx0026

Order Denying ALC's Request for Court Clarification
(Sept. 30, 2025) (Dkt. 91).......................................................Appx0028

U.S. Patent No. 11,839,408 (Jan. 10, 2025) (Dkt. 1-1) ...............Appx0029

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RAYDIANT OXIMETRY, INC.,<br><br>Plaintiff,<br><br>v.<br><br>ALC MEDICAL HOLDINGS LLC,<br><br>Defendant. | Case No.  25-cv-00392-VC<br><br>**ORDER GRANTING RAYDIANT OXIMETRY'S MOTIONS FOR SANCTIONS AND DENYING ALC MEDICAL'S MOTION TO DISMISS**<br><br>Re: Dkt. Nos. 44, 63, 65 |

This dispute began when ALC Medical Holdings sent Raydiant Oximetry a demand letter alleging that Raydiant's medical device infringed ALC Medical's patent. This accusation was false. Raydiant's device has a "placement marker" that is permanently affixed, while the device claimed in ALC Medical's patent requires an adjustable placement marker. In fact, the Patent and Trademark Office declined to approve the patent application until it was narrowed to require that the placement marker be adjustable.

Unfortunately, patent plaintiffs send baseless demand letters to defendants with some regularity. But this was no ordinary fishing expedition. To the contrary, all evidence available to ALC Medical and its lawyers at the time they sent the letter pointed strongly towards noninfringement. The sole founder of ALC Medical, Jennifer West, used to work at Raydiant. She helped develop Raydiant's device and knew that it did not have a moveable placement marker. There was a reason for this design choice: Raydiant concluded that if the device's placement marker were moveable, it would be dangerous to the patients who use it. Presumably for the same reason, the device West developed after she left Raydiant does not contain a moveable placement marker, even though her company's patent requires one.

**Appx0001**

Thus, when Raydiant brought an action in this Court seeking a declaratory judgment of noninfringement, ALC Medical and its lawyers should have apologized and walked away. They should have realized that, whatever bad blood existed between West and her former employer, it did not justify their false infringement allegation. Instead, they doubled down. They brought counterclaims against Raydiant, including one for infringement, asserting again that Raydiant's device possessed a moveable placement marker. They also falsely alleged that West's own device practiced the invention—that is, that her device had a moveable placement marker.

In support of the infringement counterclaim, ALC Medical and its lawyers submitted several diagrams depicting Raydiant's device. On each diagram, they cited the YouTube video of a presentation Raydiant gave at an industry conference, indicating that the diagrams originated from the slide deck used in that presentation. But that was not entirely true. The lawyers manipulated one of the diagrams, superimposing dotted lines to make it seem like Raydiant's device had a moveable placement marker. Nothing in Raydiant's actual slide deck or the video of the presentation suggested that was the case.

Subsequently, Raydiant allowed ALC Medical and its lawyers to inspect the device. The inspection confirmed what all the evidence had previously suggested: the placement marker was not moveable. Again, at this point, one would have expected ALC Medical and its lawyers to drop the infringement counterclaim unconditionally. Instead, they embarked on a ham-fisted scramble to avoid liability for Raydiant's attorneys' fees. First, they refused to dismiss their infringement counterclaim (or their equally frivolous false advertising counterclaim) unless Raydiant also agreed to dismiss its declaratory judgment action, with each side to bear its own fees and costs. Naturally, Raydiant refused. Then, ALC Medical and its lawyers filed a frivolous motion to dismiss Raydiant's declaratory relief action for lack of jurisdiction, claiming falsely that Raydiant's device was an "investigational device" immune from infringement claims. Later, they cobbled together a covenant not to sue that they argued mooted Raydiant's declaratory relief claim, even though it clearly did not. At each step of the way, the position taken by ALC Medical and its lawyers became increasingly disconnected from the reality of the situation, in a

2

**Appx0002**

way that would have made even SNL's Tommy Flanagan blush.[1]

For all this, ALC Medical and its lawyers must be sanctioned. Raydiant is entitled to recover $1,437,075.80 in attorneys' fees. ALC Medical and Womble Bond are jointly and severally liable for this award.

## I.    FACTUAL AND PROCEDURAL HISTORY

Raydiant Oximetry is a biomedical engineering and healthcare company specializing in creating devices to improve maternal and fetal safety during childbirth. Raydiant is represented by the law firm Greenberg Traurig in this dispute. ALC Medical Holdings is a single-member LLC, with Jennifer West being the sole shareholder. ALC Medical is represented by the law firm Womble Bond Dickinson, with a case team primarily consisting of Womble Bond partners Christine H. Dupriest, Matthew Blackburn, and Barry J. Herman.

### A.

In November 2021, West began working as a consultant for Raydiant. Soon after, she was hired full-time as Raydiant's Vice President of Market Development. In that role, West oversaw the development of Raydiant's postpartum uterine device, which later became known as DAISY. The DAISY device uses suction technology to treat postpartum hemorrhage, which refers to severe bleeding during childbirth and is commonly associated with C-section deliveries. The DAISY device contains a "placement marker" designed to keep the device in place in a patient's uterine cavity during surgery. This placement marker is permanently bonded to a suction tube that removes excess blood from the patient during surgery. Raydiant settled on this design choice for patient safety purposes, as it was concerned that if the placement marker were not permanently attached to the suction tube on the DAISY device, the piece could get dislodged and left in the patient's uterus upon vaginal removal of the device. Hannula Decl. ISO Mot. for Sanctions (Dkt. No. 63-9) ¶ 32.

From the initial conception of the DAISY device to its current iteration, an attached

---

[1] *Cold Openings: Tommy Flanagan - Saturday Night Live*, YouTube (Sept. 25, 2013), https://www.youtube.com/watch?v=Qz6wHELTkr8.

placement marker has always been part of the design. *Id.* ¶ 19. West herself personally reviewed and approved the design with an attached placement marker during her time at Raydiant. In one email exchange with other Raydiant employees, West declared that the permanently bonded DAISY design was "just stunning." September 27, 2022, Email (Dkt. No. 63-12) at 2. West also was responsible for creating the illustration of the DAISY product, including the attached placement marker, that was sent to the FDA for pre-submission approval in October 2022. The FDA pre-submission process allows inventors to request feedback and guidance from the FDA regarding the classification of their medical devices to help determine whether they must seek formal approval before putting the device on the market.

Over the course of West's employment, a rift formed between her and Raydiant regarding patent application No. 63/328,257 for a postpartum hemorrhage treatment device. On April 6, 2022, the '257 Application was filed, listing West as a co-inventor along with several other Raydiant employees. Later that year, Raydiant presented West with an employment agreement that affirmed assignment of the rights to the device and its associated intellectual property to Raydiant. West refused to sign the agreement and instead sent a letter to Raydiant through her counsel asserting sole ownership of the invention identified in the '257 Application, which she claimed was entirely derived from her January 2022 invention of the product that later became the DAISY device. West ultimately agreed to take a leave of absence from Raydiant, and the two parties entered settlement negotiations. West was terminated by Raydiant on March 3, 2023.

Shortly after officially severing ties with Raydiant, West filed her own patent application claiming priority to the '257 Application. On December 12, 2023, West's application was approved and issued as patent No. 11,839,408. Every claim of the '408 Patent was amended during prosecution to require that the placement marker be moveable rather than fixed:

> a placement marker, the placement marker being configured for movement along the suction line extension for personalization of the postpartum hemorrhage mitigation device to a size of the uterus, the placement marker covering one or more ports.

'408 Patent (Dkt. No. 18-7) at 21. After leaving Raydiant, West formed ALC Medical and

4

Appx0004

developed her own postpartum hemorrhage treatment device called KIRA. While ALC Medical originally alleged in its counterclaims that the KIRA device practiced the '408 Patent and possessed an adjustable placement marker, *see* Countercls. (Dkt. No. 18) ¶ 43, West later admitted that it does not, *see* West Decl. ISO Opp'n to Sanctions Mot. (Dkt. No. 73-8) ¶ 16.

In the time since West left the company, the FDA reviewed Raydiant's pre-submission of the DAISY device and agreed in September 2023 that it was a Class II medical device exempt from pre-market notification and approval requirements. Raydiant later filed patent application No. 18/756,562 for the DAISY device on June 27, 2024. Raydiant is currently conducting a post-market Institutional Review Board-approved clinical study of the DAISY device. It has also begun to sell the product, entering distribution contracts with medical providers and actively soliciting new customers. *See* Raydiant Amend. Interrog. Responses (Dkt. No. 52-8) at 4; *see also* Dkt. No. 52-3 (DAISY Pilot commercial agreement with Moses Taylor Medical Center); Dkt. No. 52-5 (DAISY price quotation and marketing flyer related to agreement with University of California-Davis Medical Center). The commercialized version of DAISY is the same design West approved while working at Raydiant. *See* Hannula Decl. ISO Mot. for Sanctions ¶ 11.

**B.**

On December 11, 2024, ALC Medical sent Raydiant a cease-and-desist letter through its counsel at Womble Bond. The letter accused Raydiant of willful infringement of the '408 Patent through the DAISY device and demanded that Raydiant halt all activities related to the product by January 10. ALC Medical claimed that the purported infringement came to its attention through Raydiant's presentation of the DAISY device at the Stanford Medicine Pediatric & Maternal Innovation Showcase on April 23, 2024. West also attended the pitch competition and presented the KIRA device. The demand letter threatened that absent a "satisfactory response," ALC Medical was "prepared to take all steps necessary to protect its valuable intellectual property rights, without further notice to [Raydiant], including filing a lawsuit in federal court."

5

**Appx0005**

Demand Ltr. (Dkt. No. 18-2) at 4.

In response to the demand letter, Raydiant preemptively filed a claim for declaratory judgment of noninfringement in this court on January 10, 2025. On February 11, ALC Medical filed an answer to the complaint as well as a counterclaim against Raydiant for infringement of the '408 Patent under 35 U.S.C. § 271. ALC Medical also asserted a counterclaim for false advertisement under the Lanham Act, 15 U.S.C. § 1125(a)(1)(B), related to representations made during Raydiant's Stanford Showcase presentation. In support of its infringement counterclaim, ALC Medical alleged that the DAISY device possessed a placement marker "configured for movement." Countercls. ¶ 60. ALC Medical attached several diagrams to the counterclaims as Exhibit M, representing that they were taken directly from Raydiant's Stanford Showcase presentation. *See* Countercls. Ex. M at M-5 (citing video recording of Stanford Showcase presentation under diagram with specific timestamp). One of these diagrams, Exhibit M-5, indicated the apparent moveability of the placement marker with dashed lines.

Raydiant filed its answer to the counterclaims on March 4, asserting that the DAISY device did not infringe the '408 Patent because it did not practice every claim element. Specifically, Raydiant explained that the DAISY device's placement marker was permanently bonded to the tube and that West knew this fact from her time at Raydiant. Further, Raydiant accused ALC Medical of having "intentionally altered" Exhibit M-5 by "superimposing 'dashed lines' to purportedly show a device whose placement marker is moveable along the suction line extension . . . even though ALC knows that is not the case." Raydiant Answer at 3.

ALC Medical, through its counsel, sent Raydiant another letter on March 28, offering to dismiss its counterclaims—without prejudice—contingent on (1) Raydiant's allowing ALC Medical and Womble Bond to inspect a working model of the DAISY device to confirm noninfringement and (2) Raydiant's dismissing its declaratory judgment claim. Raydiant insisted that the counterclaims must be dismissed with prejudice, but still ultimately provided a sample DAISY device for inspection on April 18. During their inspection, ALC Medical and its counsel confirmed that the placement marker was permanently bonded to the tube of the DAISY device.

Days later, they served discovery responses admitting that the DAISY device did not infringe the '408 Patent and that they had superimposed the dotted lines onto Exhibit M-5.

Instead of moving to dismiss its counterclaims at that point, on May 2, ALC Medical filed a Rule 12(b)(1) Motion to Dismiss Raydiant's declaratory judgment claim for lack of subject matter jurisdiction. ALC Medical and its counsel argued that DAISY was an investigational device exempt from the federal patent infringement statute, meaning there was no justiciable dispute for the Court to adjudicate. They claimed they "discovered" this exempt status from the DAISY device provided to ALC Medical for inspection, which was delivered in packaging that labeled the product as an "INVESTIGATIONAL DEVICE." MTD (Dkt. No. 44) at 6–10; Blackburn Decl. ISO Opp'n to Bond Mot. (Dkt. No. 41-1) ¶ 18. ALC Medical also asked the Court to dismiss its own counterclaims without prejudice under Rule 41(a)(2), should the Court agree with its jurisdictional arguments. Alternatively, and without citing supporting authority, ALC Medical requested that both parties' claims be dismissed with prejudice with each party to bear its own fees.

During briefing on the motion to dismiss, Raydiant filed a Motion for Bond in anticipation of filing a sanctions motion. The Motion for Bond made a strong case that ALC Medical's counterclaims were frivolous, that Raydiant was destined to be the prevailing party, and that the only reasonable outcome would be entry of judgment against ALC Medical (which would free Raydiant up to seek costs and attorneys' fees). Rather than granting the Motion for Bond, the Court simply stayed the litigation so that it could consider Raydiant's impending sanctions motions and ALC Medical's Rule 12(b)(1) Motion in tandem. The day after the hearing, ALC Medical filed a reply to its Motion to Dismiss. Attached to this reply was a proposed covenant not to sue, which ALC Medical claimed mooted the dispute. ALC Medical reiterated that the case should be dismissed with each side to bear its own costs and fees.

On June 26, Raydiant filed two separate sanctions motions related to ALC Medical's counterclaims and Rule 12(b)(1) Motion. The first motion seeks sanctions pursuant to Federal Rule of Civil Procedure 11, and the second seeks sanctions pursuant to 28 U.S.C. § 1927 and the

7

**Appx0007**

Court's inherent authority. In advance of the September 4 hearing on the sanctions motions and ALC Medical's Motion to Dismiss, Raydiant submitted a proposed fee request of $1,449,109.70. ALC Medical opposed the request as facially unreasonable and argued that any award should be no more than $72,455.49. On September 16, the Court ordered Raydiant's counsel, Greenberg Traurig, to submit copies of its contemporaneous billing records for in camera review. When submitting those records, Raydiant modified its requested fee award to $1,437,075.80.

## II.    THE COUNTERCLAIMS

Raydiant first contends that ALC Medical and its lawyers should be sanctioned under Rule 11 for filing the patent infringement counterclaim and the false advertising counterclaim. Sanctions are warranted under Rule 11 if "(1) 'the [challenged pleading, written motion, or other paper] is legally or factually baseless from an objective perspective,' and (2) the attorneys failed to conduct 'a reasonable and competent inquiry before signing and filing [it].'" *Segan LLC v. Zynga Inc.*, 131 F. Supp. 3d 956, 963 (N.D. Cal. 2015) (quoting *Christian v. Mattel, Inc.*, 286 F.3d 1118, 1127 (9th Cir. 2002)). Both counterclaims easily meet this test.

### A.

ALC Medical and its counsel argue that because the DAISY device was not freely available to the public, they had "more leeway" under Rule 11 to bring the patent infringement counterclaim. Opp'n to Sanctions Mot. (Dkt. No. 73) at 9 (quoting *Townsend v. Holman Consulting Corp.*, 929 F.2d 1358, 1364 (9th Cir. 1990)). They assert that, in light of the information asymmetry between the parties, their pre-filing investigation sufficed for them to conclude it was plausible that the DAISY device possessed a moveable placement marker and that Raydiant therefore infringed the '408 Patent. But whatever additional "leeway" a patentholder might normally possess when it lacks access to the potentially infringing product, that could not possibly have justified an infringement counterclaim here. Indeed, this is not merely a case where a patentholder and its lawyers went on a fishing expedition in the hope of stumbling upon some colorable infringement claim. This is a case where all evidence available to ALC Medical and its lawyers pointed in the direction of noninfringement. In other words, all

available evidence counseled against sending a demand letter in the first place, much less asserting an infringement counterclaim.

When West worked for Raydiant, first as a consultant and then later as the Vice President of Market Development, she was intimately involved in developing the same DAISY design at issue in this case. Not only did West review and approve detailed renderings of the DAISY device clearly showing the placement marker permanently bonded to the suction line; she gave them her enthusiastic endorsement. *See* September 27, 2022, Email at 1 ("These [renderings] are amazing! . . . [T]he design is just stunning. Bravo!"). West insists that even though she had direct knowledge of the DAISY device during her time at Raydiant, she was "not aware of changes Raydiant may have secretly made from her December 2022 departure from Raydiant to when the counterclaims were filed on February 11, 2025." Opp'n to Sanctions Mot. at 11; *see also* West Decl. ISO Opp'n to Sanctions Mot. ¶ 23. Maybe so. But the ensuing "inquiry" by ALC Medical and Womble Bond into the DAISY device was still unjustified because none of their supposed evidence could have reasonably given rise to suspicions of infringement.

Previously, West and her lawyers asserted that they had watched Raydiant's presentation at the April 23, 2024, Stanford Showcase and arrived at the good faith belief that the DAISY included a moveable placement marker. *See* ALC Medical RFA Responses (Dkt. No. 67-2) at 4; *Stanford Medicine Pediatric & Maternal Innovation Showcase 2024*, YouTube (Apr. 23, 2024), https://www.youtube.com/watch?v=LUEm35JYszc. Both have since backtracked. West now states that "it was impossible to determine whether the location of the DAISY placement marker was fixed" from the presentation. West Decl. ISO Opp'n to Sanctions Mot. ¶ 15. And Christine Dupriest, a member of the Womble Bond team, similarly states that "[a]fter reviewing the entirety of the Stanford Showcase and the publicly available information about the DAISY device, [she] could neither confirm such movement nor exclude the possibility that it occurs." Dupriest Decl. ISO Opp'n to Sanctions Mot. (Dkt. No. 73-6) ¶ 14.

When Dupriest says she could not "exclude the possibility" that the placement marker was moveable, she might as well be saying that she cannot exclude the possibility that the sky

will turn green. Her backtracking statement about the Stanford video presupposes that there was a reason to suspect a moveable placement marker in the first place. But the record contains no such reason, just as there is no reason to suspect waking up to emerald clouds tomorrow. A more accurate phrasing of her declaration would be: Before I watched the video of the Stanford Showcase presentation, there was no reason to suspect that Raydiant had changed its device to include a moveable placement marker. And after watching that video, I still had no reason to suspect that Raydiant had changed its device to include a moveable placement marker.

Perhaps this is why ALC Medical and its lawyers manipulated a diagram of the DAISY device to make it seem like it had a moveable placement marker. The counterclaims reference a series of diagrams in Exhibit M that purport to explain how the DAISY device infringes the '408 patent. The diagrams cite to the video of Raydiant's Stanford Showcase presentation, thereby making it seem like they came from that presentation without alteration. And that's true of many of the illustrations. But the diagram at page M-5—the one cited as showing that the placement marker is moveable—does not appear in the counterclaims as it did in the Stanford presentation. Instead, ALC Medical's lawyers superimposed dotted lines over the original image, giving the impression that the placement marker moves:

| US 11,839,408 | Raydiant Oximetry DAISY Device |
|---|---|
| 1[f] a placement marker, the placement marker being configured for movement along the suction line extension for personalization of the postpartum hemorrhage mitigation device to a size of the uterus, the placement marker covering one or more ports; and | Raydiant Oximetry's DAISY Device includes a placement marker, the placement marker being configured for movement along the suction line extension for personalization of the postpartum hemorrhage device to a size of the uterus, the placement marker covering one or more ports, as shown in the image below. |

In other words, Exhibit M-5 makes it seem like Raydiant's presentation revealed a moveable placement marker, even though the video of the presentation provides no basis to suspect that the design of the DAISY device had changed in this way from the time West was at Raydiant. Indeed, any reasonable person watching the Stanford Showcase video would have refrained from accusing Raydiant of infringement. That is doubly true for West: the DAISY design shown during the Stanford Showcase was the exact same as the one she previously approved and included as part of the illustration produced for Raydiant's FDA pre-submission. *See* Hannula Decl. ISO Sanctions Mot. ¶ 17; Hershkowitz Decl. ISO Bond Mot. Ex. C (Dkt. No. 49-19) (emails between West and other Raydiant staff approving FDA pre-submission illustrations).

Dupriest denies that the Womble Bond team prepared and submitted Exhibit M-5 in bad faith, stating that "[i]t was not [their] intent to represent that these annotations were in the original slide/image." Dupriest Decl. ISO Opp'n to Sanctions Mot. ¶ 15. She also asserts that the annotated dashed lines were made with a different font and in red color to distinguish the exhibit from the original slide. This is difficult to swallow, particularly because counsel only submitted a black and white copy of its counterclaims to the Court, and the two fonts apparently used on Exhibit M-5 are not easily distinguishable. If Womble Bond and ALC Medical had truly been concerned about not misleading the Court, as opposed to disguising the baselessness of the infringement counterclaim, they could have easily included a disclaimer alongside the image clarifying that it had been annotated.[2]

The other publicly available information cited by ALC Medical and its counsel as evidence of potential infringement is no more credible. For example, Raydiant put the same rendering of the DAISY device approved by West on its website before ALC Medical filed its counterclaims. *See* Herskowitz Decl. ISO Sanctions Mot. (Dkt. No. 63-7) ¶ 4. And although

---

[2]  If the Womble Bond lawyers had done nothing else improper in this case, perhaps it would be a bit easier to accept that the diagram did not reflect a deliberate intent to mislead. Anyway, even in the highly unlikely event that Exhibit M-5 was just a mistake, that does not change the fact that the counterclaims were objectively baseless and brought without any real investigation.

ALC Medical and its counsel point to Raydiant's subsequent '562 Patent Application as suggesting that the device had been changed to include a moveable placement marker, that is false. ALC Medical is simply wrong that any diagrams from the application show the placement marker in multiple locations.[3]

ALC Medical and its counsel insist that their assumption of product evolution was appropriate in this case because "Ms. West's work developing similar devices led her to believe it would be beneficial for devices like the DAISY device" to possess adjustable placement markers so as "to be able to be tailored to the size of the [patient's] uterus, which changes size during pregnancy." Opp'n to Sanctions Mot. at 10; *see also* West Decl. ISO Opp'n to Sanctions Mot. ¶ 16. But even if West truly believed a moveable placement marker could be beneficial, that hunch would not be nearly enough on its own to claim patent infringement. More importantly, West's own device, KIRA, does not have a moveable placement marker, even though her patent claims one (and even though ALC Medical initially alleged in its counterclaims that the KIRA device practices the invention). If West's own device doesn't even practice her invention, why would she think that Raydiant's device did?

Although we don't know for sure why West's KIRA device does not include a moveable placement marker, one possible explanation is that she knows such a design would be unsafe. Don Hannula, a biomedical engineer engaged by Raydiant to develop the DAISY device, stated in his declaration in support of Raydiant's Rule 11 Motion that the placement marker must be permanently affixed to the suction line for patient safety. *See* Hannula Decl. ISO Sanctions Mot. ¶ 32 (explaining that it was "common sense" that an unbonded placement marker "would run the risk of being left in the patient's uterus upon vaginal removal of the device"). Perhaps that's why West never suggested making the DAISY placement marker moveable during her time at

---

[3] ALC Medical and its counsel also argue that their suspicion of infringement was reasonable because while Raydiant's '562 Patent Application contemplates that device components may sometimes be "permanently affixed together prior to use," that configuration is not required. Opp'n to Sanctions Mot. at 11 (quoting '562 Application (Dkt. No. 18-8) at 62). However, conditional language in a patent application is not sufficient for parties to bring a colorable infringement claim. If it were, the number of patent suits would grow exponentially overnight.

Raydiant. *See* Hannula Decl. ISO Bond Mot. ¶ 13. West's belief in the "benefits" of a moveable placement marker appears to be nothing more than a post hoc justification for ALC Medical's baseless infringement claim.

**B.**

ALC Medical's second counterclaim, brought under the Lanham Act, alleges that Raydiant made false and misleading statements during its Stanford Showcase presentation. Specifically, it alleges that Raydiant's discussion of the DAISY device's being "cleared" or "approved" by the FDA was misleading because DAISY is a Class II device exempt from premarket notification requirements. Countercls. ¶¶ 78–87.

ALC Medical and its counsel knew or should have known that the claim was objectively baseless under Ninth Circuit law. Only "commercial advertising or promotion" is actionable under 15 U.S.C. § 1125(a)(1)(B). A statement is commercial advertising if it is: (1) commercial speech; (2) made by a defendant who is in competition with the plaintiff; (3) for the purpose of influencing consumers to buy the defendant's goods or services; and (4) "disseminated sufficiently to the relevant purchasing public to constitute 'advertising' or 'promotion' within that industry." *Genus Lifesciences Inc. v. Lannett Co., Inc.*, 378 F. Supp. 3d 823, 834 (N.D. Cal. 2019) (quotation omitted). Raydiant's presentation at the Stanford Showcase, a one-off grant competition, clearly does not constitute "commercial advertising or promotion" under that definition. *See*, *e.g.*, *Realtek Semiconductor Corp. v. MediaTek, Inc.*, 769 F. Supp. 3d 1067, 1097 (N.D. Cal. 2025) (holding that allegations of "a handful of private statements to Realtek's actual or prospective customers" was insufficient to state a valid Lanham Act claim). ALC Medical has no basis for asserting that Raydiant participated in a pitch competition for seed funding and industry networking to influence consumers to buy Raydiant's goods.

Neither case cited by ALC Medical in its sanctions opposition supports a different result. In *Realtek Semiconductor*, Judge Pitts held that the plaintiff had stated a valid Lanham Act claim based on representations made in one defendant's press release. 769 F. Supp. 3d at 1096. A single, brief presentation by Raydiant at a conference is not equivalent to a press release; it is

more akin to the private statements made to actual and potential customers that Judge Pitts found were insufficient "to plausibly suggest that MediaTek's misstatements were disseminated widely to the relevant purchasing public or within the industry." *Id.* at 1097. And in *Technoprobe S.p.A. v. Formfactor, Inc.*, a district court held that the plaintiff had alleged sufficient dissemination because, in addition to making the allegedly false statements at a conference, the defendant "continued to market and sell the Accused Products after the [conference] through its website, to which slides from the Defendants' conference presentation were posted." 2024 WL 2271885, at *7 (D. Del. May 20, 2024). ALC Medical and its counsel have made no comparable allegations that the Stanford Showcase slides are available on Raydiant's website or otherwise disseminated to potential customers.

By the time they filed their motion to dismiss, ALC Medical and Womble Bond had already capitulated on the Lanham Act counterclaim, declaring that they "had no interest in pursuing [it] as a stand-alone claim." MTD at 10 n.4. But as with the patent infringement counterclaim, the Lanham Act counterclaim has still not been dropped. Faced with the threat of sanctions liability, ALC Medical and Womble Bond have suddenly renewed their defense on the merits—albeit poorly. The false advertising counterclaim was frivolous from the time it was filed and warrants sanctions under Rule 11.

## III.    THE MOTION TO DISMISS

### A.

Raydiant also moves for Rule 11 sanctions regarding ALC Medical's Rule 12(b)(1) Motion to Dismiss and accompanying reply. In its original motion, ALC Medical argued that the Court did not have subject matter jurisdiction to adjudicate Raydiant's unripe declaratory claim because the DAISY device falls under the patent infringement statute's safe harbor for investigational medical devices. That exception states:

> It shall not be an act of infringement to make, use, offer to sell, or sell within the United States or import into the United States a patented invention . . . solely for uses reasonably related to the development and submission of information under a Federal law which regulates the manufacture, use, or sale of drugs or veterinary

biological products.

35 U.S.C. § 271(e)(1).

ALC Medical and its counsel claim that they "discovered" that the Section 271(e)(1) safe harbor was applicable here through their April 18, 2025, inspection of the DAISY device. *See* Blackburn Decl. ISO Opp'n to Bond Mot. ¶ 18. During the inspection, ALC Medical's counsel noticed that the model provided by Raydiant was delivered in packaging labeled "INVESTIGATIONAL DEVICE" and was "limited by Federal law to investigational use." *Id.* As noted earlier, the inspection also confirmed that the DAISY device did not have a moveable placement marker and therefore did not infringe upon the '408 Patent. But rather than immediately moving for an unconditional dismissal of its claims under Rule 41(a), ALC Medical and Womble Bond latched onto the packaging label as the grounds for filing their 12(b)(1) motion.

This jurisdictional argument is baseless on its face. To fall under the Section 271(e)(1) safe harbor, the alleged infringing act must be done "solely for uses reasonably related to the development and submission of information under a Federal law." 35 U.S.C. § 271(e)(1); *see also AbTox, Inc. v. Exitron Corp.*, 122 F.3d 1019, 1030 (Fed. Cir. 1997) ("[S]ection 271(e)(1) requires only that the otherwise infringing act be performed solely for uses reasonably related to FDA approval." (quotation omitted)), *opinion amended on reh'g*, 131 F.3d 1009 (Fed. Cir. 1997). That is obviously not the case here. The "INVESTIGATIONAL DEVICE" labeling on the inspected DAISY model was included by Raydiant on certain individual devices subject to a post-market Institutional Review Board-approved clinical study. *See* Opp'n to MTD (Dkt. No. 52) at 6–7; Ray Decl. ISO Opp'n to MTD (Dkt. No. 52-1) ¶ 6 (explaining that the "INVESTIGATIONAL DEVICE" label was "voluntarily included by Raydiant in its clinical study as a precaution to help prevent misuse or uses of those devices beyond the subject of the study"). Contrary to their assertions of "discovery," ALC Medical and its lawyers have been aware of this clinical study from the onset of the dispute. *See* Demand Ltr. at 2 ("We understand that Raydiant Oximetry . . . is currently enrolling participants in a clinical trial to test [the

15

**Appx0015**

DAISY] device."); Countercls. ¶ 45 ("Today, Raydiant is recruiting participants for a clinical trial involving DAISY.").

Raydiant's clinical study has no relation to securing FDA approval for the DAISY device because the product does not require it. *See Proveris Scientific Corp. v. Innovasystems, Inc.*, 536 F.3d 1256, 1265 (Fed. Cir. 2008). Both parties agree that DAISY is a Class II medical device exempt from the FDA's 510(k) premarket notification requirements. *See* Countercls. ¶¶ 46–48; FDA Response Ltr. (Dkt. No. 52-2) ("[The FDA] concur[s] that the Daisy Device falls under 21 CFR 884.3200, with product code HFL, which is 510(k) exempt."). Indeed, Raydiant had already entered the postpartum hemorrhage treatment market, offering the DAISY device for sale before and after the commencement of this action. *See* Raydiant Amend. Interrog. Responses (Dkt. No. 52-8) at 4; *see also* Dkt. No. 52-3 (DAISY Pilot commercial agreement with Moses Taylor Medical Center); Dkt. No. 52-5 (DAISY price quotation and marketing flyer related to agreement with University of California-Davis Medical Center). ALC Medical knew of this commercialization at the time it filed its counterclaims, alleging that "Raydiant actively encourages medical providers, by and through its sales and marketing efforts, to directly infringe the '408 Patent." Countercls. ¶ 71.[4]

Raydiant's commercial use of the DAISY device obviously does not fall within the investigational safe harbor. *See Momenta Pharmaceuticals, Inc. v. Teva Pharmaceuticals USA Inc.*, 809 F.3d 610, 621 (Fed. Cir. 2015) (*Momenta II*); *see also Proveris*, 536 F.3d at 1265 (reasoning that "Congress could [not] have intended that the safe harbor of section 271(e)(1) [would] apply to" a party selling an allegedly infringing research device); *BlueAllele Corp. v. Intellia Therapeutics, Inc.*, 2024 WL 5046278, at *3–4 (D. Del. Dec. 9, 2024) (finding that

---

[4] In its reply, ALC Medical cites *AbTox* for the proposition that a product's designation as a Class II device does not categorically bar the applicability of the investigational safe harbor. *See* Reply ISO MTD at 9; *AbTox*, 122 F.3d at 1029 (holding that Section 271(e)(1) may apply to Class II devices). But unlike the DAISY device, the Class II medical device at issue in *AbTox* was not exempted from premarket approval. The data collection for the FDA application in that case was thus necessary to secure federal approval and so was protected by the investigational safe harbor. *See* 122 F.3d at 1027.

Section 271(e)(1) did not apply because plaintiff alleged that defendant had used product "for basic scientific research and for commercial purposes not related to FDA submission"). "[R]outine quality control testing," like the clinical study referenced on the inspected DAISY device's packaging, is a standard "part of the post-approval, commercial production process" and is "not reasonably related to the development and submission of information to the FDA." *Momenta II*, 809 F.3d at 620. The Section 271(e)(1) safe harbor argument was thus frivolous from the start. Beyond failing to perform a reasonable and competent investigation, ALC Medical and its counsel purposefully ignored evidence disproving their argument. Accordingly, sanctions under Rule 11 are warranted, and the Motion to Dismiss on this basis is denied.

**B.**

Apparently hedging against the weakness of its safe harbor argument, ALC Medical moved in the alternative for "dismissal of both parties' claims with respect to the infringement of the current design of the DAISY device made available for inspection on April 25, 2025 with prejudice, with each party to bear its own fees." MTD at 11. In support of that position, ALC Medical and its counsel attached a proposed covenant not to sue as an exhibit to their reply brief. They argue that this covenant resolves the dispute and strips the Court of subject matter jurisdiction. This is wrong. Although a covenant not to sue certainly can moot a live controversy, it does not necessarily do so. "[A] defendant claiming that its voluntary compliance moots a case bears the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013). ALC Medical therefore has the "burden to show that," by proposing the covenant, "it could not reasonably be expected to resume its enforcement efforts against" Raydiant. *Id.* at 92.

ALC Medical has not met that burden. While the covenant states that it is made "unconditionally and irrevocably," it is too narrowly tailored to effectively moot Raydiant's declaratory relief claim. Covenant (Dkt. No. 57-2) at 1. For example, the covenant covers only claims related to the two DAISY device models that ALC Medical inspected as they existed at the time of the inspection. *See id.* at 2. But ALC Medical has already threatened Raydiant with

**Appx0017**

action related to the development and manufacture of *any* DAISY prototypes, *see* Demand Ltr. at 2, as well as all "substantially similar" DAISY variants, Countercls. ¶ 66. Those gaps distinguish this case from *Already*. *See* 568 U.S. at 93 (holding that the dispute had been mooted by Nike's providing a covenant that prohibited it "from making any claim *or* any demand . . . cover[ing] not just current or previous designs, but any colorable imitations"). Raydiant is actively developing new prototypes and variants of the DAISY device that fall outside the scope of the covenant. *See* DeLonzor Decl. ISO Sec. 1927 Mot. (Dkt. No. 65-1) ¶¶ 3–8. Because it is reasonable to expect ALC Medical to accuse Raydiant of infringement in connection with these activities (especially given the conduct of ALC Medical and its counsel thus far), there is a live controversy supporting declaratory relief. *See ICOS Vision Systems Corp., N.V. v. Scanner Technologies Corp.*, 699 F. Supp. 2d 664, 670 (S.D.N.Y. 2010) (reasoning that a "documented history of aggressively pursuing [patent infringement claims] supports a finding of declaratory judgment jurisdiction"). Accordingly, Rule 11 sanctions are warranted for the attempt to obtain dismissal based on the covenant not to sue. And, of course, the motion to dismiss on that basis is denied.

At this point, it's worth taking a step back to reflect on what ALC Medical and its lawyers were trying to accomplish with their motion to dismiss for lack of jurisdiction. Faced with the reality that their counterclaims were frivolous, they tried everything under the sun to prevent Raydiant from being the "prevailing party" within the meaning of 35 U.S.C. § 285, which allows courts to award attorneys' fees to the prevailing party in "exceptional" patent cases. But the energy they have spent attempting to avoid liability under Section 285 has only increased their sanctions liability because their ham-fisted efforts to prevent Raydiant from becoming the prevailing party were uniformly frivolous. Had ALC Medical and its lawyers put the same amount of energy into investigating the legitimacy of their claims in the first place, they would not be in this situation.[5]

_____

[5]  Speaking of creative-yet-frivolous efforts to avoid liability, ALC Medical and its lawyers also argue that they should benefit from Rule 11's 21-day safe harbor because they offered to dismiss

## C.

Raydiant also moves for sanctions against Womble Bond under Section 1927 and the Court's inherent authority stemming from ALC Medical's Motion to Dismiss.

Section 1927 provides that an attorney, but not a party, "who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." 28 U.S.C. § 1927. Sanctions under this statute must be supported by a finding of bad faith. *Lake v. Gates*, 130 F.4th 1064, 1070 (9th Cir. 2025); *EscapeX IP LLC v. Google LLC*, 2024 WL 557729, at *1 (N.D. Cal. Feb. 12, 2024). Attorneys have a "duty [under Section 1927] to correct or withdraw litigation positions after it becomes obvious that they are meritless." *In re Girardi*, 611 F.3d 1027, 1064 (9th Cir. 2010).

The Womble Bond attorneys vexatiously multiplied these proceedings by continuing to pursue ALC Medical's frivolous counterclaims and scrambling to prevent Raydiant from becoming the "prevailing party" well past the point of reason. Womble Bond's actions here "bespeak not negligence, but bad faith: the willful continuation of a suit known to be meritless." *Edwards v. General Motors Corp.*, 153 F.3d 242, 247 (5th Cir. 1998). They have consistently refused to take the only rational course of action to end the dispute: agreeing to dismiss with prejudice ALC Medical's counterclaims under Rule 41(a)(2), refraining from filing (or at least withdrawing) the Rule 12(b)(1) motion, and allowing Raydiant to seek fees as the prevailing party. Maybe that approach could have cut against a finding that this was an exceptional case within the meaning of Section 285, but even if not, it would have dramatically reduced the amount of fees Raydiant was required to incur. Instead, ALC Medical and Womble Bond

---

their counterclaims around the time Raydiant filed its Motion for Bond. *See* Fed. R. Civ. P. 11(c)(2). But they never actually withdrew the counterclaims; instead, they conditioned their dismissal offer on (1) dismissal of Raydiant's declaratory judgment claim and (2) both parties' agreeing to cover their own attorneys' fees. *See* MTD at 11 ("ALC Medical seeks dismissal of both parties' claims with respect to the infringement of the current design of the DAISY device made available for inspection on April 25, 2025 with prejudice, with each party to bear its own fees."); Reply ISO MTD at 1 ("The Court should grant ALC Medical's motion to dismiss the claims and counterclaims of both parties with prejudice.").

rejected every offer by Raydiant to negotiate a consent judgment. *See* Sokol Decl. ISO Sanctions Mot. Reply (Dkt. No. 75-1) ¶ 9. They have only offered dismissal contingent on unreasonable terms, like Raydiant's meritorious declaratory judgment claim also being thrown out and ALC Medical's being shielded from liability for attorneys' fees. And they made frivolous arguments for why the case should be dismissed for lack of jurisdiction.

Courts also have the inherent authority to impose sanctions against a party or an attorney who "has acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 766 (1980) (citation omitted); *see also Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101, 104 (2017). "'Bad faith' may be found, not only in the actions that led to the lawsuit, but also in the conduct of the litigation." *Roadway Exp.*, 447 U.S. at 766 (citation omitted) (cleaned up). Here, the only reasonable way to understand the conduct by ALC Medical and Womble Bond is that it was intentional. But even if it were unintentional, inherent-authority sanctions would be warranted for "conduct tantamount to bad faith . . . including recklessness when combined with an additional factor such as frivolousness, harassment, or an improper purpose." *Fink v. Gomez*, 239 F.3d 989, 994 (9th Cir. 2001). Sanctions under this Court's inherent authority are accordingly appropriate in this case.[6]

## IV. SANCTIONS LIABILITY

### A.

Raydiant seeks an award of $1,437,075.80 in attorneys' fees stemming from Greenberg Traurig's work on this matter occurring after ALC Medical filed its counterclaims.

ALC Medical and Womble Bond do not dispute that Greenberg Traurig's requested hourly rates are reasonable. Instead, they accuse Greenberg Traurig of padding its billable hours by including (1) tasks unrelated to the challenged conduct and (2) duplicative and excessive

---

[6] Incidentally, it is impossible to accept Womble Bond's assertion that the request by its experienced team of attorneys for Raydiant's declaratory judgment claim to be dismissed with prejudice was "inadvertent." Opp'n to Sanctions Mot. at 21. Even after Raydiant flagged that dismissal with prejudice would be inappropriate in its opposition, *see* Opp'n to MTD at 2, ALC Medical continued to seek such relief in its reply, *see* Reply ISO MTD at 1, 12.

labor. That is wrong. Raydiant is seeking attorneys' fees only for work done after ALC Medical filed its counterclaims on February 11—the same counterclaims that comprise part of the sanctionable conduct at issue. And all that work was necessitated by the conduct of ALC Medical and its lawyers, from the filing of the frivolous counterclaims to the fruitless efforts to prevent Raydiant from being the prevailing party. The general case management tasks performed by Greenberg Traurig, including drafting the Joint Case Management Conference Statement and revising Raydiant's discovery requests, would not have been necessary to nearly the same extent (if at all) but for the frivolous counterclaims exploding the scope of the matter. ALC Medical and its counsel also single out the fees related to Raydiant's Motion for Bond as being inappropriate, but that motion was a reasonable response to Womble Bond's vexatious tactics. Not only was the Motion for Bond a potential deterrent against further misconduct by ALC Medical and its counsel; it also secured Raydiant a stay of proceedings pending the resolution of its sanctions motions.

ALC Medical and Womble Bond also assert that a fee request of almost $1.5 million is not proportional to a dispute where less than $1 million is at issue based on the limited sales of the DAISY device to date. They argue that Raydiant cobbled together its 1,407.3 claimed billable hours through piling on unnecessary work even after ALC Medical proposed a stipulated dismissal on March 28. But that's not true. As already discussed, ALC Medical and its lawyers conditioned their offer of a stipulated dismissal on an opportunity to inspect the DAISY device. After examining the model and confirming that Raydiant had not infringed, rather than simply dismissing their frivolous counterclaims, ALC Medical and Womble Bond insisted that each side bear its own costs and fees. When that didn't work, they filed a frivolous Rule 12(b)(1) motion to try to mitigate their own liability. Raydiant had every right to respond in kind with a robust defense, "correctly treat[ing] this case as bet-the-company litigation imperiling its only current business market and its employees." Reply ISO Fee Req. at 6. The average patent litigation costs in this district do not account for those uniquely high stakes. Nor do they account for ALC Medical's estimate that its competitor KIRA device will generate over $25 million in sales

through 2026. *See* Sokol Decl. ISO Fee Req. Reply (Dkt. No. 84-3) ¶ 2.

"By and large, the court should defer to the winning lawyer's professional judgment as to how much time he was required to spend on the case; after all, he won, and might not have, had he been more of a slacker." *Moreno v. City of Sacramento*, 534 F.3d 1106, 1112 (9th Cir. 2008). ALC Medical and its counsel cannot overcome that deference. Greenberg Traurig employed three partners and one associate on the core case team; this is roughly equivalent to the staffing by Womble Bond, which assigned three partners to this matter as the attorneys of record. *See* Reply ISO Fee Req. at 7. Brent Sokol, lead counsel for Raydiant, billed for this matter at a steep discount from his standard fee. *Id.* And while ALC Medical and Womble Bond complain that Greenberg Traurig had multiple attorneys working on various motions, that is simply good practice for litigating a case of this import for the client. Not only did Greenberg Traurig utilize junior associates and other staff members to assist where viable; they excluded those costs from their fee request. There was no unreasonable duplication by Greenberg Traurig here justifying a reduction in Raydiant's requested award.[7]

Generally, Rule 11 and Section 1927 sanctions should be limited to the amount necessary to deter similar kinds of misconduct in the future. *See* Fed. R. Civ. P. 11(c)(4); *Beatrice Foods Co. v. New England Printing & Lithographing Co.*, 899 F.2d 1171, 1177 (Fed. Cir. 1990).[8] But that guiding principle does not warrant a reduction in the requested award here—quite the opposite, in fact. These Womble Bond attorneys were already on notice that pursuing these objectively baseless claims could render them jointly and severally liable for the full amount of

---

[7] ALC Medical and Womble Bond also argue that it is impossible to properly evaluate the reasonableness of Raydiant's fee request because Greenberg Traurig failed to provide contemporaneous billing records with their initial motion. ALC Medical and its counsel are wrong on the law, as Civ. L.R. 54-5(b)(3) advises litigants that detailed billing records are not always necessary to support a successful sanctions motion. But even if disclosure were required, Greenberg Traurig has since produced its records for in camera review. Based on its inspection of the records, the Court finds that Raydiant has provided sufficient specificity and adequate justification for its proposed fee amount.

[8] The same limitation does not exist for sanctions brought under the Court's inherent authority, which may extend to any amount of fees that a "party would not have incurred but for the bad faith" conduct. *Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101, 104 (2017).

any fee award. The risk of significant sanctions, and joint and several liability, for bringing obviously frivolous patent infringement claims was discussed at length in *Segan LLC v. Zynga Inc*, 131 F. Supp. 3d 956 (N.D. Cal. 2015), a case that Greenberg Traurig and the Court repeatedly warned Womble Bond about. *See* Reply ISO Fee Req. at 9; Bond Hr. Tr. (Dkt. No. 64-6) at 13:15–17. And the conduct by ALC Medical and its lawyers was actually worse than the conduct of the lawyers in *Segan*. ALC Medical and Womble Bond have ignored every possible red flag in bringing and litigating this case. Words alone have not acted as a deterrent to their conduct up until now, and an award of Raydiant's full fee request—with joint and several liability for lawyers and client—is perfectly appropriate as a deterrent.[9]

**B.**

The attorneys of record for ALC Medical—Christine H. Dupriest, Matthew Blackburn, and Barry J. Herman—assert that any sanctions liability should be imposed on their law firm, rather than them as individuals.[10] *See* Opp'n to Fee Req. at 1. This is a close call. At every stage of this litigation, these three attorneys have made the wrong choice. They sent a frivolous demand letter and filed baseless counterclaims despite all signs pointing against any wrongdoing by Raydiant. They included a manipulated diagram with their infringement counterclaim, passing it off as having come directly from Raydiant. And when the counterclaims were exposed as being baseless, the attorneys concocted a frivolous argument to try to strip the Court of jurisdiction.

---

[9]  ALC Medical's arbitrary counterproposal of $72,455.49 is clearly not enough to effectively deter further bad behavior by a firm that generated more than $700 million in gross revenue in 2024. Further, compensation for the affected party is a relevant factor for courts to consider in imposing sanctions under Section 1927 and a court's inherent authority so long as the award does not enter the territory of punitive damages. *See Haynes v. City & County of San Francisco*, 688 F.3d 984, 987 (9th Cir. 2012) ("The purpose of § 1927 may be to deter attorney misconduct, or to compensate the victims of an attorney's malfeasance, or to both compensate and deter."); *DNA Sports Performance Lab, Inc. v. Major League Baseball*, 2020 WL 6290374, at *5 (N.D. Cal. Oct. 27, 2020) (inherent authority), *aff'd sub nom. Nix v. Major League Baseball*, 2022 WL 4482455 (9th Cir. Sept. 27, 2022).
[10]  Herman did not get involved with this case until April 16, 2025. *See* Herman Pro Hac Vice Order (Dkt. No. 32). Therefore, his possible sanctions liability is limited to the misconduct that occurred after that date.

Still, the Court finds that holding Womble Bond jointly and severally liable for the entirety of a substantial sanctions award is likely—hopefully—sufficient to deter these lawyers from bringing other frivolous patent suits in the future. And this ruling should put other lawyers on notice: if they engage in bad faith conduct comparable to that of Dupriest, Blackburn, and Herman, they will be held jointly and severally liable for the full fee amount as individuals.

V.     **CONCLUSION**

ALC Medical's Motion to Dismiss is denied, and Raydiant Oximetry's Motions for Sanctions are granted. ALC Medical and Womble Bond are jointly and severally liable for attorneys' fees in the amount of $1,437,075.80 to be awarded to Raydiant. Payment shall be made within 28 days of this order unless alternative terms are negotiated by the parties. A joint case management conference is scheduled for November 7 to discuss what else (if anything) needs to be done before judgment can be entered in favor of Raydiant. The parties need not file a joint case management statement.

       **IT IS SO ORDERED.**

Dated: October 29, 2025

VINCE CHHABRIA
United States District Judge

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RAYDIANT OXIMETRY, INC., <br><br> Plaintiff, <br><br> v. <br><br> ALC MEDICAL HOLDINGS LLC, <br><br> Defendant. | Case No. 25-cv-00392-VC <br><br> **ORDER GRANTING RAYDIANT'S MOTION FOR JUDGMENT ON THE PLEADINGS** <br><br> Re: Dkt. No. 118 |

Raydiant's Motion for Judgment on the Pleadings is granted. Judgment is entered in Raydiant's favor against ALC Medical on Raydiant's non-infringement declaratory judgment claim and ALC Medical's patent infringement and false advertising counterclaims.

**IT IS SO ORDERED.**

Dated: January 14, 2026

_____

VINCE CHHABRIA
United States District Judge

**Appx0025**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RAYDIANT OXIMETRY, INC., <br><br> Plaintiff, <br><br> v. <br><br> ALC MEDICAL HOLDINGS LLC, <br><br> Defendant. | Case No.  25-cv-00392-VC <br><br> **ORDER REGARDING MOTION FOR ATTORNEYS' FEES AND COSTS** <br><br> Re: Dkt. Nos. 131, 132 |

Raydiant's Motion for Attorneys' Fees pursuant to 35 U.S.C. § 285 and 15 U.S.C. § 1117(a) is granted. As the Court explained in its Sanctions Order, ALC Medical and Womble Bond have operated in bad faith at every turn: sending their initial demand letter without performing proper due diligence, continually pursuing meritless claims against Raydiant, and wasting judicial and party resources in their attempts to escape fees liability. *See* Dkt. No. 92. Their objectively unreasonable conduct makes this the paramount example of an "exceptional case" that warrants fee shifting to Raydiant as the prevailing party under the Patent and Lanham Acts. *See Segan LLC v. Zynga Inc.*, 131 F. Supp. 3d 956, 960 (N.D. Cal. 2015) (awarding exceptional case fees where patent claims were "objectively baseless from the start"); *Albrecht v. Tkachenko*, 2015 WL 2227607, *1 (N.D. Cal. May 11, 2015) (awarding exceptional case fees where Lanham Act claim was "groundless, unreasonable, [and] vexatious"). Raydiant's request for taxable costs under Fed. R. Civ. P. 54(d)(2) and Civil L.R. 54 is also granted. *See* Dkt. No. 131.

In addition, Raydiant's objection to ALC Medical's reliance in its Opposition on Raydiant's settlement proposal is sustained. *See* Opp'n (Dkt. No. 137) at 3 (citing June 24, 2025,

**Appx0026**

email from Raydiant to ALC Medical regarding settlement offer (Opp'n Ex. 15)). This evidence is irrelevant, and in any event it is barred by Federal Rule of Evidence 408. Accordingly, Opposition Exhibit 15 and the discussion of the settlement proposal on pages 3-4 and 11 of the Opposition are stricken.

ALC Medical and Womble Bond are jointly and severally liable for attorneys' fees and associated costs under this Order and the Court's prior Sanctions Order in the total amount of $2,348,367.11 to be awarded to Raydiant. The enforcement of these sanctions is stayed pending appeal in accordance with the Court's November 21, 2025 Order, contingent on ALC Medical and Womble Bond posting supersedeas bond for the updated total fees award amount. Judgment has already been entered in favor of Raydiant, *see* Dkt. No. 130, and the Clerk of Court is directed to close the case.

**IT IS SO ORDERED.**

Dated: February 27, 2026

_____
VINCE CHHABRIA
United States District Judge

2

**Appx0027**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RAYDIANT OXIMETRY, INC., <br><br> Plaintiff, <br><br> v. <br><br> ALC MEDICAL HOLDINGS LLC, <br><br> Defendant. | Case No. 25-cv-00392-VC <br><br> **ORDER DENYING ALC MEDICAL'S REQUEST FOR CLARIFICATION OF THE COURT'S ORDER** <br><br> Re: Dkt. No. 89 |

ALC Medical's Request for Clarification of the Court's Order for Raydiant to produce detailed billing records for in camera review (Dkt. No. 86) is denied.

**IT IS SO ORDERED.**

Dated: September 30, 2025

_____
VINCE CHHABRIA
United States District Judge

**Appx0028**

Case 3:25-cv-00392    Document 1-1    Filed 01/10/25    Page 1 of 22

# EXHIBIT 1

**Appx0029**

Case 3:25-cv-00392    Document 1-1    Filed 01/10/25    Page 2 of 22

US011839408B2

## (12) United States Patent
### Cobb

(10) **Patent No.:**    **US 11,839,408 B2**
(45) **Date of Patent:**        **Dec. 12, 2023**

(54) **SYSTEMS, DEVICES, AND METHODS FOR UTERINE HEMOSTASIS**

(71) Applicant: **Lucie Medical Inc**, Spartanburg, SC (US)

(72) Inventor: **Jennifer West Cobb**, Spartanburg, SC (US)

(73) Assignee: **Lucie Medical Inc.**, Spartanburg, SC (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **18/185,311**

(22) Filed: **Mar. 16, 2023**

(65) **Prior Publication Data**

US 2023/0320753 A1      Oct. 12, 2023

**Related U.S. Application Data**

(60) Provisional application No. 63/328,257, filed on Apr. 6, 2022.

(51) **Int. Cl.**
  *A61B 17/42*          (2006.01)
  *A61B 17/12*          (2006.01)
    (Continued)

(52) **U.S. Cl.**
  CPC ....  *A61B 17/42* (2013.01); *A61B 2017/00849* (2013.01); *A61B 2017/00942* (2013.01);
    (Continued)

(58) **Field of Classification Search**
  CPC ........... A61M 1/84; A61M 1/87; A61B 17/42; A61B 2017/4216; A61B 2017/4225;
    (Continued)

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 9,550,014 B2 | 1/2017 | Norred et al. | |
| 10,064,651 B2 | 9/2018 | Norred et al. | |

(Continued)

OTHER PUBLICATIONS

Cebekhulu, S. N. et al. (2022), "Suction Tube Uterine Tamponade" for treatment of refractory postpartum hemorrhage: Internal feasibility and acceptability pilot of a randomized clinical trial. International Journal of Gynecology & Obstetrics, 158(1), 79-85. 7 pages.

(Continued)

*Primary Examiner* — Wade Miles

(74) *Attorney, Agent, or Firm* — Dority & Manning, P.A.

(57)        **ABSTRACT**

A device may include a flexible tube comprising: a distal end, a proximal tip, the proximal tip comprising a suction line extension being configured for placement in a uterine cavity of a uterus after childbirth, a tube center of the flexible tube; and at least one lumen around the tube center, the at least one lumen comprising a suction line, the suction line being in communication with a source of negative pressure and the suction line extension, the suction line extension being configured for applying the negative pressure to the uterine cavity using the source of the negative pressure thereby causing mechanical hemostasis of bleeding blood vessels of a uterine wall of the uterine cavity. Embodiments include an anchoring mechanism being proximate to the suction line extension along the flexible tube, the anchoring mechanism being configured for maintaining the suction line extension in a desired position within the uterine cavity.

**15 Claims, 10 Drawing Sheets**



## US 11,839,408 B2

Page 2

(51) **Int. Cl.**
   *A61M 1/00*      (2006.01)
   *A61M 25/10*    (2013.01)
   *A61M 25/00*    (2006.01)
   *A61B 17/00*    (2006.01)

(52) **U.S. Cl.**
   CPC ............... *A61B 2017/12004* (2013.01); *A61B 2017/4216* (2013.01); *A61B 2217/005* (2013.01); *A61M 1/87* (2021.05); *A61M 25/007* (2013.01); *A61M 25/10* (2013.01)

(58) **Field of Classification Search**
   CPC ........... A61B 2017/12004; A61B 2017/00849; A61B 2217/005
   See application file for complete search history.

(56)        **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 10,820,926 B1 * | 11/2020 | Leal .................... | A61B 17/4241 |
| 11,241,254 B2 | 2/2022 | Norred et al. | |
| 11,291,473 B2 | 4/2022 | Norred et al. | |
| 11,517,336 B2 | 12/2022 | Bair et al. | |
| 2008/0045924 A1 * | 2/2008 | Cox ........................ | A61B 17/42 |
| | | | 604/515 |
| 2010/0274260 A1 * | 10/2010 | D'Arpiany ......... | A61B 17/4241 |
| | | | 606/119 |
| 2014/0378750 A1 * | 12/2014 | Buster .................... | A61B 17/42 |
| | | | 600/33 |
| 2014/0378752 A1 * | 12/2014 | Buster .................... | A61B 50/13 |
| | | | 600/33 |
| 2014/0378754 A1 * | 12/2014 | Buster .................... | A61B 17/42 |
| | | | 600/34 |
| 2015/0272622 A1 * | 10/2015 | Carson ................. | C12Q 1/6883 |
| | | | 514/10.5 |
| 2017/0014218 A1 * | 1/2017 | Kawaura ............ | A61B 17/3403 |
| 2017/0224379 A1 * | 8/2017 | Carson ................. | A61K 31/568 |
| 2019/0282271 A1 * | 9/2019 | Plessala ................ | A61M 25/01 |
| 2021/0059739 A1 * | 3/2021 | Holman ................. | A61B 90/04 |
| 2022/0022916 A1 * | 1/2022 | Uchida ............ | A61B 17/12136 |
| 2022/0240982 A1 * | 8/2022 | Norred ............. | A61B 17/12131 |
| 2023/0075988 A1 * | 3/2023 | Scheib ................... | A61B 1/303 |
| 2023/0076736 A1 * | 3/2023 | Scheib ................. | A61G 13/101 |

### OTHER PUBLICATIONS

Hofmeyr, G. J. et al. (2019). Randomized feasibility study of suction-tube uterine tamponade for postpartum hemorrhage. International Journal of Gynecology & Obstetrics, 146(3), 339-343. 10 pages.

Hofmeyr, G. J. et al. (2020). Novel suction tube uterine tamponade for treating intractable postpartum haemorrhage: description of technique and report of three cases. BJOG: An International Journal of Obstetrics & Gynaecology, 127(10), 1280-1283. 4 pages.

Haslinger, C. et al. (2021). Vacuum-induced tamponade for treatment of postpartum hemorrhage. Obstetrics and Gynecology, 138(3), 361. 5 pages.

Samartha Ram, H. et al. (2014). Vacuum retraction of uterus for the management of atonic postpartum hemorrhage. IOSR J Dent Med Sci (IOSR-JDMS), 2279-0853. 5 pages.

Panicker, T. N. Vasudeva. "Panicker's Vacuum Suction Haemostatic Device for Treating Post-Partum Haemorrhage", The Journal of Obstetrics and Gynecology of India (Mar.-Apr. 2017) 67(2):150-151, Mar. 1, 2017, 2 pages.

* cited by examiner

Case 3:25-cv-00392   Document 1-1   Filed 01/10/25   Page 4 of 22

**U.S. Patent**   Dec. 12, 2023   **Sheet 1 of 10**   **US 11,839,408 B2**



**FIG. 1**

Appx0032

**U.S. Patent**  Dec. 12, 2023  Sheet 2 of 10  **US 11,839,408 B2**



FIG. 2A



FIG. 2B

U.S. Patent     Dec. 12, 2023     Sheet 3 of 10     US 11,839,408 B2



FIG. 3

Case 3:25-cv-00392    Document 1-1    Filed 01/10/25    Page 7 of 22

**U.S. Patent**    Dec. 12, 2023    **Sheet 4 of 10**    **US 11,839,408 B2**



FIG. 4

Appx0035



**FIG. 5**

**Appx0036**

U.S. Patent    Dec. 12, 2023    Sheet 6 of 10    US 11,839,408 B2



FIG. 6B



FIG. 6A

**U.S. Patent**    Dec. 12, 2023    Sheet 7 of 10    US 11,839,408 B2



FIG. 7

**U.S. Patent**    Dec. 12, 2023    **Sheet 8 of 10**    **US 11,839,408 B2**



FIG. 8



**FIG. 9**

Appx0040

Case 3:25-cv-00392    Document 1-1    Filed 01/10/25    Page 13 of 22

**U.S. Patent**    Dec. 12, 2023    Sheet 10 of 10    **US 11,839,408 B2**



**FIG. 10**

US 11,839,408 B2

**1**

## SYSTEMS, DEVICES, AND METHODS FOR UTERINE HEMOSTASIS

### CROSS-REFERENCE TO RELATED APPLICATIONS

This patent application claims the priority and benefit of Provisional Patent Application Ser. No. 63/328,257, filed on Apr. 6, 2022. The aforementioned disclosure is hereby incorporated by reference including all references cited therein.

### INVENTIVE FIELD

The present technology pertains to medical devices. The present technology, in particular, pertains to systems, devices, and methods for monitoring and controlling postpartum hemorrhage and excessive uterine bleeding.

### SUMMARY

In some aspects, the techniques described herein relate to a postpartum hemorrhage mitigation device including: a flexible tube including: a distal end; a proximal tip, the proximal tip including a suction line extension being configured for placement in a uterine cavity of a uterus after childbirth either vaginally or via cesarean section; a tube center of the flexible tube; and at least one lumen around the tube center, the at least one lumen including a suction line, the suction line being in communication with a source of negative pressure and the suction line extension, the suction line extension being configured for applying the negative pressure to the uterine cavity using the source of the negative pressure thereby causing mechanical hemostasis of bleeding blood vessels of a uterine wall of the uterine cavity; and an anchoring mechanism being proximate to the suction line extension along the flexible tube, the anchoring mechanism being configured for maintaining the suction line extension in a desired position within the uterine cavity.

In some aspects, the techniques described herein relate to a postpartum hemorrhage mitigation device, wherein the suction line extension further includes one or more ports, the one or more ports being configured for drawing blood and other bodily fluids into the suction line extension from the bleeding blood vessels of the uterus.

In some aspects, the techniques described herein relate to a postpartum hemorrhage mitigation device, wherein at least one of the suction line extension and the suction line include volumetric indications, the volumetric indications being configured for measurement of a volume of blood within the suction line extension and the suction line for quantifying blood loss from the bleeding blood vessels of the uterus for a clinician to evaluate postpartum hemorrhaging.

In some aspects, the techniques described herein relate to a postpartum hemorrhage mitigation device, wherein the one or more ports include a plurality of ports, the plurality of ports including at least one of round pores, slits, and oval pores.

In some aspects, the techniques described herein relate to a postpartum hemorrhage mitigation device, wherein the one or more ports include both suction ports and protection pores, the protection pores protruding beyond an outer boundary of the flexible tube for protecting endometrium of the uterine wall from damage during suction.

In some aspects, the techniques described herein relate to a postpartum hemorrhage mitigation device, wherein the one or more ports include suction ports, the suction ports being

**2**

positioned in a one-hundred-and-eighty-degree spiral configuration around the tube center.

In some aspects, the techniques described herein relate to a postpartum hemorrhage mitigation device, wherein the at least one lumen includes a plurality of lumens; and wherein the at least one lumen further includes a guidewire.

In some aspects, the techniques described herein relate to a postpartum hemorrhage mitigation device, wherein the guidewire includes a malleable plastic-coated metal rod placed inside the at least one lumen to reinforce the at least one lumen, the malleable plastic-coated metal rod being configured for aiding directing of the suction line towards the uterus.

In some aspects, the techniques described herein relate to a postpartum hemorrhage mitigation device, wherein the suction line includes a semi-flexible catheter.

In some aspects, the techniques described herein relate to a postpartum hemorrhage mitigation device, wherein the proximal tip of the flexible tube further includes a semi-ridged end, the semi-ridged end being configured for steerability and push-ability of the postpartum hemorrhage mitigation device.

In some aspects, the techniques described herein relate to a postpartum hemorrhage mitigation device, wherein the anchoring mechanism is a collapsible anchoring mechanism, the collapsible anchoring mechanism being configured for an open state when the collapsible anchoring mechanism is positioned within the uterine cavity and for a collapsed state during positioning of the postpartum hemorrhage mitigation device within the uterine cavity.

In some aspects, the techniques described herein relate to a postpartum hemorrhage mitigation device, wherein the anchoring mechanism is an inflatable anchoring mechanism, the inflatable anchoring mechanism being configured for an inflated state when the inflatable anchoring mechanism is positioned within the uterine cavity and in a deflated state during positioning of the postpartum hemorrhage mitigation device within the uterine cavity.

In some aspects, the techniques described herein relate to a postpartum hemorrhage mitigation device, wherein the suction line extension further includes a first wing and a second wing, the first wing and the second wing being in a proximate position along the flexible tube to the anchoring mechanism and being configured for maintaining a position of the suction line extension in the uterine cavity.

In some aspects, the techniques described herein relate to a postpartum hemorrhage mitigation device, further including an hourglass shaped placement marker, the hourglass shaped placement marker being configured for movement along the suction line for personalization of the postpartum hemorrhage mitigation device to a size of the uterus.

In some aspects, the techniques described herein relate to a postpartum hemorrhage mitigation device, wherein the hourglass shaped placement marker covers one or more ports.

In some aspects, the techniques described herein relate to a postpartum hemorrhage mitigation device, wherein the anchoring mechanism is a wavy placement anchor.

In some aspects, the techniques described herein relate to a postpartum hemorrhage mitigation device, wherein the flexible tube is tapered towards the distal end for positioning of the postpartum hemorrhage mitigation device within the uterine cavity.

In some aspects, the techniques described herein relate to a postpartum hemorrhage mitigation device, wherein the at least one lumen includes a hydrophilic coating, the hydro-

Appx0042

US 11,839,408 B2

3

philic coating providing compatibility with bodily fluids and reducing friction of the at least one lumen.

In some aspects, the techniques described herein relate to a postpartum hemorrhage mitigation device including: a flexible tube including: a distal end; a proximal tip, the proximal tip including a suction line extension being configured for placement in a uterine cavity of a uterus after childbirth either vaginally or via cesarean section, the suction line extension including one or more ports, the one or more ports being configured for drawing blood and other bodily fluids into the suction line extension from bleeding blood vessels of a uterine wall of the uterine cavity, the one or more ports including suction ports, the suction ports being positioned in a one-hundred-and-eighty-degree spiral configuration around a tube center of the flexible tube, the one-hundred-and-eighty-degree spiral configuration preventing blockage of all of the suction ports; wherein the suction line extension further includes volumetric indications, the volumetric indications being configured for measurement of a volume of blood within the suction line extension and the suction line for quantifying blood loss from the bleeding blood vessels for a clinician to evaluate postpartum hemorrhaging; and at least one lumen around the tube center, the at least one lumen including a suction line, the suction line being in communication with a source of negative pressure and the suction line extension, the suction line extension being configured for applying the negative pressure to the uterine cavity using the source of the negative pressure thereby causing mechanical hemostasis of the bleeding blood vessels of the uterine wall of the uterine cavity; and an anchoring mechanism being proximate to the suction line extension along the flexible tube, the anchoring mechanism being configured for maintaining the suction line extension in a desired position within the uterine cavity.

In some aspects, the techniques described herein relate to a postpartum hemorrhage mitigation device including: a flexible tube including: a distal end; a proximal tip, the proximal tip including a suction line extension being configured for placement in a uterine cavity of a uterus after childbirth either vaginally or via cesarean section, the suction line extension including one or more ports, the one or more ports being configured for drawing blood and other bodily fluids into the suction line extension from bleeding blood vessels of a uterine wall of the uterine cavity, the one or more ports including suction ports, the suction ports being positioned in a one-hundred-and-eighty-degree spiral configuration around a tube center of the flexible tube, the one-hundred-and-eighty-degree spiral configuration preventing blockage of all of the suction ports; and at least one lumen around the tube center, the at least one lumen including a suction line, the suction line being in communication with a source of negative pressure and the suction line extension, the suction line extension being configured for applying the negative pressure to the uterine cavity using the source of negative pressure thereby causing mechanical hemostasis of the bleeding blood vessels of the uterine wall of the uterine cavity; and an anchoring mechanism being proximate to the suction line extension along the flexible tube, the anchoring mechanism being configured for maintaining the suction line extension in a desired position within the uterine cavity.

## BACKGROUND

Postpartum hemorrhage (PPH) is the leading cause of maternal morbidity and mortality worldwide and is responsible for twenty-five percent of maternal deaths. Complica-

4

tions for PPH are also high with more than 1.5 million women annually experiencing morbidities. Literature states that the incidence and severity are increasing in both low-resourced and high-resourced settings. Uterine atony is the root cause of nearly eighty percent of PPH's and uterine atony is also the most preventable. Other less common causes include trauma, coagulopathy and retained tissue. After the placenta is delivered, the uterus must contract the fibers of the myometrium to control the bleeding. If the uterus remains atonic, the vessels are unable to constrict causing hemorrhage.

Postpartum hemorrhage is a condition that occurs when a woman's uterus bleeds more than 500 mL of blood within 24 hours following vaginal childbirth or 1000 mL of blood within twenty-four hours following cesarean childbirth. Often, the condition is caused when the woman's uterus fails to contract postpartum, which leaves blood vessels within the uterus open, so they continue to bleed. Postpartum hemorrhage may lead to a significant loss of blood from, and in extreme cases death of the woman.

Traditionally, it is difficult to diagnose and/or determine the amount of postpartum hemorrhage because it is difficult to determine or measure the volume of postpartum blood-loss, as there are inadequate means to capture the blood and accurately measure it. This is further complicated by blood pooling in the uterine cavity over time. This pooled blood may be held in place via, for example, a blood clot that forms at the base of the uterus and covers the opening to the cervical canal so that the woman may be bleeding internally (occult blood loss) with no vaginal bleeding to alert medical staff that postpartum hemorrhage may be occurring.

## BRIEF DESCRIPTION OF THE DRAWINGS

The accompanying drawings, where like reference numerals refer to identical or functionally similar elements throughout the separate views, together with the detailed description below, are incorporated in and form part of the specification, and serve to further illustrate embodiments of concepts that include the claimed disclosure, and explain various principles and advantages of those embodiments.

The methods and systems disclosed herein have been represented where appropriate by conventional symbols in the drawings, showing only those specific details that are pertinent to understanding the embodiments of the present disclosure so as not to obscure the disclosure with details that will be readily apparent to those of ordinary skill in the art having the benefit of the description herein. The present technology is illustrated by way of example, and not limitation, in the figures of the accompanying drawings in which:

FIG. **1** is an illustration of a first exemplary postpartum hemorrhage mitigation device positioned within a mammal's uterus, in accordance with some embodiments of the present technology.

FIG. **2**A is an illustration of a second exemplary postpartum hemorrhage mitigation device in an inflated state and positioned within a uterine cavity and cervical canal of a mammal who recently gave birth either vaginally or via cesarean section, in accordance with some embodiments of the present technology.

FIG. **2**B is an illustration of a second postpartum hemorrhage mitigation device of FIG. **2**A with the inflatable anchoring mechanism in a deflated state, in accordance with some embodiments of the present technology.

FIG. **3** is an illustration of a third exemplary postpartum hemorrhage mitigation device positioned within a uterine

US 11,839,408 B2

5

cavity and cervical canal of a mammal who recently gave birth either vaginally or via cesarean section, in accordance with some embodiments of the present technology.

FIG. **4** is an illustration of exemplary postpartum hemorrhage mitigation devices before being positioned within a uterine cavity, in accordance with some embodiments of the present technology.

FIG. **5** is an illustration of exemplary postpartum hemorrhage mitigation devices before being positioned within a uterine cavity, in accordance with some embodiments of the present technology.

FIG. **6**A and FIG. **6**B are illustrations of exemplary postpartum hemorrhage mitigation devices after being positioned within a uterine cavity, in accordance with some embodiments of the present technology.

FIG. **7** is an illustration of an exemplary postpartum hemorrhage mitigation device before being positioned within a uterine cavity including a tapered tip to attach to the suction line, in accordance with some embodiments of the present technology.

FIG. **8** is an illustration of an exemplary stylet for proper positioning of a postpartum hemorrhage mitigation device within the uterus including a tapered tip to attach to the suction line, in accordance with some embodiments of the present technology.

FIG. **9** is an illustration of an exemplary Malecot "flower" design used as an anchoring mechanism for a postpartum hemorrhage mitigation device within the vagina, in accordance with some embodiments of the present technology.

FIG. **10** is an illustration of an exemplary collapsible anchoring mechanism for a postpartum hemorrhage mitigation device within the uterus, in accordance with some embodiments of the present technology.

Throughout the drawings, the same reference numerals, and characters, unless otherwise stated, are used to denote like features, elements, components, or portions of the illustrated embodiments. Moreover, while the subject technology will now be described in detail with reference to the drawings, the description is done in connection with the illustrative embodiments. It is intended that changes and modifications can be made to the described embodiments without departing from the true scope and spirit of the present technology as defined by the appended claims.

DETAILED DESCRIPTION

Embodiments of the present disclosure are directed to postpartum hemorrhage mitigation devices as described herein. For example, embodiments include postpartum hemorrhage mitigation devices for contraction of a uterus, restoration of uterine tone, maintenance of uterine tone, and hemostasis of blood vessels within the uterus. Cesarean sections are the most common surgery performed each year. It is expected that by 2030, there will be thirty-eight million surgeries per year, worldwide. Cesarean sections are an independent risk factor for Postpartum hemorrhage (PPH) and sepsis.

In various embodiments postpartum hemorrhage mitigation devices of the present technology use negative pressure wound therapy. For example, negative pressure wound therapy is an innovative procedure used both on the skin surface and in endoscopic procedures. Furthermore, negative pressure wound therapy is used to provide local debridement, reduce bacterial contamination, drain wound secretions, reduce local edema and stimulate the froth of granulation tissue. Worldwide, sepsis episodes are one of the five most common causes of death associated with child-

6

birth. Although rare, peritonitis can cause cesarean section scar dehiscence. Moreover, a history of cesarean sections and uterine surgery increases the risk of dehiscence.

Traditionally, postpartum blood loss is estimated by clinicians via visual observation of absorbent materials positioned near a pregnant mammal such as menstrual pads and bed sheets. These visual observations often underestimate the volume of blood loss by thirty-three percent to fifty percent, particularly when large amounts of blood are lost. The inaccuracy of visual observations is further exacerbated by the fact that pregnant mammals excrete fluids other than blood (e.g., urine, irrigation fluid, and/or amniotic fluid) during labor, delivery, and postpartum recovery, which may make it difficult to visually assess how much blood (as opposed to other fluids) may have been lost. The present technology solves these problems by providing a way to quantify postpartum blood loss through evacuation of blood directly from the uterus before the blood may be contaminated with other fluids.

Various embodiments of the present technology are directed to postpartum hemorrhage mitigation devices for treatment of postpartum hemorrhage (PPH) and the prevention of PPH. For example, the postpartum hemorrhage mitigation devices of the present technology decrease uterine bleeding both in obstetric and gynecologic cases and treat uterine wounds with negative pressure (i.e., wound therapy) including the hysterotomy incision (i.e., C/S incision) and accreta (uterine defects).

Embodiments of the present technology are directed to postpartum hemorrhage mitigation devices including monitoring and diagnosing postpartum hemorrhage (PPH) by qualification of real-time blood loss from the uterus. Embodiments include treating or preventing local infection control. Embodiments further include clot extraction. For example, a postpartum hemorrhage mitigation device may be placed vaginally when clots cannot be expressed manually. For example, this may be important during minimally or not dilated cervices such as during a planned cesarean section.

In some embodiments, postpartum hemorrhage mitigation devices of the present technology include single or multiple lumens, a flexible tube with a semi-ridged end for steerability and push-ability, a guidewire or stylet for proper positioning, oval pores and/or slits and/or round pores, a positioning ring at the cervical external orifice, a hydrophilic coating (e.g., polymer) on the inside of the catheter, and markings on the end of the tube (e.g., external of the vagina) for quantification of blood loss. In some embodiments a stylet is a single straight wire with a hub at one end which is inserted into the catheter prior to placement. The stylet may be used to add stiffness to the catheter during insertion and the stylet may be manually adjusted by a clinician to be curved for ease of placement. After placement, the stylet may be removed from the catheter. In some embodiments a guide wire is a thin wire used to guide the placement of postpartum hemorrhage mitigation devices of the present technology.

In various embodiments the present technology is directed to postpartum hemorrhage mitigation devices configured to monitor and quantitatively measure postpartum blood loss after cesarean delivery and prevent postpartum hemorrhage by, for example, mechanical, vacuum-induced tamponade that may encourage contraction of the uterus, restoration of uterine tone, maintenance of uterine tone, and/or hemostasis of the blood vessels within the uterus. In some embodiments, the devices disclosed herein may configured to be positioned within the uterus of mammals (e.g., human

US 11,839,408 B2

7

women) who have recently undergone childbirth via, for example, a cesarean section and apply negative pressure to the uterus to assist with contraction of the uterus. This contraction of the uterus acts to close uterine blood vessels and/or reduce bleeding from uterine blood vessels thereby controlling risks associated with postpartum hemorrhage. The negative pressure may be applied to the uterus via, for example, a vacuum pump and/or a standard suction cannister that may be coupled to a wall-regulated suction of a hospital room. Exemplary amounts of negative pressure applied to the postpartum hemorrhage mitigation devices disclosed herein range from 50-300 mmHg depending on, for example, a duration of time following childbirth that the negative pressure is applied. For example, an initially high negative pressure (e.g., 150-300 mmHg) may be applied to the uterine cavity between five and ten minutes following placement of the postpartum hemorrhage mitigation device disclosed herein to maximize the initial uterine contraction/ restoration of uterine tone. The amount of negative pressure may then be gradually reduced over time to assist with, for example, continued contraction of the uterus, maintenance of uterine tone, and/or evacuation of blood from the uterine cavity following the initial contraction of the uterus.

The postpartum hemorrhage mitigation device disclosed herein may also be configured to draw blood away from the uterine cavity into a collection vessel so that a volume of blood the mammal is losing can be quantified in order to, for example, diagnose postpartum hemorrhage and/or determine when it is advisable to remove the device from the mammal's uterus because bleeding has been sufficiently reduced.

In various embodiments, the postpartum hemorrhage mitigation devices disclosed herein may be placed within a mammal's uterus via a surgical opening caused by a hysterotomy during cesarean delivery of her child and following delivery of the baby and placenta. The postpartum hemorrhage mitigation devices disclosed herein may be configured to be placed within the lower-uterine segment and, following placement of the postpartum hemorrhage mitigation device, a suction line (e.g., semi-flexible catheter) may be fed through the cervix and out the vagina for coupling to an external vacuum source. Then, the surgical opening may be closed, sealing a postpartum hemorrhage mitigation device within the uterus. Next, a cervical seal may be created via, for example, a diaphragm that covers the cervical opening and/or an inflatable balloon that occludes the cervical opening upon inflation. Once the seal is created, negative pressure may be applied to the suction line via the vacuum source and this negative pressure may contract the uterus and evacuate blood from the uterine cavity for quantification. Finally, the postpartum hemorrhage mitigation device may be extracted from the uterus via the cervix and vagina typically one to twenty-four hours following closure of the surgical opening when, for example attending clinical staff determines that the patient is no longer at risk for postpartum hemorrhage.

Turning now to the figures, FIG. 1 is an illustration of an exemplary postpartum hemorrhage mitigation device 100 positioned within a uterine cavity 190 bounded by a uterine wall 170 of a uterus 160 of a mammal (e.g., human woman, horse, dog, etc.) that recently gave birth via cesarean section. Postpartum hemorrhage mitigation device 100 includes a suction line extension 110, an anchoring mechanism 120, and a suction line 130. In various embodiments the suction line 130 may include a guidewire. The guidewire may be used to guide the anchoring mechanism 120, and the suction line 130 of the postpartum hemorrhage mitigation device

8

100 into place during insertion of the postpartum hemorrhage mitigation device 100 within the uterine cavity 190. In some embodiments, the postpartum hemorrhage mitigation device 100 includes a guidewire and the purpose of the guidewire is to properly position the postpartum hemorrhage mitigation device 100 using a minimally invasive technique.

In some embodiments, the postpartum hemorrhage mitigation device 100 includes a flexible tube (not shown) comprising: a distal end 115; a proximal tip 105, the proximal tip 105 comprising a suction line extension 110 being configured for placement in the uterine cavity 190 of the uterus 160 after childbirth; a tube center (not shown) of the flexible tube; and at least one lumen (not shown) around the tube center, the at least one lumen comprising a suction line 130, the suction line 130 being in communication with a source of negative pressure (not shown) and the suction line extension 110, the suction line extension 110 being configured for applying the negative pressure to the uterine cavity 190 using the source of the negative pressure thereby causing mechanical hemostasis of bleeding blood vessels (not shown) of a uterine wall 170 of the uterine cavity 190; and the anchoring mechanism 120 being proximate to the suction line extension 110 along the flexible tube, the anchoring mechanism 120 being configured for maintaining the suction line extension 110 in a desired position within the uterine cavity 190. For example, the anchoring mechanism 120 may be a collapsible anchoring mechanism 450. Furthermore, the exemplary collapsible anchoring mechanism 450 is shown in FIG. 10 including a plurality of wings.

In various embodiments, the suction line 130 may be configured to couple to a source of negative pressure, such as a vacuum pump (not shown) so that negative pressure may be applied to the suction line 130. The suction line 130 is configured to be in communication with the suction line extension 110 and negative pressure applied to the suction line 130 may be communicated to the suction line extension 110 so that suction line extension 110 may apply negative pressure to the uterine cavity 190 via one or more ports (which may be embodied as holes) positioned within the suction line extension 110. In many embodiments, multiple ports (e.g., four ports to ten ports) may be used to, for example, distribute force attributable to the negative pressure over a particular surface area and/or maintain functioning of the device if one or more of the ports becomes occluded by, for example, a blood clot. Application of negative pressure via the port(s) in the suction line extension 110 may facilitate the application of negative pressure to the inner surface of uterine wall 170, thereby contracting the inner surface area uterine wall 170 and thereby causing mechanical hemostasis of potentially bleeding blood vessels positioned within the uterine wall 170. The ports in the suction line extension 110 may also be configured to draw blood and other bodily fluids into the suction line extension 110 so that they may be evacuated away from the uterine cavity 190 via the suction line 130. In some embodiments, the suction line 130 may be coupled to a collection vessel (e.g., jar or bag) configured to collect the fluids evacuated from the uterine cavity 190 so that a quantity of fluid/blood evacuated from the uterine cavity 190 may be measured. Additionally, or alternatively, the suction line 130 may have volumetric indications (e.g., in ten mL, twenty mL, or fifty mL increments) printed or stamped thereon so that a clinician may measure a volume of blood within the suction line 130. This measurement may be used to quantify blood loss and/or evaluate the mammal's risk of postpartum hemorrhage and/or the severity thereof.

US 11,839,408 B2

9 | 10

In various embodiments, the anchoring mechanism **120** may be configured to assist with maintaining the suction line extension **110** in a desired position within the uterine cavity **190**. Often times, the desired position for the suction line extension **110** is at the base of uterine cavity **190** directly above cervical canal **180** so that the suction line **130** extends from a base of the anchoring mechanism **120** through the cervical canal **180** and out of the mammal's body via the vagina to be coupled to the vacuum pump and/or collection receptacle. The guidewire may be used to properly position the anchoring mechanism **120** using a minimally invasive technique. The anchoring mechanism **120** may be made from a soft, flexible, material such as silicon and/or plastic and, some occasions, the anchoring mechanism **120** may open or otherwise spread apart to cover the cervical opening after being properly place into position. In some embodiments, suction line extension **110** may be configured with a port positioned proximate to anchoring mechanism **120** to evacuate any bodily fluids that may accumulate within the anchoring mechanism **120**. In some embodiments, the at least one lumen comprises a plurality of lumens; and wherein the at least one lumen further comprises a guidewire (now shown).

In some embodiments, the postpartum hemorrhage mitigation device **100** is placed within the uterus **160** of a human woman, with the suction line **130** extending through the cervical canal **180** following a cesarean delivery of her child while the abdomen and the uterus **160** are surgically open. The anchoring mechanism **120** may be configured to enable extraction of the postpartum hemorrhage mitigation device **100** from uterine cavity **190** via pulling on the suction line **130** so that the anchoring mechanism **120** collapses enough to allow passage of the anchoring mechanism **120** and the suction line extension **110** through the cervical canal **180** and the vagina (not shown) and eventually to be extracted from the mammal's body.

FIG. **2A** is an illustration of a second exemplary postpartum hemorrhage mitigation device **200** with an inflatable anchoring mechanism in an inflated state and positioned within the uterine cavity **190** and the cervical canal **180** of a mammal who recently gave birth either vaginally or via cesarean section according to various embodiments. FIG. **2B** is an illustration of the second postpartum hemorrhage mitigation device **200** with the inflatable anchoring mechanism **220** in a deflated state **225** prior to insertion into the uterus **160** according to some embodiments. The postpartum hemorrhage mitigation device **200** operates in a manner similar to the postpartum hemorrhage mitigation device **100** with the exception of the anchoring mechanism **120** of FIG. **1** may be an inflatable anchoring mechanism **220** (e.g., inflatable anchoring mechanism **220** in an inflated state is shown in FIG. **2A** and the inflatable anchoring mechanism **220** in a deflated state **225** prior to insertion into the uterus **160** is shown in FIG. **2B**). Postpartum hemorrhage mitigation device **200** includes a suction line extension **210**, the inflatable anchoring mechanism **220**, and a suction line **230**. Prior to insertion into the uterus **160**, the inflatable anchoring mechanism **220** (e.g., inflatable anchoring mechanism **220** in an inflated state is shown in FIG. **2A** and the inflatable anchoring mechanism **220** in a deflated state **225** prior to insertion into the uterus **160** is shown in FIG. **2B**) may be in a deflated state **225** as shown in FIG. **2B**. The inflatable anchoring mechanism **220** in a deflated state **225** as shown in FIG. **2B** may be inserted into cervical canal **180** either vaginally or via a surgical opening caused by a cesarean delivery of the mammal's baby or babies. Once placed within cervical canal **180**, the inflatable anchoring mechanism **220** may be inflated to a degree sufficient to hold second exemplary postpartum hemorrhage mitigation device **200** and/or the inflatable anchoring mechanism **220** in a desired position within the uterine cavity **190** and/or the cervical canal **180**. Additionally, or alternatively, the inflatable anchoring mechanism **220** may be inflated via insertion/injection of a fluid into the inflatable anchoring mechanism **220** via a port **240** positioned on the uterine-facing side of the inflatable anchoring mechanism **220** prior to surgically closing the uterus **160**. The port **240** may be, for example, a one- or two-direction valve in various embodiments. The inflatable anchoring mechanism **220** may also be configured to seal the cervical canal **180** so that blood and other bodily fluids do not escape from the cervical cavity.

In various embodiments, the suction line **230** may be configured to inflate/deflate the inflatable anchoring mechanism **220** and/or communicate negative pressure to the suction line extension **210** via one or more ports positioned therein. The ports of suction line extension **210** may also be configured to evacuate blood and other bodily fluids from the uterine cavity **190** in a manner similar to the ports of the suction line extension **110**.

In some embodiments, the inflatable anchoring mechanism **220** is configured for an inflated state when the inflatable anchoring mechanism **220** is positioned within uterine cavity **190** and in a deflated state during positioning of the postpartum hemorrhage mitigation device **200** within the uterine cavity **190**.

In some embodiments, the suction line **230** may have two lumens; a first lumen configured as an inflation line lumen for inflating and deflating the inflatable anchoring mechanism **220** and a second lumen configured as a suction line similar to suction line **130**. The inflation line lumen may be configured to couple with an air and/or liquid source (not shown) that may be used to provide air/liquid used to inflate the inflatable anchoring mechanism **220**.

In various embodiments, the postpartum hemorrhage mitigation device **200** is placed within the uterus **160** of a mammal, with the suction line extension **210** extending through the cervical canal **180** following a cesarean delivery of her child while the abdomen and uterus **160** are surgically open. Alternatively, postpartum hemorrhage mitigation device **200** may be inserted into cervical canal **180** and uterine cavity **190** via a vaginal route. Prior to extraction of postpartum hemorrhage mitigation device **200** from cervical canal **180**, the inflatable anchoring mechanism **220** may be deflated enough to enable extraction of the postpartum hemorrhage mitigation device **200** from the uterine cavity **190** via pulling on the suction line **230** to allow passage of postpartum hemorrhage mitigation device **200** through the cervical canal **180** and the vagina (not shown) and eventual extraction from the mammal's body.

According to various embodiments, FIG. **3** is an illustration of a third exemplary postpartum hemorrhage mitigation device **300** positioned within uterine cavity **190** and cervical canal **180** of a mammal who recently gave birth either vaginally or via cesarean section. Postpartum hemorrhage mitigation device **300** includes a suction line **330**, an anchoring mechanism **320**, a suction line extension **310**, a first wing **315A** and a second wing **315B**.

In some embodiments, the postpartum hemorrhage mitigation device **300** operates in a manner similar to the postpartum hemorrhage mitigation device **100** with the exception that the anchoring mechanism **320** is positioned on the vaginal side of the cervical canal **180** (as opposed to the uterine side as shown by the anchoring mechanism **120** in FIG. **1**) and suction line extension **310** includes a first

US 11,839,408 B2

11

wing 315A and a second wing 315B. The suction line extension 310, the first wing 315A, and/or the second wing 315B may include one or more ports configured to evacuate blood and other bodily fluids from the uterine cavity 190 in a manner similar to the ports of the suction line extension 110 and the suction line extension 210.

In some embodiments, the postpartum hemorrhage mitigation device 300 is placed within the uterus of a mammal, with the suction line 130 extending through cervical canal 180 following a cesarean delivery of her child while the abdomen and the uterus 160 are surgically open. Alternatively, the postpartum hemorrhage mitigation device 300 may be inserted into the cervical canal 180 via a vaginal route. The first wing 315A and the second wing 315B and/or the anchoring mechanism 320 may be configured to enable extraction of the postpartum hemorrhage mitigation device 300 from uterine cavity 190 via pulling on the suction line 330 so that first wing 315A and the second wing 315B and/or the anchoring mechanism 320 collapse enough to allow passage thereof through the cervical canal and the vagina (not shown) and eventually extracted from the mammal's body.

In some cases, the postpartum hemorrhage mitigation device(s) disclosed herein may be configured to be radio opaque and/or observable via fluoroscopy imaging techniques during a uterine artery embolization and also observable using ultrasound.

Additionally, or alternatively, a suction line may have a bifurcated lumen with, for example, a diaphragm or membrane running along the length that divides the lumen into two or more sub-lumens.

FIG. 4 is an illustration 400 of exemplary postpartum hemorrhage mitigation devices before being positioned within a uterine cavity, in accordance with some embodiments of the present technology. FIG. 4 illustrates various exemplary postpartum hemorrhage mitigation devices including a postpartum hemorrhage mitigation device 410, a postpartum hemorrhage mitigation device 420, a postpartum hemorrhage mitigation device 430, and a postpartum hemorrhage mitigation device 440. According to various embodiments, the postpartum hemorrhage mitigation device 410 includes a collapsible anchoring mechanism 450 shown in the open configuration in the postpartum hemorrhage mitigation device 410. In some instances, for example during insertion of the postpartum hemorrhage mitigation device 410 into the uterus, the collapsible anchoring mechanism 450 may be in the collapsed configuration 455. For example, the postpartum hemorrhage mitigation device 410 may comprise the anchoring mechanism being a collapsible anchoring mechanism 450, the collapsible anchoring mechanism being configured for an open state when the collapsible anchoring mechanism 450 is positioned within the uterine cavity 190 and for a collapsed state (e.g., collapsible anchoring mechanism 450) during positioning of the postpartum hemorrhage mitigation device 410 within the uterine cavity 190.

In some embodiments the collapsible anchoring mechanism 450 is an umbrella configuration comprising a plurality of wings. For example, an exemplary collapsible anchoring mechanism 450 is shown in FIG. 10 including a plurality of wings in the umbrella configuration.

The postpartum hemorrhage mitigation device 420 includes an hourglass shaped placement marker 460, which may slide up and cover ports (e.g., round pores 465 and/or slits 485 and/or oval pores 475) to allow the postpartum hemorrhage mitigation device 420 to be personalized and properly positioned to the size of a uterus. The ports may

12

also be round pores 465 and/or slits 485 and/or oval pores 475 to allow for suction by connection to the suction line extension 110. In some embodiments, multiple ports (e.g., four ports to ten ports) may be used to, for example, distribute force attributable to the negative pressure over a particular surface area and/or maintain functioning of the device if one or more of the ports becomes occluded by, for example, a blood clot. Application of negative pressure via the ports in the suction line extension 110 may facilitate the application of negative pressure to the inner surface of uterine wall 170, thereby contracting the inner surface area uterine wall 170 and thereby causing mechanical hemostasis of potentially bleeding blood vessels positioned within the uterine wall 170. The ports in the suction line extension 110 (e.g., round ports 465) may also be configured to draw blood and other bodily fluids into the suction line extension 110 so that they may be evacuated away from the uterine cavity 190 via the suction line 130. FIG. 4 further illustrates the postpartum hemorrhage mitigation device 430 that includes a wavy placement anchor 470, which is variation of an anchoring mechanism (e.g., the anchoring mechanism 120 in FIG. 1). The postpartum hemorrhage mitigation device 440 includes a placement collar 480.

In some embodiments the at least one lumen comprises a plurality of lumens. For example, the postpartum hemorrhage mitigation device 440 shows a tapered inner lumen 490 and an outer lumen 495 with the outer lumen 495 having a consistent diameter adding thickness and push-ability of a catheter without using a stylet or guidewire. Furthermore, for example, postpartum hemorrhage mitigation device 440 shows ports (e.g., slits 485).

In some embodiments, the postpartum hemorrhage mitigation device 410 includes oval pores 475 and the postpartum hemorrhage mitigation device 420 includes round ports 465. For example, wherein the suction line extension further comprises one or more ports (e.g., round pores 465 and/or oval pores 475 and/or slits 485), the one or more ports (e.g., round ports 465 and oval pores 475) being configured for drawing blood and other bodily fluids into the suction line extension from the bleeding blood vessels of the uterus. For example, the postpartum hemorrhage mitigation device 410 includes ports comprising oval pores 475. For example, the postpartum hemorrhage mitigation device 420 includes round ports 465 a comprising round pores.

In some embodiments a problem in the field is having two rows of pores on each side of the flexible tube may be a problem because the postpartum uterine cavity (e.g., uterine cavity 190) may be a flat potential space with an anterior and posterior wall in apposition. If the two rows of pores could suck against the anterior and posterior walls, respectively, the two rows of pores may become obstructed leaving only a tip port for suction. Thus, it may be important to have pores facing in all directions so that in any position, some apertures would face laterally and would not be obstructed. A solution to this problem is that the pores may be positioned in one-hundred-and-eighty degree spirals rather than straight lines. For example, according to various embodiments the round ports 465 and the oval pores 475 may comprise suction ports, the suction ports being positioned in a one-hundred-and-eighty-degree spiral configuration around the tube center as shown by the round ports 465 and the oval pores 475.

FIG. 5 is an illustration 500 of exemplary postpartum hemorrhage mitigation devices before being positioned within a uterine cavity, in accordance with some embodiments of the present technology. FIG. 5 is an illustration 500 of various exemplary postpartum hemorrhage mitigation

Appx0047

US 11,839,408 B2

13

devices including a postpartum hemorrhage mitigation device **510**, a postpartum hemorrhage mitigation device **520**, a postpartum hemorrhage mitigation device **530**, and protection pores **540** for a postpartum hemorrhage mitigation device. For example, postpartum hemorrhage mitigation device **510** shows ports (e.g., round ports **465** such as round pores and/or slits **485** and/or oval pores **475**). The lighter shaded pores **512** may be suction pores to facilitate the application of negative pressure to the inner surface of uterine wall **170** and the darker shaded ports may be protection pores **514** may protrude beyond the outer boundaries of the postpartum hemorrhage mitigation device **510** to protect the endometrium from damage during suction. Furthermore, the postpartum hemorrhage mitigation device **530** illustrates a top down view of a catheter showing a plurality of projections. For example, two, three or four projections that may be pores that show protection pores **514** that protrude beyond the outer boundaries of the postpartum hemorrhage mitigation device **530**. For example, protection pores **540** for a postpartum hemorrhage mitigation device. In some instances the postpartum hemorrhage mitigation device **530** includes the one or more ports comprise both suction ports and protection pores **514**, the protection pores **514** protruding beyond an outer boundary of the flexible tube **516** for protecting endometrium of the uterine wall (not shown) from damage during suction.

FIG. **6A** and FIG. **6B** are illustrations **600** of exemplary postpartum hemorrhage mitigation devices after being positioned within a uterine cavity, in accordance with some embodiments of the present technology. FIG. **6A** and FIG. **6B** show exemplary postpartum hemorrhage mitigation devices after being placed in position in the uterus, in contrast, FIG. **4** shows the postpartum hemorrhage mitigation devices before being positioned within in the uterus. For example, illustration **610** of FIG. **6A** shows the hourglass shaped placement marker **460** positioned within the uterine cavity (e.g., uterine cavity **190**) and a cervical canal (e.g., the cervical canal **180**) of a mammal who recently gave birth either vaginally or via cesarean section. For example, the hourglass shaped placement marker **460** may be configured for movement along the suction line (not shown, e.g., suction line **130**) for personalization of the postpartum hemorrhage mitigation device to a size of the uterus **160**. For example, illustration **620** of FIG. **6B** shows the collapsible anchoring mechanism **450** of FIG. **4** shown in the open configuration positioned covering a cervical canal (e.g., the cervical canal **180**) of a mammal who recently gave birth either vaginally or via cesarean section.

FIG. **7** is an illustration of an exemplary postpartum hemorrhage mitigation device **700** before being positioned within a uterine cavity including a tapered catheter tip **715** to attach to the suction line, in accordance with some embodiments of the present technology. For example, illustration **710** of FIG. **7** shows the shape of a tapered catheter tip **715** including ridges (now shown) to attach to the suction line (not shown, e.g., the suction line **130**). For example, the tapered catheter tip **715**, which tapers on the proximal tip **105** that adds thickness and push-ability allowing ease of placement of the postpartum hemorrhage mitigation device **700** into a desired position. For example, the proximal tip **105** of the flexible tube further comprises a semi-ridged end **720**, the semi-ridged end **720** being configured for steerability and push-ability of the postpartum hemorrhage mitigation device **700**.

FIG. **8** is an illustration **800** of an exemplary stylet **810** for proper positioning of a postpartum hemorrhage mitigation device within the uterus including a tapered tip to attach to

14

the suction line, in accordance with some embodiments of the present technology. For example, FIG. **8** shows the stylet **810** attached to an exemplary postpartum hemorrhage mitigation device for proper positioning of the postpartum hemorrhage mitigation device. For example, the stylet **810** may be a small, malleable plastic-coated metal rod that may be placed inside a suction line to reinforce or pre-shape the lumen of the tube to aid in directing the suction line towards the uterus. In some instances a guidewire (e.g., stylet **810**) may be used to ease proper positioning of a postpartum hemorrhage mitigation device. For instance, the guidewire (e.g., stylet **810**) may be used to properly position an anchoring mechanism in the uterus of a female woman who recently gave birth either vaginally or via cesarean section. For example, the guidewire (e.g., stylet **810**) may comprise a malleable plastic-coated metal rod placed inside the at least one lumen to reinforce the at least one lumen, the malleable plastic-coated metal rod being configured for aiding directing of the suction line **130** towards the uterus **160**.

In some embodiments, the guidewire may be used to guide the anchoring mechanism **120**, and the suction line **130** of the postpartum hemorrhage mitigation device **100** into place during insertion of the postpartum hemorrhage mitigation device **100** within the uterine cavity **190**.

FIG. **9** is an illustration **900** of an exemplary Malecot "flower" design anchoring mechanism **920** used as an anchoring mechanism for a postpartum hemorrhage mitigation device **910** within the vagina, in accordance with some embodiments of the present technology. For example, illustration **900** of FIG. **9** shows an exemplary anchoring mechanism (e.g., anchoring mechanism **120** of FIG. **1** and anchoring mechanism **450** of FIG. **4**) for a postpartum hemorrhage mitigation device **910** within the uterus **160**. For example, the anchoring mechanism may use a Malecot "flower" design anchoring mechanism **920** that anchors the postpartum hemorrhage mitigation device **910** in the vagina of a woman after birth either vaginally or via cesarean section.

FIG. **10** is an illustration **1000** of an exemplary collapsible anchoring mechanism **450** for a postpartum hemorrhage mitigation device within the uterus, in accordance with some embodiments of the present technology. For example, FIG. **10** shows the collapsible anchoring mechanism **450** is an umbrella configuration comprising a plurality of wings. For example, wing A and wing B in alternating fashion. For example, the exemplary collapsible anchoring mechanism **450** may include a plurality of wings that alternate (e.g., wing A, wing B, wing A, wing B, wing A) and may be made of different materials such as solid material or mesh. Furthermore, in some embodiments a wing may be absent from the exemplary collapsible anchoring mechanism **450**.

While this technology is susceptible of embodiments in many different forms, there is shown in the drawings and has been described in detail several specific embodiments with the understanding that the present disclosure is to be considered as an exemplification of the principles of the technology and is not intended to limit the technology to the embodiments illustrated.

Although the terms first, second, etc. may be used herein to describe various elements, components, regions, layers and/or sections, these elements, components, regions, layers and/or sections should not necessarily be limited by such terms. These terms are only used to distinguish one element, component, region, layer or section from another element, component, region, layer, or section. Thus, a first element, component, region, layer or section discussed below could

US 11,839,408 B2

15

be termed a second element, component, region, layer or section without departing from the teachings of the present disclosure.

The terminology used herein is for the purpose of describing particular embodiments only and is not intended to be necessarily limiting of the disclosure. As used herein, the singular forms "a," "an" and "the" are intended to include the plural forms as well, unless the context clearly indicates otherwise. The terms "comprises," "includes" and/or "comprising," "including" when used in this specification, specify the presence of stated features, integers, steps, operations, elements, and/or components, but do not preclude the presence or addition of one or more other features, integers, steps, operations, elements, components, and/or groups thereof.

Example embodiments of the present disclosure are described herein with reference to illustrations of idealized embodiments (and intermediate structures) of the present disclosure. As such, variations from the shapes of the illustrations as a result, for example, of manufacturing techniques and/or tolerances, are to be expected. Thus, the example embodiments of the present disclosure should not be construed as necessarily limited to the particular shapes of regions illustrated herein, but are to include deviations in shapes that result, for example, from manufacturing.

Any and/or all elements, as disclosed herein, can be formed from a same, structurally continuous piece, such as being unitary, and/or be separately manufactured and/or connected, such as being an assembly and/or modules. Any and/or all elements, as disclosed herein, can be manufactured via any manufacturing processes, whether additive manufacturing, subtractive manufacturing and/or other any other types of manufacturing. For example, some manufacturing processes include three dimensional (3D) printing, laser cutting, computer numerical control (CNC) routing, milling, pressing, stamping, vacuum forming, hydroforming, injection molding, lithography and/or others.

Unless otherwise defined, all terms (including technical and scientific terms) used herein have the same meaning as commonly understood by one of ordinary skill in the art to which this disclosure belongs. The terms, such as those defined in commonly used dictionaries, should be interpreted as having a meaning that is consistent with their meaning in the context of the relevant art and should not be interpreted in an idealized and/or overly formal sense unless expressly so defined herein.

Furthermore, relative terms such as "below," "lower," "above," and "upper" may be used herein to describe one element's relationship to another element as illustrated in the accompanying drawings. Such relative terms are intended to encompass different orientations of illustrated technologies in addition to the orientation depicted in the accompanying drawings. For example, if a device in the accompanying drawings is turned over, then the elements described as being on the "lower" side of other elements would then be oriented on "upper" sides of the other elements. Similarly, if the device in one of the figures is turned over, elements described as "below" or "beneath" other elements would then be oriented "above" the other elements. Therefore, the example terms "below" and "lower" can, therefore, encompass both an orientation of above and below.

The description of the present disclosure has been presented for purposes of illustration and description, but is not intended to be exhaustive or limited to the present disclosure in the form disclosed. Many modifications and variations will be apparent to those of ordinary skill in the art without departing from the scope and spirit of the present disclosure.

16

Exemplary embodiments were chosen and described in order to best explain the principles of the present disclosure and its practical application, and to enable others of ordinary skill in the art to understand the present disclosure for various embodiments with various modifications as are suited to the particular use contemplated.

While various embodiments have been described above, it should be understood that they have been presented by way of example only, and not limitation. The descriptions are not intended to limit the scope of the technology to the particular forms set forth herein. Thus, the breadth and scope of a preferred embodiment should not be limited by any of the above-described exemplary embodiments. It should be understood that the above description is illustrative and not restrictive. To the contrary, the present descriptions are intended to cover such alternatives, modifications, and equivalents as may be included within the spirit and scope of the technology as defined by the appended claims and otherwise appreciated by one of ordinary skill in the art. The scope of the technology should, therefore, be determined not with reference to the above description, but instead should be determined with reference to the appended claims along with their full scope of equivalents.

What is claimed is:

1. A postpartum hemorrhage mitigation device comprising:
a flexible tube comprising:
    a distal end;
    a proximal tip, the proximal tip comprising a suction line extension being configured for placement in a uterine cavity of a uterus after childbirth either vaginally or via cesarean section;
    a tube center of the flexible tube; and
    at least one lumen around the tube center, the at least one lumen comprising a suction line, the suction line being in communication with a source of negative pressure and the suction line extension, the suction line extension being configured for applying the negative pressure to the uterine cavity using the source of the negative pressure thereby causing mechanical hemostasis of bleeding blood vessels of a uterine wall of the uterine cavity;
    a placement marker, the placement marker being configured for movement along the suction line extension for personalization of the postpartum hemorrhage mitigation device to a size of the uterus, the placement marker covering one or more ports; and
    an anchoring mechanism being proximate to the suction line extension along the flexible tube, the anchoring mechanism being configured for maintaining the suction line extension in a desired position within the uterine cavity.

2. The postpartum hemorrhage mitigation device of claim 1, wherein the suction line extension further comprises one or more ports, the one or more ports being configured for drawing blood and other bodily fluids into the suction line extension from the bleeding blood vessels of the uterus.

3. The postpartum hemorrhage mitigation device of claim 2, wherein at least one of the suction line extension and the suction line comprise volumetric indications, the volumetric indications being configured for measurement of a volume of blood within the suction line extension and the suction line for quantifying blood loss from the bleeding blood vessels of the uterus for a clinician to evaluate postpartum hemorrhaging.

US 11,839,408 B2

17

**4**. The postpartum hemorrhage mitigation device of claim **2**, wherein the one or more ports comprise a plurality of ports, the plurality of ports comprising at least one of round pores, slits, and oval pores.

**5**. The postpartum hemorrhage mitigation device of claim **2**, wherein the one or more ports comprise suction ports, the suction ports being positioned in a one-hundred-and-eighty-degree spiral configuration around the tube center.

**6**. The postpartum hemorrhage mitigation device of claim **5**, wherein the at least one lumen comprises a plurality of lumens; and wherein the at least one lumen further comprises a guidewire.

**7**. The postpartum hemorrhage mitigation device of claim **6**, wherein the guidewire comprises a malleable plastic-coated metal rod placed inside the at least one lumen to reinforce the at least one lumen, the malleable plastic-coated metal rod being configured for aiding directing of the suction line towards the uterus.

**8**. The postpartum hemorrhage mitigation device of claim **1**, wherein the suction line comprises a semi-flexible catheter.

**9**. The postpartum hemorrhage mitigation device of claim **1**, wherein the proximal tip of the flexible tube further comprises a semi-ridged end, the semi-ridged end being configured for steerability and push-ability of the postpartum hemorrhage mitigation device.

**10**. The postpartum hemorrhage mitigation device of claim **1**, wherein the placement marker is an hourglass shaped placement marker, the hourglass shaped placement marker being configured for movement along the suction line for personalization of the postpartum hemorrhage mitigation device to a size of the uterus.

**11**. The postpartum hemorrhage mitigation device of claim **10**, wherein the hourglass shaped placement marker covers one or more ports.

**12**. The postpartum hemorrhage mitigation device of claim **1**, wherein the anchoring mechanism is a wavy placement anchor.

**13**. The postpartum hemorrhage mitigation device of claim **1**, wherein the at least one lumen comprises a hydrophilic coating, the hydrophilic coating providing compatibility with bodily fluids and reducing friction of the at least one lumen.

**14**. A postpartum hemorrhage mitigation device comprising:

a flexible tube comprising:

a distal end;

a proximal tip, the proximal tip comprising a suction line extension being configured for placement in a uterine cavity of a uterus after childbirth either vaginally or via cesarean section, the suction line extension comprising one or more ports, the one or more ports being configured for drawing blood and other bodily fluids into the suction line extension from bleeding blood vessels of a uterine wall of the uterine cavity, the one or more ports comprising suction ports, the suction ports being positioned in a one-hundred-and-eighty-degree spiral configuration around a tube center of the flexible tube, the one-hundred-and-eighty-degree spiral configuration preventing blockage of all of the suction ports;

wherein the suction line extension further comprises volumetric indications, the volumetric indications

18

being configured for measurement of a volume of blood within the suction line extension and the suction line for quantifying blood loss from the bleeding blood vessels for a clinician to evaluate postpartum hemorrhaging;

a placement marker, the placement marker being configured for movement along the suction line extension for personalization of the postpartum hemorrhage mitigation device to a size of the uterus, the placement marker covering the one or more ports; and

at least one lumen around the tube center, the at least one lumen comprising a suction line, the suction line being in communication with a source of negative pressure and the suction line extension, the suction line extension being configured for applying the negative pressure to the uterine cavity using the source of the negative pressure thereby causing mechanical hemostasis of the bleeding blood vessels of the uterine wall of the uterine cavity; and

an anchoring mechanism being proximate to the suction line extension along the flexible tube, the anchoring mechanism being configured for maintaining the suction line extension in a desired position within the uterine cavity.

**15**. A postpartum hemorrhage mitigation device comprising:

a flexible tube comprising:

a distal end;

a proximal tip, the proximal tip comprising a suction line extension being configured for placement in a uterine cavity of a uterus after childbirth either vaginally or via cesarean section, the suction line extension comprising one or more ports, the one or more ports being configured for drawing blood and other bodily fluids into the suction line extension from bleeding blood vessels of a uterine wall of the uterine cavity, the one or more ports comprising suction ports, the suction ports being positioned in a one-hundred-and-eighty-degree spiral configuration around a tube center of the flexible tube, the one-hundred-and-eighty-degree spiral configuration preventing blockage of all of the suction ports;

a placement marker, the placement marker being configured for movement along the suction line extension for personalization of the postpartum hemorrhage mitigation device to a size of the uterus, the placement marker covering the one or more ports;

at least one lumen around the tube center, the at least one lumen comprising a suction line, the suction line being in communication with a source of negative pressure and the suction line extension, the suction line extension being configured for applying the negative pressure to the uterine cavity using the source of the negative pressure thereby causing mechanical hemostasis of the bleeding blood vessels of the uterine wall of the uterine cavity; and

an anchoring mechanism being proximate to the suction line extension along the flexible tube, the anchoring mechanism being configured for maintaining the suction line extension in a desired position within the uterine cavity.

\*    \*    \*    \*    \*

FORM 19. Certificate of Compliance with Type-Volume Limitations

Form 19
July 2020

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:**  26-1443, 26-1444, 26-1613

**Short Case Caption:**  Raydiant Oximetry, Inc. v. ALC Medical Holdings LLC

**Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑ the filing has been prepared using a proportionally-spaced typeface and includes __13,984__ words.

☐ the filing has been prepared using a monospaced typeface and includes _____ lines of text.

☐ the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: __06/08/2026__

Signature: /s/ Matthew J. Dowd

Name: Matthew J. Dowd

**FORM 31. Certificate of Confidential Material**

Form 31
July 2020

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF CONFIDENTIAL MATERIAL

**Case Number:** 26-1443, 26-1444, 26-1613

**Short Case Caption:** Raydiant Oximetry, Inc. v. ALC Medical Holdings LLC

**Instructions:** When computing a confidential word count, Fed. Cir. R. 25.1(d)(1)(C) applies the following exclusions:

- Only count each unique word or number once (repeated uses of the same word do not count more than once).

- For a responsive filing, do not count words marked confidential for the first time in the preceding filing.

The limitations of Fed. Cir. R. 25.1(d)(1) do not apply to appendices; attachments; exhibits; and addenda. *See* Fed. Cir. R. 25.1(d)(1)(D).

The foregoing document contains __6__ number of unique words (including numbers) marked confidential.

☑ This number does not exceed the maximum of 15 words permitted by Fed. Cir. R. 25.1(d)(1)(A).

☐ This number does not exceed the maximum of 50 words permitted by Fed. Cir. R. 25.1(d)(1)(B) for cases under 19 U.S.C. § 1516a or 28 U.S.C. § 1491(b).

☐ This number exceeds the maximum permitted by Federal Circuit Rule 25.1(d)(1), and the filing is accompanied by a motion to waive the confidentiality requirements.

Date: 06/08/2026

Signature: /s/ Matthew J. Dowd

Name: Matthew J. Dowd